**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
**ROBERT CORWIN on behalf of himself**
**and all others similarly situated,**

Plaintiff,

**BERND R. SEIZINGER, MARTINE**
**GEORGE, MARCEL ROSENCZWEIG,**
**and GPC BIOTECH AG,**

Defendants.

--------------------------------------------------------x



JUDGE CHIN

**07 CIV 6728**
Civ. No.

JURY TRIAL DEMANDED

JUL 2 6 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by GPC Biotech AG ("GPC Biotech" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of securities analysts' reports concerning GPC Biotech; (c) review and analysis of press releases and media reports issued by and disseminated by GPC Biotech; and (d) review of other publicly available information concerning GPC Biotech.

## INTRODUCTION

1.      This is a class action against GPC Biotech and certain of its officers and directors for violation of the federal securities laws. Plaintiff brings this action on behalf of himself and all other persons or entities, except for Defendants and certain of their related parties as described below, who purchased GPC Biotech securities (the "Class")

during the period from December 5, 2005 through July 24, 2007, inclusive (the "Class Period").

2.     GPC Biotech is a pharmaceutical research and development company, whose efforts for the past ten years have been almost exclusively focused on efforts to develop and gain approval for Satraplatin, an oral drug therapy whose goal is to increase overall survival rates, reduce pain, and produce "progression free survival" for advanced prostate cancer patients who have proved resistant to conventional treatments.

3.     By December 2005, the beginning of the Class Period, GPC Biotech had spent years attempting to successfully develop Satraplatin, and it was running out of time and money. It had an accumulated deficit of €229.5 million (roughly $314 million),[1] and faced the prospect that patents for the technology underlying Satraplatin would expire in 2008 and 2010 in the U.S., and in 2009 in most other countries. Obtaining an extension of these dates would require substantial progress and regulatory approval. Thus, the Company had a dire need to convince the private investors and collaboration partners who were funding the Company each year that it was making substantial progress toward Satraplatin's "early" approval. Toward this end, the individual defendants, all of whom had substantial industry experience embarked upon a scheme to commence a Phase 3 "SPARC" trial aimed at gaining FDA marketing approval by 2007.[2]  Prior to the commencement of the Phase 3 trial, the FDA reviewed the Company's "registrational approached" to enrolling patients in the study and approved it, but warned that the study would only form the basis for Satraplatin's approval if executed "flawlessly."

---

[1]     Since GPC maintains its corporate headquarters in Germany, it reports the results of its operations in Euros. For purposes of this Complaint, the reported figures will be translated into U.S. dollars using the current exchange rate of 1.37 dollars per Euro.
[2]     SPARC is an acronym for the for the administration of Satraplatin together with the steroid prednisone. It stands for "Satraplatin and Prednisone Against Refractory Cancer."

4.     During the next 18 months, as the trial progressed, GPC Biotech avoided bankruptcy, and raised close to $150 million, from collaboration partners who had European and other marketing rights, and from private investors. FDA trials must follow rigid protocols to be successful. They must reflect goals (referred to as "endpoints") which the FDA recognizes as valid to assess a drug's effectiveness. Unbeknownst to public investors, however, the Phase 3 trial that needed to be conducted "flawlessly" was deeply flawed and employed improper methods for measuring Satraplatin's efficacy. The defendants knew of these gross irregularities not only because of their substantial experience in pharmaceutical development and testing, but also because (as was revealed at the end of the Class Period) they were specifically warned by FDA representatives during Satraplatin's development phase that they were deviating from accepted methodologies, and that the "endpoint" they had selected was one with which the FDA was "unfamiliar" and had "no prior experience." In addition to using a unique endpoint whose reliability at measuring anything was highly questionable, the FDA questioned whether the study conducted by GPC Biotech was truly "blind"--*i.e.,* that the researchers conducting the study were unaware of which patients were receiving Satraplatin and which were receiving a placebo. This was because, as defendants would have known, Satraplatin was causing enormously high rates of kidney failure (almost four times higher than the placebo group), high rates of nausea, vomiting and diarrhea (58.5% of all patients taking the drug), and twice the infection rate as the placebo group.

5.     Defendants stayed silent about these matters until they were forced to address them due to FDA disclosures. On May 15, 2007, the Company announced that the FDA would consider approval of Satraplatin at a meeting scheduled for July 24, 2007.

3

On that day, the stock closed at $28.50 per share. On June 4, 2007 GPC Biotech presented data at an oncology conference that it claimed showed Satraplatin to be extremely effective. These representations caused the stock to leap $3.16 to close at $32.81. As the FDA trial assessment date approached, the stock remained high, closing at $31.80 on July 19, 2007.

6.     The Company's rosy pronouncements were in sharp contrast to the adverse news that began to be revealed on July 20, 2007. On that day, an FDA committee issued preliminary comments in advance of the July 24, 2007 meeting with the Company. Among other things, the committee questioned the measurements in the study that GPC Biotech used to determine the drug's effectiveness, including a main goal defined as a "composite endpoint." The committee said the FDA had *no prior experience with that type of endpoint*, an issue which was "clearly communicated" to GPC Biotech while the drug was in development. On this news, the stock dropped $10.85 over the next two trading days, closing at $20.95 on July 23, 2007. After the close of trading on July 24, 2007, the FDA announced that its oncology panel had unanimously recommended against the approval of Satraplatin, and would wait until the end of 2008 to see if Satraplatin offered any overall survival benefit. Dr. Wyndham Wilson, a panel member and National Cancer Institute researcher said: "Survival benefit may well be seen, but I don't think we see it at the current time."

7.     In reaction to these unexpected revelations, GPC Biotech stock fell $7.20 on July 25, 2007 to close at $13.16. Industry analysts were highly critical of GPC Biotech's behavior. An analyst for Friedman Billings & Ramsey, for example, observed

that both public investors and the Company's collaborators (such as Spectrum) had been

deceived. An article in *Science Daily* on July 25, 2007 observed:

> GPC had been handling the discussions with the FDA, *and it appears the clinical trial design and endpoints for the SPARC study were never signed off on by the agency even though both investors and Spectrum were under the impression they had been.*

8.     Forbes.com reported that the meeting between the Company and the FDA

had been a "spectacle":

> There was a spectacle at the event, watched via a Webcast. It basically came down to a debate between the company and the FDA *in which the FDA insisted, fairly strenuously, that it had let the biotech know that its measures of disease progression and pain were not valid.*

9.     For the foregoing reasons, Plaintiff seeks damages for himself and for the

Class for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of

1934, and Rule 10b-5 thereunder.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. §§ 1331, and 1367, and Section 27 of the Securities Exchange Act of 1934

(the "Exchange Act") (15 U.S.C. § 78aa).

11.     This action arises under Sections 10(b) and 20(a) of the Exchange Act (15

U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R.

§ 240.10b-5).

12.     Venue is proper in this District pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and (c).  Substantial acts in furtherance

of the alleged fraud and/or its effects have occurred within this District, and the Company

maintains its principal executive offices in this District.

5

13.     In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff purchased GPC Biotech common stock during the Class Period, as set forth in the certification attached hereto.

15.     Defendant GPC Biotech AG is a publicly traded biopharmaceutical company focused on discovering, developing and commercializing new anticancer drugs. GPC Biotech's lead product candidate Satraplatin is currently under review by the U.S. FDA for hormone-refractory prostate cancer patients whose prior chemotherapy has failed. Its principal offices are at Fraunhofenstrasse 20, Munich, Germany 82152, and it maintains additional clinical facilities in the United States.   Its sponsored American Depositary Receipts evidencing American Depositary Shares are registered and trade on the NASDAQ Global Market under the symbol GPCB.  On or about July 2, 2004, 7,460,000 American Depositary Receipts were sold by the Company pursuant to a registered public offering.

16.     Defendant Bernd R. Seizinger ("Seizinger").  Seizinger has been Chief Executive Officer of GPC Biotech since 1998. He joined GPC Biotech from Genome Therapeutics Corporation (now Oscient Pharmaceuticals Corporation) of Waltham, Massachusetts, where he was Executive Vice President and Chief Scientific Officer (1996–1998). From 1992 to 1996, Dr. Seizinger was at Bristol-Myers Squibb Pharmaceutical Research Institute in Princeton, New Jersey, where he held the posts of

6

Vice President of Oncology Drug Discovery and, in parallel, Vice President of Corporate and Academic Alliances.

17.     Defendant Martine George ("George"), GPC Biotech's Senior Vice President for Clinical Development, is an oncology expert with over fifteen years of experience at major pharmaceutical companies, in addition to serving in an academic post in medical oncologyat the Institut G. Roussy, France. Prior to joining GPC Biotech, Dr. George was Senior Vice President, Head of Oncology atJohnson & Johnson Pharmaceutical Research and Development. Before that she held a number of executive positions in the areas of clinical and medical affairs, including at Johnson & Johnson,Rohne-Poulenc Rorer (now part of Sanofi-Aventis), Sandoz Pharmaceuticals Corporation (now Novartis) and American Cynamid.

18.     Defendant Marcel Rosenczweig ("Rosenczweig"), the Company's Chief Medical Officer and Senior Vice President for Drug Development, joined GPC Biotech in 2001 and servesthe Company as Senior Vice President, Drug Development and Chief Medical Officer. He previously worked for Bristol-Myers Squibb for 18 years, where he held several senior leadership positions in drug development and strategic planning, including Vice President, Oncology, Infectious Diseases and Immunology Clinical Research; and Vice President, Strategic Planning and Portfolio Management. The Company's website descibes Rozencweig as "a world-renowned expert in oncology drug development."

19.     Defendants Seizinger, George and Rosenczweig are herein collectively referred to as the "Individual Defendants." Each of the Individual Defendants is a member of GPC Biotech's Executive Committee.

7

20. The Individual Defendants, who were the Company's principal officers in charge of clinical development, controlled GPC Biotech and its public disclosures regarding Satraplatin. Each of them made false and misleading statements and/or failed to disclose material adverse information concerning the Company's business and operations during the Class Period, as detailed herein. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board of Directors meetings and committees thereof, and via reports and other information provided to them in connection therewith.

21. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, were the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and/or directors of GPC Biotech, by virtue of their high level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or

8

disseminating the false and misleading statements and information alleged herein, were aware or deliberately disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

22.    As officers and/or directors and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ Global Market, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information.    The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23.    The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with GPC Biotech, each of the Individual Defendants had access to the adverse, undisclosed information about the Company's operations, the financial condition and performance of the Company as particularized herein and knew

9

(or deliberately disregarded) that these adverse facts rendered the positive representations made by or about GPC Biotech and its business issued or adopted by the Company materially false and misleading.

24.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

25.    Each of the Defendants is liable as a participant in a wrongful scheme and course of business that operated as a fraud or deceit on those who purchased or otherwise acquired GPC Biotech common stock during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding GPC Biotech's business, operations, and the intrinsic value of the Company's common stock, and caused plaintiff and other members of the Class to purchase GPC Biotech common stock at artificially inflated prices.

## CLASS ALLEGATIONS

26.    Plaintiff brings this as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased GPC Biotech

securities during the Class Period. Excluded from the Class are Defendants, officers and directors of the Company, members of the immediate families of the Individual Defendants and each of their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or has had a controlling interest.

27. This action is properly maintainable as a class action because:

a. the members of the proposed Class in this action are dispersed throughout the United States and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that Class members number in the thousands. Millions of GPC Biotech American Depository Receipts or "ADR's" were traded publicly during the Class Period on the NASDAQ Global Market under the symbol "GPCB." GPC Biotech has 7,460,000 ADR shares outstanding.

b. Plaintiff's claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws as alleged herein;

c. Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class that Plaintiff seeks to represent;

d. A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the

11

Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for Class members to redress the wrongs done to them. The likelihood of individual Class members prosecuting separate claims is remote;

        e.     Plaintiff anticipates no unusual difficulties in the management of this action as a class action; and

        f.     The questions of law and fact common to the members of the Class predominates over any questions affecting individual members of the Class.

    28.    Among the questions of law and fact common to the Class are:

        a.     whether Defendants' acts and/or omissions as alleged herein violated the federal securities laws;

        b.     whether the Company's Class Period public statements and filings misrepresented and/or omitted material facts;

        c.     whether Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

        d.     whether Defendants participated in and pursued the common course of conduct complained of herein;

        e.     whether the market price of GPC Biotech securities was inflated artificially as a result of Defendants' material misrepresentations and/or omissions during the Class Period; and

        f.     to what extent the members of the Class have sustained damages and the proper measure of damages.

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS

### A.    Pre-Class Period Business Events Sets the Stage For the Fraud

12

29.     GPC Biotech was founded in 1997, and has focused since 2002 primarily on the development of Satraplatin, an oral therapy for prostate cancer patients, whose disease has proved resistant to established therapies, including hormone therapy. Satraplatin is administered in conjunction with the synthetic steroid, prednisone.

30.     It was crucial to the Company's ability to continue to raise money to survive to show steady progress towards the approval and commercialization of Satraplatin. Toward this end, the Company laid the groundwork in late 2003 for what was known as a "SPARC" (Satraplatin and Prednisone Against Refractory Cancer) Trial.

31.     Designing and enrolling patients in the SPARC Trial was a lengthy and difficult process. Defendants knew that enrollment procedures acceptable to the FDA needed to be strictly followed if FDA approval was to be obtained on schedule, some time in 2007. Defendants were also well aware that the FDA demanded that a drug with substantial side effects like Satraplatin would have to show significant results in terms of either prolonging life, arresting disease progress, or minimizing pain. Drug effectiveness is measure by "endpoints"--specific results the Company is aiming to produce which reflect benefits the FDA deems sufficient for approval and commercialization of a new drug. The FDA has reviewed thousands of new drug applications, and has established endpoints which it perceives reflect proof that a drug truly works as hoped. The defendants herein knew this, as all were experienced in the drug testing and approval process. Instead of adopting accepted endpoints, the defendants created a new one, which they thought Satraplatin could meet, regardless of the fact that no such endpoint had ever been accepted by the FDA, and despite admonishments and warnings by the

13

FDA that its panel had never deemed such a methodology to produce reliable results.

Defendants concealed these matters throughout the Class Period from investors

  **B.** **Class-Period Allegations**

  32. On December 5, 2005, the commencement of the Class Period, the

Company issued a press release entitled, "GPC Biotech Announces Achievement of

Target Enrollment in Satraplatin Phase 3 Registrational Trial (SPARC) for Second-Line

Chemotherapy of Hormone Refractory Prostate Cancer." This press release stated, in

relevant part:

> GPC Biotech AG ...today announced the achievement of target
> enrollment in the Phase 3 registrational trial of its lead drug candidate
> satraplatin, the only orally bioavailable platinum-based compound in
> advanced clinical development. More than 200 clinical sites in fifteen
> countries on four continents have now achieved the goal of accruing 912
> patients to the SPARC (Satraplatin and Prednisone Against Refractory
> Cancer) trial. A number of additional patients are in screening, and the
> Company will allow those patients to complete the process and either be
> randomized into the trial or disqualified, in accordance with the trial
> protocol. The SPARC trial is a multicenter, multinational, double blind,
> randomized study that is assessing the safety and efficacy of satraplatin in
> combination with prednisone as a second-line chemotherapy in patients
> with hormone-refractory prostate cancer (HRPC).

> "We are excited to have achieved this major milestone in the development
> of satraplatin. This is indeed a significant accomplishment for GPC
> Biotech," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer.
> "The rapid accrual rate of the SPARC trial supports the need for effective
> second-line chemotherapy treatments for hormone-refractory prostate
> cancer patients. We are thus committed to completing the study and
> moving forward in the registration process as expeditiously as possible."

> "The accrual goal of 912 patients was reached in just over 26 months,
> making the SPARC trial one of the fastest accrued Phase 3 clinical trials
> for chemotherapy drugs in prostate cancer. This rapid enrollment was
> made possible by the dedication and hard work of the clinical
> investigators, the study site personnel and our own drug development
> team," said Marcel Rozencweig, M.D., Senior Vice President, Drug
> Development. "I would like to thank them, as well as all of the patients
> who participated in the trial."

33.    This development was viewed as positive by investors, who were unaware that the Company had selected an endpoint which was highly unlikely ever to be accepted by the FDA, a brazen tactic which would substantially delay or even defeat the acceptance of Satraplatin as a prostate cancer therapy. But the scheme did allow to allow the cash-starved company to raise new funds.    On Feb. 23, 2006, GPC Biotech announced that it had privately sold 2.86 million shares, raising approximately $49 million.

34.    On Feb. 27, 2006, the Company issued bullish data on Satraplatin data which would be shown to be misleading at the end of the Class Period. In a press release, the Company stated: "Satraplatin appeared to be well tolerated, with no significant cardio-, renal, liver or neurological toxicities observed. Other common toxicities like nausea, vomiting and diarrhea were mild to moderate and were reported to be controlled with prophylactic oral anti-emetic therapy."

35.    On March 15, 2006, the Company reported that cash burn for 2005 was approximately $60 million, but that its purported progress with Starplantin has enable it to raise subtantial fresh money: "Of note, in the first quarter of 2006, the Company received an additional € 67.5 million from an upfront development-related payment of € 31.3 million from its partner Pharmion in connection with the co-development and license agreement signed in December 2005 and € 36.2 million through a private placement with two investment companies..."

36.    On April 25, 2006, GPC announced that the SPARC Trial had been deemed safe enough by an independent board to continue as it had passed the "futility analysis." No mention was made that such a futility analysis merely assesses whether a

15

new drug has a possibility of meeting the endpoint defined by the Company, and does not

constitute agreement with the reliability or the validity of that endpoint. The press

release stated, in relevant part:

> "We are delighted that the independent Data Monitoring Board made this
> recommendation and that satraplatin passed the futility analysis," said
> Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer. "The results of
> this planned interim analysis are as expected – namely that the Board has
> recommended that the SPARC trial continue to its completion. We look
> forward to reporting the final PFS results from the trial this fall and, if the
> data are positive, we anticipate completing the NDA filing by the end of
> 2006. In parallel to completing the registrational trial, we will continue to
> initiate additional clinical trials with satraplatin in other cancer indications
> and in combination with other anticancer treatments."

37.   On Sept. 24, 2006, the Company issued a bullish press release stating that

Satraplantin was showing positibe topline results for the endpoint selected by the

Company, "progression free survival" or "PFS". No mention was made that this was an

endpoint that had never demonstrated reliability, was unfamiliar to the FDA, or that the

FDA panel had clearly communicated to GPC that PFS was not a proven endpoint for

such a trial. The press release stated, in relevant part:

> Using the protocol-specified hazard ratio, which measured the overall risk
> of disease progression, patients in the SPARC trial who received
> satraplatin plus prednisone had a 40% reduction in the risk of disease
> progression (hazard ratio of 0.6; 95% Confidence Interval: 0.5-0.7)
> compared with patients who received prednisone plus placebo. The
> improvement seen in progression-free survival by patients treated with
> satraplatin increased over time. Progression-free survival at the median
> (50th percentile) demonstrated a 13% improvement in patients who
> received satraplatin plus prednisone (11 weeks) compared to patients who
> received prednisone plus placebo (9.7 weeks). Progression-free survival
> at the 75th percentile showed an 89% improvement for patients in the
> satraplatin arm (36 weeks) versus patients in the placebo arm (19 weeks).
> At 6 months, 30% of patients in the satraplatin arm had not progressed,
> compared to 17% of patients in the control arm. At 12 months, 16% of
> patients who received satraplatin had not progressed, compared to 7% of

16

patients in the control arm. All of these analyses were conducted on an intent-to-treat basis.

38.     On Nov. 9, 2006, GPC issued another press release touting Straplantin without revealing the adverse onformation regarding its unproven and disfavored methodology. That release stated, in relevant part:

> Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said: "In the third quarter of 2006, we achieved a landmark event in the corporate history of GPC Biotech, with the announcement of positive results on progression-free survival from our Phase 3 registrational trial with our lead anticancer drug candidate satraplatin. These results will form the basis of our NDA filing, which we expect to submit to the FDA in the next six to twelve weeks, with the goal of filing by the end of this year. They will also serve as the basis for our partner Pharmion to move forward with the MAA filing in Europe in the first half of 2007. We are also moving forward aggressively to further build our marketing and sales infrastructure in the U.S. for the commercialization of satraplatin."

39.     Once again, this apprently postiive results enabled GPC to raise more money from private investors. In a Jan. 24, 2007 press release the Company stated, in relevant part:

> GPC Biotech...has raised gross proceeds of € 33.6 million (approximately $43.7 million) in a private placement with institutional investors. GPC Biotech sold 1,564,587 million shares at a price of € 21.50/share and will receive the proceeds upon registration of the corresponding capital increase. The share price and the number of shares were determined by an accelerated bookbuilding procedure with an underwriter.

> "With the announcement this past fall of positive data from the satraplatin Phase 3 trial in second-line hormone refractory prostate cancer, we were able to accelerate the building of our commercialization infrastructure in the U.S.," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer. "The funds we have raised will assist us both in aggressively moving forward with commercialization activities, as well as continuing to expand the development of satraplatin in other cancer settings."

40.    On Feb. 23, 2007, GPC issued yet another bullish press release, which
omitted the adverse information known to defendants about the specious PFS endpoint
for the SPARC Trial. The press release also downplayed Satraplantin's toxity, and stared
in relevant part:

> GPC Biotech AG ... today announced that final progression-free survival
> (PFS) results for the double-blind, randomized satraplatin Phase 3
> registrational trial, the SPARC trial (Satraplatin and Prednisone Against
> Refractory Cancer) are being presented today at the ASCO Prostate
> Cancer Symposium in Orlando, Florida. The trial is evaluating satraplatin
> plus prednisone versus placebo plus prednisone in 950 patients with
> hormone-refractory prostate cancer (HRPC) who have failed prior
> chemotherapy. All analyses of PFS being presented were conducted on an
> intent-to-treat basis.
>
> Safety findings were consistent with previous clinical studies involving
> satraplatin. The reported adverse reactions were mostly mild to moderate
> in severity. The most common adverse reactions consisted of
> myelosuppression (bone marrow functions): Twenty-one percent of
> patients in the satraplatin arm experienced grade 3 or 4 thrombocytopenia;
> 14 percent had leucopenia and 21 percent had neutropenia. Eight percent
> of patients in the satraplatin arm experienced grade 3 or 4 gastrointestinal
> toxicities, including nausea, vomiting, diarrhea and constipation. Five
> percent or less of patients in the satraplatin arm experienced grade 3 or 4
> fatigue, grade 3 or 4 infections and pulmonary/respiratory grade 3 or 4
> toxicities.

41.    On May 15, 2007, GPC issue yet another misleading and omissive press
release, stating:

> Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said: "We have
> already had several key achievements in the first few months of 2007,
> including completion of the NDA submission for satraplatin and its
> acceptance for filing by the FDA. We are very pleased that FDA has
> granted the NDA submission priority review status and look forward to an
> action by the agency in August this year."
>
> Dr. Seizinger [stated]: "We are very busy preparing for the possible U.S.
> launch of satraplatin later this year. With the acceptance of the NDA filing
> and the assignment of priority review by the FDA, and with the senior

management of our U.S. marketing and sales organization in place, we have begun to hire the field sales force. In addition, we continue to move forward satraplatin clinical trials in other oncology indications, as well as our other development and discovery programs."

"We are delighted with the strong detailed results presented today from the satraplatin SPARC Phase 3 trial," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer of GPC Biotech. "Moving forward, we plan to work closely with the FDA regarding our application for marketing approval of satraplatin in the U.S. We also are continuing to aggressively build our marketing and sales organization in the U.S. to prepare for a potential launch of satraplatin later this year."

42.     Defendants stayed silent about the adverse facts regarding Satraplatin and its unapproved endpoint methodology until they were forced to address them due to FDA disclosures. On May 15, 2007, the Company announced that the FDA would consider approval of Satraplatin at a meeting scheduled for July 24, 2007. On that day, the stock closed at $28.50 per share. On June 4, 2007 GPC Biotech presented data at an oncology conference that it claimed showed Satraplatin to be extremely effective.    These representations caused the stock to lead $3.16 to close at $32.81.  As the FDA trial assessment date approached, the stock remained high, closing at $31.80 on July 19, 2007.

43.     The Company's rosy pronouncement were in sharp contrast to the adverse news that began to be revealed on July 20, 2007. On that day, and FDA committee issued preliminary comments in advance of the July 24, 2007 meeting with the Company. Among other things, the committee questioned the measurements in the study that GPC Biotech used to determine the drug's effectiveness, including a main goal defined as a "composite endpoint." The committee said the FDA had no prior experience with that type of endpoint, an issue which was "clearly communicated" to GPC Biotech while the drug was in development. On this news, the stock dropped $10.85 over the next two trading days, closing at $20.95 on July 23, 2007. After the close of trading on July 24,

19

2007, the FDA announced that its oncology panel had unanimously recommended against the approval of Satraplatin, and would wait until the end of 2008 to see if Satraplatin offered any overall survival benefit. Dr. Wyndham Wilson, a panel member and National Cancer Institute researcher said: "Survival benefit may well be seen, but I don't think we see it at the current time."

44.     The FDA panel report, officially dated July 24, 2007, had five major issues with GPC's application, and its conduct:

1)     The first issue was the definition of one of the two primary endpoints, PFS. PFS was defined as a composite endpoint, consisting of radiographic progression, symptomatic progression (pain, analgesics, ECOG performance status, weight loss and other clinical events related to prostate cancer) and skeletal related events. The Report stated: *"The FDA has no prior experience with this endpoint. This was clearly communicated to the Applicant during the development phase."*

2)     Radiologists were *unable* to clearly determine disease progression from GPC's results. The Report stated: "This raises the question whether PFS could be reliably assessed in this clinical trial."

3)     GPC used a methodology to asses pain progression that was unapproved, and due to a high level of toxic reactions, the FDA Panel openly doubted GPC's claim that the study had remained "blinded" throughout.

4)     It wasn't clear whether patient survival would shown to be improved in patients who were taking newer prostate cancer drugs, and GPC had failed to study this, even though it could have done so.

20

5)    The FDA Panel took issue with GPC's claim of improved overall survival from the data it has so far. "An interim analysis of overall survival after 463 deaths *does not show* that [Satraplatin] is better than placebo."

45.    In reaction to these unexpected revelations and the Panel's decision to unanimously recommend denial of approval, GPC Biotech stock fell to $13.16, from $31.80 just a few days before. Industry analysts were highly critical of GPC Biotech's behavior. An analyst for Friedman Billings & Ramsey, for example, observed that both public investors and the Company's collaborators (such as Spectrum) had been deceived. An article in *Science Daily* on July 25, 2007 observed:

> GPC had been handling the discussions with the FDA, *and it appears the clinical trial design and endpoints for the SPARC study were never signed off on by the agency even though both investors and Spectrum were under the impression they had been.*

46.    Forbes.com reported that the meeting between the Company and the FDA had been a "spectacle":

> There was a spectacle at the event, watched via a Webcast. It basically came down to a debate between the company and the FDA *in which the FDA insisted, fairly strenuously, that it had let the biotech know that its measures of disease progression and pain were not valid.*

47.    For the foregoing reasons, Plaintiff seeks damages for himself and for the Class for violations of Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934, and Rule 10b-5 thereunder.

## ADDITIONAL SCIENTER ALLEGATIONS

48.    As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents

21

would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding GPC Biotech, their control over, and/or receipt and/or modification of GPC Biotech' allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning GPC Biotech, participated in the fraudulent scheme alleged herein.

49.    Defendants were motivated to engage in the fraudulent conduct because the Individual Defendants realized at the start of the Class Period that GPC needed desperately to raise money, and concocting a new and unproved endpoint Satraplatin could meet was the only way to show progress, even though defendants knew that such "progress" was illusory.

## LOSS CAUSATION/ECONOMIC LOSS

50.    During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of GPC Biotech stock and operated as a fraud or deceit on Class Period purchasers of GPC Biotech stock by concealing the true facts concerning the SPARC Trial. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of GPC Biotech stock fell precipitously as the prior artificial inflation came out. As a result of their purchases of GPC Biotech stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.,* damages under the federal securities laws.

22

51.     Defendants' false and misleading statements had the intended effect and caused GPC Biotech common stock to trade at artificially inflated levels throughout the Class Period, reaching prices well over $30 per share.

52.     As a direct result of the announcements in July 2007, the price of GPC Biotech stock price fell precipitously. These stock price drops removed the inflation from the price of GPC Biotech stock causing real economic loss to investors who had purchased the Company's common stock during the Class Period.

53.     The over 50% decline in the price of GPC Biotech common stock after these disclosures and partial disclosures came to light was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of GPC Biotech stock price decline negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

54.     Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the prices of GPC Biotech stock and the subsequent significant decline in the value of GPC Biotech stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD-ON-THE-MARKET DOCTRINE

55.     The market for GPC Biotech's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, GPC Biotech's securities traded at artificially inflated

23

prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired GPC Biotech securities relying upon the integrity of the market price of GPC Biotech's securities and market information relating to GPC Biotech, and have been damaged thereby.

56.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of GPC Biotech's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

57.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class. As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about GPC Biotech's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of GPC Biotech and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

24

58.   At all relevant times, the market for GPC Biotech's securities was an efficient market for the following reasons, among others:

(a)   GPC Biotech's stock met the requirements for listing, and was listed and actively traded on the NADAQ Global Market, a highly efficient and automated market;

(b)   As a regulated issuer, GPC Biotech filed periodic public reports with the SEC; and

(c)   GPC Biotech regularly communicated with public investors by established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. GPC Biotech also was a frequent presented at conferences attended and monitored by stock analysts in the United States, and in Europe. GPC's website lists no fewer than 21 investment analysts who follow the Company, all of whom are with respected and influential firms.

59.   As a result of the foregoing, the market for GPC Biotech's securities promptly digested current information regarding GPC Biotech from all publicly available sources and reflected such information in GPC Biotech's stock price. Under these circumstances, all purchasers of GPC Biotech's securities during the Class Period suffered similar injury through their purchase of GPC Biotech's securities at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### For Violations of Sections 10(b) of
### The Exchange Act And Rule 10b-5

60.     Plaintiff repeats and realleges paragraphs 1 through 59 as if set forth fully herein.

61.     In connection with the sale of GPC Biotech securities throughout the Class Period, Defendants participated, directly or by acquiescence, despite a duty to act, in the preparation and/or issuance of materially false and misleading statements and omissions.

62.     Defendants knew, or were reckless in not knowing, that the statements contained in GPC Biotech public filings and press releases were materially false and misleading.   Plaintiff and the Class relied, directly or indirectly by reliance on the integrity of the market, on Defendants' misstatements and/or omissions and were damaged as a result.   But for Defendants' misrepresentations and/or omissions, Plaintiff and the Class would not have purchased GPC Biotech securities or would have purchased them at non-artificially inflated prices.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants, as defined below)

63.     Plaintiff repeats and realleges each of the preceding paragraphs 1 through 62 as if fully set forth herein.

64      This claim is brought against the Individual Defendants.

65.     The Individual Defendants were control persons within the meaning of the Exchange Act.

66.     As set forth above, these Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5, by their acts and omissions as alleged in this complaint. By virtue of their positions as control persons, the Section 20(a) Defendants, each of

whom violated Section 10(b) and Rule 10b-5, are liable pursuant to Section 20(a) of the Exchange Act.

67.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## NO SAFE HARBOR

68.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this Complaint that actual results "could differ materially from those projected," and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of GPC Biotech who knew that the statement was false when made.

27

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and all other Class members, prays for judgment as follows:

      A.    A determination that this action is a proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

      B.    An award of compensatory damages in favor of Plaintiff and the other Class members against all Defendants for damages sustained as a result of Defendants' wrongdoing, including interest thereon;

      C.    An award to Plaintiff and the Class of their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements; and

      D.    A grant of such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: July 26, 2007

ABBEY SPANIER RODD &
ABRAMS, LLP

By: _Nancy Kaboolian_

Nancy Kaboolian, Esq. (NK 6346)
212 East 39th Street
New York, New York 10016
Tel:    (212) 889-3700
Fax:    (212) 684-5191

--and--

**PASKOWITZ & ASSOCIATES**
Laurence D. Paskowitz, Esq. (LP-7324)
60 East 42nd Street, 46th Floor
New York, New York 10016
Tel:  (212) 685-0969
Fax:  (212) 685-2306

**Attorneys for Plaintiff**

## OF COUNSEL:

ROY JACOBS & ASSOCIATES
Roy L.  Jacobs
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 867-1156
Facsimile:  (212) 504-8343

29

## PLAINTIFF'S CERTIFICATE

The undersigned ("Plaintiff") declares, as to the claims asserted under the federal securities laws, that:

1.   Plaintiff has reviewed the complaint against GPC Biotech, AG ("GPCB") and certain other defendants.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

5.   Plaintiff made the following transactions during the Class Period in the common shares of GPCB:

| Purchases | | | | Sales | | |
|-----------|---|---|---|-------|---|---|
| Date(s) | Number of Shares | Price | | Date(s) | Number of Shares | Price |
| 3/28/06 | 200 | $16.48 | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6.   During the three years prior to the date of this Certification, Plaintiff has not moved to serve or served as a representative party for a class in an action filed under the federal securities laws.

7.   I declare under penalty of perjury, this 26th day of July, 2007 that the information above is accurate.

Robert Corwin