UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x
                                  :

IN RE GPC BIOTECH AG          :   Civil Action No.: 1:07-cv-06728 (DC)
SECURITIES LITIGATION         :

                                    :

---------------------------------------------------- x

## PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT

Lead Plaintiff Axxion S.A. Luxemburg ("Axxion"), and named plaintiff Agamemnon

Chua ("Chua") (Axxion and Chua are referred to collectively as "Plaintiffs"), purchasers of the

securities of GPC Biotech AG ("GPC" or the "Company") by their undersigned attorneys, on

behalf of themselves and the class they seek to represent, for their Consolidated Class Action

Complaint (the "Complaint"), allege the following upon information and belief, except as to

those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs'

information and belief are based upon, among other things, their counsel's investigation, which

includes: (a) review and analysis of regulatory filings made by GPC with the United States

Securities and Exchange Commission ("SEC") and in Europe; (b) review and analysis of

securities analysts' reports concerning GPC; (c) review and analysis of press releases and media

reports issued by and disseminated by GPC; and (d) review of other publicly available

information concerning GPC.

## INTRODUCTION

1.     This is a class action against GPC and certain of its officers and former officers

("Defendants") for violations of the federal securities laws. Plaintiffs bring this action on

behalf of themselves and all other persons or entities, except for Defendants, who purchased

GPC securities (the "Class") during the period from December 5, 2005 through July 24, 2007, inclusive (the "Class Period").

2.    GPC is a publicly traded biopharmaceutical research and development company headquartered in Munich, Germany, with a wholly owned, United States subsidiary based in Princeton, New Jersey. The Company focuses on discovering, developing and commercializing new anticancer drugs.

3.    At the end of the third quarter of 2002, GPC obtained an exclusive license to develop the experimental drug, Satraplatin. Satraplatin is a platinum-based compound intended for use as a chemotherapy treatment. At the time GPC obtained the license, Satraplatin had not been approved by the Food and Drug Administration ("FDA"), and advanced clinical testing had not taken place. GPC was not permitted to market or distribute Satraplatin in the United States or Europe until it had completed testing the drug, was able to demonstrate the drug's efficacy, and received full regulatory approval by the FDA and European regulatory authorities.

4.    At the time that the Company acquired the license to develop Satraplatin, the Defendants knew that they had a limited period of time to obtain the necessary governmental approvals because GPC faced the prospect that patents for the technology underlying Satraplatin would expire in 2008 and 2010 in the United States, and in 2009 in most other countries. If GPC went through the standard FDA procedure, patent protection for the drug would expire before regulatory approval could be obtained and before the drug could be prescribed and sold without generic competition.

5.    Specifically, there are two U.S.-issued patents protecting Satraplatin, as well as one patent issued under the European Patent Convention. Since the first of those patents was set to expire in 2008, Defendants had approximately four years to (1) plan a multi-level clinical

study involving hundreds of prostate cancer patients, (2) obtain FDA approval to conduct the study, (3) conduct the study and submit the results to the FDA, (4) obtain FDA approval to commence manufacturing and marketing the drug, and (5) begin marketing the drug in the United States.

6.     Although Defendants may have had reason to hope that Satraplatin would prove effective in fighting cancer, and in particular, prostate cancer, they knew that success was not assured. While the Defendants sought expedited consideration by the FDA of its New Drug Application ("NDA") for Satraplatin, and strived to raise additional money from private investors to finance this endeavor, they also put in place a plan to divest themselves of a significant portion of their holdings of GPC stock at high prices. This ensured that the Company's three founders and its CEO could become millionaires even if Satraplatin did not ultimately prove effective as a cancer treatment, so long as they could sell their stock for high prices before the drug was seen as a failure.

7.     Profitably selling their own shares prior to a final ruling by the FDA, however, depended upon positive initial reports regarding the clinical trials and the creation of an expectation in the market that Satraplatin ultimately would receive FDA approval in a timely manner. Strong demand for the Company's stock among investors was crucial to the success of this plan.

8.     GPC needed to undertake many steps in order to obtain FDA approval to sell Satraplatin to consumers in the United States. After preliminary testing of the drug was completed, representatives of the Company held meetings with the FDA to evaluate the Company's plans to initiate human trials on patients suffering from prostate cancer. This "Phase 3" testing was known internally as the "SPARC" trial.

3

9.      Designing the protocol and enrolling patients in this Phase 3 trial was a lengthy and difficult process. Defendants knew that enrollment procedures acceptable to the FDA would have to be strictly followed if FDA approval was to be obtained. Successful completion of the SPARC trial would form the primary basis for an efficacy claim for GPC's NDA for Satraplatin.

10.      Enrollment for the SPARC trial commenced in September 2003 and was completed in December 2005. In all, 950 patients were enrolled in 170 clinical centers in 16 countries on 4 continents. The study was planned in consultation with the FDA, which was crucial to GPC since it was seeking FDA approval on an expedited basis.

11.      Early in the approval process, the FDA made it clear that the appropriate "endpoint" to measure the "success" of the SPARC trial was different from the measurement that GPC sought and preferred. An "endpoint" for a Phase 3 drug trial is the specific result sought by the applicant which, if shown, would reflect benefits warranting FDA approval. A drug applicant's refusal to follow FDA endpoints when conducting a clinical trial practically ensures that the drug will not be approved at the conclusion of such a trial.

12.      The FDA told Defendants that the unique and unprecedented endpoint proposed by GPC, "progression-free survival" or "PFS," would not suffice as the study's primary endpoint. Until the end of the Class Period, this fact was never made known to the investing public.

13.      The FDA's statement regarding acceptable endpoints was a major setback. Defendants had hoped to convince the FDA that their preferred, less stringent, quicker-to-prove endpoint showing that Satraplatin was effective in delaying progression of prostate cancer would warrant approval of the Company's NDA on an expedited basis. It would be much more difficult, risky and time consuming to show that patients who took the new drug lived longer

4

than those given the placebo. This "overall survival" endpoint was an endpoint that the FDA used regularly in evaluating the success of Phase 3 clinical trials.

14.     Notwithstanding the clear directive of the FDA, Defendants pursued a plan to obtain expedited FDA approval of Satraplatin using the more easily satisfied and subjectively measured "progression-free" endpoint. In public filings and statements, Defendants consistently touted the ongoing "success" of the SPARC trial, citing preliminary reports of the drug's ability to delay the progression of prostate cancer. Defendants knew that investors would connect positive reports of SPARC trial successes with an increased likelihood that the Company's NDA would be approved by the FDA. Defendants never disclosed that the FDA had already told them that PFS could not serve as the study's primary endpoint.

15.     The reported success of the ongoing drug trial was well received by investors and analysts. In early 2007, one analyst called GPC a "must have" stock, and some wrote that FDA approval of the Company's NDA was 100% guaranteed. Some analysts even projected that Satraplatin would prove to be a $1 billion drug. What analysts and investors did not know, however, was that the FDA had already informed Defendants that a "progression free" endpoint could not serve as a primary endpoint and would not, on its own, lead to approval of the Company's NDA on an expedited basis.

16.     As intended, the positive reports issued at the Defendants' direction resulted in an increase in the trading price of the Company's stock, which allowed the Company to issue new shares to investors, and even more importantly, allowed Defendants to sell their shares at increasingly higher prices. During the Class Period, GPC raised in excess of $92 million from the public, while the Company's three founders and its CEO collectively sold approximately $39 million of their own, personal holdings of GPC stock.

17.    As Defendants anticipated, the FDA advisory panel did not recommend expedited approval of the Company's NDA.  In recommending that consideration of GPC's NDA await final results from SPARC trial, including a formal analysis of the "overall survival" of those tested, the advisory panel cited five reasons, including its denunciation of the "progression-free" endpoint, an endpoint which the panel said it had "no experience with."  In its findings, the panel went out of its way to point out that the message that PFS would be unacceptable as a primary endpoint had been "clearly communicated" to GPC during the development phase of the SPARC trial.  The panel also raised serious concerns regarding the efficacy of the clinical study itself.  Not only was the Company's NDA rejected, but Defendants' deception was exposed.

18.    *Forbes.com* reported that the meeting between the Company and the FDA had been a "spectacle":

> There was a spectacle at the event, watched via a Webcast. It basically came down to a debate between the company and the FDA in which the *FDA insisted, fairly strenuously, that it had let the biotech know that its measures of disease progression and pain were not valid.*

19.    As the truth became known to the marketplace, shares of GPC plummeted in value.  After trading as high as $32.81 in the weeks leading up to the FDA hearing, its shares trading on NASDAQ dropped to $13.16 on July 25, 2007, after the panel publicly released its findings.

20.    Industry analysts were highly critical of Defendants' behavior. An analyst for Friedman Billings & Ramsey, for example, observed that both public investors and the Company's collaborators (such as Spectrum) had been deceived. An article in *Science Daily* on July 25, 2007 observed:

> GPC had been handling the discussions with the FDA, and it appears the clinical trial design and endpoints for the SPARC study

were never signed off on by the agency even though both investors and Spectrum were under the impression they had been.

21.    Within weeks of the hearing with the FDA panel, GPC pulled its application for fast track approval. In making this decision, Defendants acknowledged that final results from the SPARC study would not be available until the first quarter 2008 and that preliminary results suggested that satraplatin was improving patients' "overall survival" only minimally. Months later, when more complete results from the SPARC trial were available showing that overall survival did not improve for those patients taking satraplatin compared to those taking the placebo, GPC pulled its NDA completely.

22.    In the winter of 2007 to 2008, the Company's three co-founders announced their resignations. Their departures took place after Satraplatin's fate was sealed, after the insiders had successfully raised millions in currency from the investment community, and not to be overlooked, after the three co-founders (along with the CEO) pocketed millions at the expense of investors.

23.    For the foregoing reasons, Plaintiffs seeks damages for themselves and for the Class for violations of Sections 10(b), 20(a) and 20(A) of the Securities and Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

24.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C: § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78aa).

25.    This action arises under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), Section 20A of the Exchange Act (15 U.S.C. § 78t-1), and Rule 10b-5 promulgated under Section 10(b) (17 C.F.R. § 240.10b-5).

7

26.    Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. §§ 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.

27.    In connection with the acts and omissions alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets. Further allegations regarding subject matter jurisdiction are set out at paragraphs 129-130 below.

## PARTIES

28.    Lead Plaintiff, Axxion, is an investment firm established under the laws of Luxemburg. Axxion manages assets totaling approximately 1.7 billion euros. It establishes and manages investment funds, such as the Akrobat Fund. Axxion is proceeding in this case on behalf of its Akrobat Fund-Value, which purchased GPC common stock during the Class Period.

29.    Named plaintiff, Agamemnon Chua, is a citizen of the United States who purchased shares of GPC securities during the Class Period.

30.    Defendant, GPC Biotech AG, is a publicly traded biopharmaceutical company founded in 1997, focused on the development of anticancer drugs. GPC's lead product candidate throughout the Class Period was Satraplatin, an oral platinum compound. Its principal offices are located in Munich, Germany. GPC wholly owns a U.S. subsidiary, headquartered in Princeton, New Jersey, where the Company works on clinical drug development. During the Class Period, GPC also had a laboratory and offices in Waltham, Massachusetts.

31.    The Company's sponsored American Depositary Receipts evidencing American Depositary Shares ("ADSs") are registered and traded on the NASDAQ Global Market under the

8

symbol GPCB. On or about July 2, 2004, 7,460,000 American Depositary Receipts were sold by

the Company pursuant to a registered Initial Public Offering. The Company's common stock

trades on the Frankfurt Stock Exchange.

32.     Defendant Bernd R. Seizinger ("Seizinger") has been Chief Executive Officer

("CEO") of GPC since 1998. As CEO, Seizinger signed Sarbanes-Oxley certifications attached

to the Company's Form 20-F annual report filings with the SEC, certifying that the information

contained in the Company's annual reports fairly presented in all material respects the financial

condition and results of GPC's operations. He joined GPC Biotech from Genome Therapeutics

Corporation (now Oscient Pharmaceuticals Corporation) of Waltham, Massachusetts, where he

was Executive Vice President and Chief Scientific Officer from 1996 to 1998. From 1992 to

1996, Dr. Seizinger was at Bristol-Myers Squibb Pharmaceutical Research Institute in Princeton,

New Jersey, where he held the posts of Vice President of Oncology Drug Discovery and, in

parallel, Vice President of Corporate and Academic Alliances. He was awarded his M.D. from

the Ludwig Maximilians University and his Ph.D. from the Max Planck Institute of Psychiatry,

both in Munich. During the Class Period, Defendant Seizinger sold 512,980 shares of GPC

common stock for proceeds of approximately €8.63 million (or approximately $12.9 million at

an exchange rate of $1.50 to the euro). Claims against Seizinger are brought under Sections

10(b), 20(a) and 20(A) of the Exchange Act.

33.     Defendant Mirko Scherer ("Scherer") was, until December 4, 2007, the

Company's Chief Financial Officer ("CFO"). On December 4, 2007, Scherer resigned from his

position with the Company. Scherer was one of the Company's co-founders. As CFO, Scherer

signed Sarbanes-Oxley certifications attached to the Company's Form 20-F annual report filings,

certifying that the information contained in the Company's annual reports fairly presented in all

9

material respects the financial condition and results of GPC's operations. Prior to founding

GPC, Scherer worked for The Boston Consulting Group in Munich, where he was a management

consultant to several industries, including banking. During the Class Period, Defendant Scherer

sold 335,000 shares of GPC common stock for proceeds of approximately €5.6 million (or

approximately $8.4 million at an exchange rate of $1.50 to the euro). Claims against Scherer are

brought under Sections 10(b), 20(a) and 20(A) of the Exchange Act.

34.     Defendant Elmar Maier ("Maier") was, until February 25, 2008, the Company's

Senior Vice President, Business Development and Chief Operating Officer (Martinsried/Munich,

Germany). On February 25, 2008, he resigned his position with the Company. Maier was one of

the Company's co-founders. Previously, Maier ran a consulting firm focused on

commercializing biotech know-how. During the Class Period, Defendant Maier sold 436,000

shares of GPC common stock for proceeds of approximately €7.15 million (or approximately

$10.7 million at an exchange rate of $1.50 to the euro). Claims against Maier are brought under

Sections 20(a) and 20(A) of the Exchange Act.

35.     Defendant Sebastian Meier-Ewert ("Ewert") was, until February 25, 2008, the

Company's Senior Vice President and Chief Scientific Officer. On February 25, 2008, he

resigned from his position with the Company. Ewert was one of the Company's co-founders.

Prior to co-founding GPC, Ewert established and led a team of scientists working on gene

expression analysis and bioinformatics at the Max Planck Institute for Molecular Genetics in

Berlin. He also co-founded a consulting firm specializing in biotechnology know-how and

technologies. During the Class Period, Defendant Ewert sold 367,920 shares of GPC common

stock for proceeds of approximately €5.6 million (or approximately $8.4 million at an exchange

rate of $1.50 to the euro).  Claims against Ewert are brought under Sections 20(a) and 20(A) of the Exchange Act.

36.    Defendants Seizinger, Scherer, Maier, and Ewert are herein collectively referred to as the "Individual Defendants." Each of the Individual Defendants is or was a member of GPC's Management Board during the Class Period.  Defendants Seizinger and Scherer will, at times, be referred to as the "10(b) Individual Defendants."

37.    The Individual Defendants controlled GPC and its public disclosures regarding Satraplatin. Each of them made false and misleading statements and/or failed to disclose material adverse information concerning the Company's business and operations during the Class Period, as detailed herein. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.

38.    It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications, as alleged herein, were the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers and former officers of GPC, by virtue of their high level positions with the Company, directly participated in the management of the Company, was directly involved in the

day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, products, financial statements, and financial condition, as alleged herein. Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware or deliberately disregarded that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of the federal securities laws.

39. As officers and controlling persons of a publicly held company whose ADSs are registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ Global Market, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate and truthful information with respect to the Company's financial condition and performance; growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's securities would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

40. The Individual Defendants participated in the drafting, preparation and/or approval of the various public, shareholder and investor reports and other communications complained of herein, and were aware of, or deliberately disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and managerial positions with GPC, each of the Individual Defendants had access to the adverse, undisclosed information about the Company's

operations, the financial condition and performance of the Company as particularized herein and knew (or deliberately disregarded) that these adverse facts rendered the positive representations made by or about GPC and its business issued or adopted by the Company materially false and misleading.

41.    The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and are therefore liable for the representations contained therein.

42.    Each of the Defendants is liable as a participant in a wrongful scheme and course of business that operated as a fraud or deceit on those who purchased or otherwise acquired GPC securities during the Class Period by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding GPC's business, operations, and the intrinsic value of the Company's securities, and caused Plaintiffs and other members of the Class to purchase GPC equities at artificially inflated prices.

## CLASS ALLEGATIONS

43.    Plaintiffs bring this as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons who purchased GPC securities during the Class Period. Excluded from the Class are the Individual Defendants, officers and directors of the Company, members of the immediate families of the Individual Defendants and each of their legal

representatives, heirs, successors or assigns and any entity in which any Defendant has or has had a controlling interest.

44.    This action is properly maintainable as a class action because:

(a)    The members of the proposed Class in this action are dispersed throughout the United States and other countries and are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the thousands. Millions of GPC's securities were traded publicly during the Class Period on the NASDAQ Global Market under the symbol "GPCB." GPC has 7,460,000 ADS shares outstanding. The Company's common stock is traded on the Frankfurt Stock Exchange under the symbol, "GPC" and as of February 29, 2008, GPC has 36,836,853 common shares outstanding.

(b)    Plaintiffs' claims are typical of those of all members of the Class because all have been similarly affected by Defendants' actionable conduct in violation of federal securities laws as alleged herein;

(c)    Plaintiffs will fairly and adequately protect the interests of the Class and have retained counsel competent and experienced in class action litigation. Plaintiffs have no interests antagonistic to, or in conflict with, the Class that Plaintiffs seeks to represent;

(d)    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein because joinder of all members is impracticable. Furthermore, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually

impossible for Class members to redress the wrongs done to them. The likelihood of individual

Class members prosecuting separate claims is remote;

(e)    Plaintiffs anticipate no unusual difficulties in the management of this

action as a class action; and

(f)    The questions of law and fact common to the members of the Class

predominate over any questions affecting individual members of the Class.

45.    Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts and/or omissions as alleged herein violated the

federal securities laws;

(b)    whether the Company's Class Period public statements and filings

misrepresented and/or omitted material facts;

(c)    whether Defendants acted with knowledge or with reckless disregard for

the truth in misrepresenting and/or omitting material facts;

(d)    whether Defendants participated in and pursued the common course of

conduct complained of herein;

(e)    whether the market price of GPC securities was inflated artificially as a

result of Defendants' material misrepresentations and/or omissions during the Class Period;

(f)    whether the Individual Defendants sold shares of GPC stock while in

possession of adverse, inside information about the prospects of the Company's NDA; and

(g)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

## SUBSTANTIVE ALLEGATIONS COMMON TO ALL COUNTS

### A.     Pre-Class Period Business Events

46.     GPC was founded in 1997 by Defendants Scherer, Maier and Ewert. Late in the third quarter of 2002, GPC licensed the exclusive commercial rights to Satraplatin (including the right to sublicense) from Neo Therapeutics (k/n/a Spectrum Pharmaceuticals ("Spectrum").

47.     Originally, Satraplatin was invented and synthesized by scientists at Johnson Matthey as part of a collaboration with Bristol-Myers Squibb to find new platinum-based chemotherapy drugs. Unlike other marketed platinum-based drugs, Satraplatin showed anticancer activity when administered orally. The hope was that Satraplatin would prove effective at combating prostate cancer. Early research indicated that Satraplatin showed activity against several different cancers, including prostate, ovarian, and small cell lung (SCL) cancers.

48.     From the moment GPC acquired this sublicense, obtaining regulatory approval for the commercialization of Satraplatin for treatment of prostate cancer became the Company's primary focus. While the Company had early stage studies in place for the treatment of other forms of cancer with Satraplatin and other agents, it was the Satraplatin plus prednisone regimen, given orally to those with prostate cancer who have failed prior treatment with one chemotherapy regimen, that was touted by the Company as its best chance to get a drug on the market.

49.     It was crucial for GPC to obtain regulatory approval promptly because the patents underlying Satraplatin were set to expire only a few years later. Satraplatin was protected by two issued U.S. patents, one of which expired in 2008 (composition of matter patent 5.072,011) and the other in 2010 (use patent 5.244,919). In addition, protection for Satraplatin was covered by a patent issued under the European Patent Convention ("EPC") which expires in 2009, and a number of patents issued in other jurisdictions including other European Union countries, Japan, Canada and Australia, also set to expire in 2009. An extension to the exclusivity period provided

by these patents was possible, but obtaining regulatory approval first was a key component in an application for patent extension.

50.    In the United States, drugs are subject to regulation by the FDA. The steps ordinarily required before a new drug product may be marketed in the United States include: (a) preclinical laboratory tests, animal tests and formulation studies; (b) the submission to the FDA of a an investigational new drug application ("IND") setting forth what the sponsor of a new drug proposed for human testing in clinical trials has learned; (c) adequate, well-controlled clinical trials to establish the safety and effectiveness of the drug for each indication for which FDA approval is sought; (d) submission of an NDA for marketing approval; and (e) approval of the drug by the FDA.

51.    In addition, the FDA offers what is known as "fast track designation." Fast track designation is a program offered by the FDA to facilitate the development and to expedite the review of drugs that are intended for the treatment of serious or life-threatening conditions for which there is no effective treatment and that demonstrate the potential to address unmet medical needs.

52.    Given the exigency of time, Defendants began discussions with the FDA almost immediately upon obtaining the Satraplatin license from Spectrum. Defendants' goal was to obtain fast track designation and drug approval in 2007, with commercialization commencing in late 2007 or early 2008. In support of their effort to obtain fast track designation, Defendants pointed out that there were no drugs in the market place that provided effective treatment for prostate cancer patients who had been on one chemotherapy regimen, and relapsed.

53.    These initial discussions with the FDA culminated in an official "End-of-Phase 2 Meeting" in July 2003.

17

54.    Following this meeting, GPC was allowed to proceed with its Phase 3 clinical trial, and the Company's NDA was granted fast track designation. The FDA's decision to grant fast track designation reflected the Agency's recognition that there were no drugs with FDA approval for the treatment of prostate cancer for patients who had relapsed following one chemotherapy protocol. The ruling did not imply, however, that an NDA would be approved if clinical tests failed to show results that satisfied an agreed upon, primary "endpoint."

55.    Drug effectiveness is measured by "endpoints"--specific results the Company is aiming to produce which reflect benefits the FDA deems sufficient for approval and commercialization of a new drug. The FDA has reviewed thousands of new drug applications, and has established endpoints which it perceives reflect proof that a drug truly works as hoped. The Individual Defendants were well aware of the FDA's established endpoints because they each had years of experience in clinical drug testing and the FDA drug approval process.

56.    Before GPC was authorized to commence Phase 3 clinical trials for Satraplatin, discussions between the Company and the FDA were held during which endpoints for the proposed trials were discussed. These discussions were detailed, and the FDA made its position clear: the primary endpoint for the clinical trials advocated for by GPC was unfamiliar to the FDA and unacceptable as a primary endpoint.

57.    The FDA's early guidance was completely ignored by Defendants, who proceeded as if they were never informed by the FDA that their proposed primary endpoint was unacceptable. Instead of adopting accepted endpoints for the SPARC trial, the Defendants pushed forward with a new endpoint, one which they thought Satraplatin could meet and one which would more easily allow them to issue positive progress reports throughout the Class Period. The decision was made to proceed with a primary endpoint which Defendants called

18

"progression free survival" or "PFS". This endpoint purported to measure the effectiveness of treatment in slowing down the progression of prostate cancer in patients taking the Satraplatin protocol.

58.     In September 2003, GPC began enrollment in its Phase 3 clinical trial, which was known as the "SPARC" (Satraplatin and Prednisone Against Refractory Cancer) trial. As set forth in the Company's 2006 Annual Report on Form 20-F, the SPARC trial is a "multinational, multicenter, randomized, double-blind Phase 3 registrational trial to test satraplatin plus prednisone versus a placebo plus prednisone in patients with [prostate cancer] whose disease has progressed into first-line chemotherapy."

59.     Designing the protocol and enrolling patients in the SPARC trial was a lengthy and difficult process. Defendants knew that enrollment procedures acceptable to the FDA needed to be strictly followed if fast track and final FDA approval were to be obtained on schedule, some time in 2007.

60.     On June 9, 2004, GPC filed a Registration Statement with the SEC on Form F-1/A to register an initial public offering of 7,460,000 bearer shares of GPC in the form of American Depository Shares. Defendants also filed an amended registration statement and a Prospectus for GPC's Initial Public Offering with the SEC June 10, 2004 and July 1, 2004, respectively. Both registration statements and the prospectus including the following statement:

> We have elected to seek approval under the accelerated approval process for satraplatin. **Under the terms of the Special Protocol Assessment, the primary endpoint of the Phase 3 registrational trial for accelerated approval by the FDA will be the time to disease progression.** [emphasis added]

61.     Each of the Individual Defendants signed the original and amended registration statements.

**B.**    **Class-Period Allegations**

      62.    On December 5, 2005, the commencement of the Class Period, the Company

issued a press release entitled, "GPC Biotech Announces Achievement of Target Enrollment in

Satraplatin Phase 3 Registrational Trial (SPARC) for Second-Line Chemotherapy of Hormone

Refractory Prostate Cancer." This press release stated, in relevant part:

> GPC Biotech AG ...today announced the achievement of target
> enrollment in the Phase 3 registrational trial of its lead drug
> candidate satraplatin, the only orally bioavailable platinum-based
> compound in advanced clinical development. More than 200
> clinical sites in fifteen countries on four continents have now
> achieved the goal of accruing 912 patients to the SPARC
> (Satraplatin and Prednisone Against Refractory Cancer) trial. A
> number of additional patients are in screening, and the Company
> will allow those patients to complete the process and either be
> randomized into the trial or disqualified, in accordance with the
> trial protocol. The SPARC trial is a multicenter, multinational,
> double blind, randomized study that is assessing the safety and
> efficacy of satraplatin in combination with prednisone as a second-
> line chemotherapy in patients with hormone-refractory prostate
> cancer (HRPC).
>
> "We are excited to have achieved this major milestone in the
> development of satraplatin. This is indeed a significant
> accomplishment for GPC Biotech," said Bernd R Seizinger, M.D.,
> Ph.D., Chief Executive Officer. "The rapid accrual rate of the
> SPARC trial supports the need for effective second-line
> chemotherapy treatments for hormone-refractory prostate cancer
> patients. We are thus committed to completing the study and
> moving forward in the registration process as expeditiously as
> possible."
>
> "The accrual goal of 912 patients was reached in just over 26
> months, making the SPARC trial one of the fastest accrued Phase 3
> clinical trials for chemotherapy drugs in prostate cancer. This rapid
> enrollment was made possible by the dedication and hard work of
> the clinical investigators, the study site personnel and our own
> drug development team," said Marcel Rozeneweig, M.D., Senior
> Vice President, Drug Development. "I would like to thank them, as
> well as all of the patients who participated in the trial."

63.    These statements were false and misleading because Defendants knew but failed to disclose that the Company had selected a primary endpoint for the SPARC study which would never be accepted by the FDA, a brazen tactic which would inevitably derail fast track approval of Satraplatin as a prostate cancer therapy.

64.    The scheme did succeed, however, on two fronts.  First, it allowed each of the Individual Defendants to sell shares of GPC stock that they owned personally.  And second, it allowed the cash-starved company to raise new funds.

65.    Specifically, between December 5, 2005 and January 5, 2006, Defendants sold shares of GPC stock as follows:

| Name | Date of Transaction | Number of Shares | Avg. Share Price (Euros) | Total Proceeds (Euros) |
|------|---------------------|------------------|--------------------------|------------------------|
| Seizinger | 12/23/2005 | 35,000 | 10.86 | 380,170 |
| | 12/27/2005 | 16,000 | 10.75 | 172,034 |
| | 12/28/2005 | 10,000 | 10.71 | 107,100 |
| | 12/29/2005 | 5,127 | 10.54 | 54,023 |
| | 1/2/2006 | 33,873 | 10.86 | 367,895 |
| | 1/3/2006 | 11,872 | 11.17 | 132,610 |
| | 1/5/2006 | 7,907 | 11.11 | 87,863 |
| | 1/5/2006 | 5,221 | 11.03 | 57,562 |
| Scherer | 12/23/2005 | 35,000 | 10.86 | 380,181 |
| | 12/27/2005 | 12,000 | 10.79 | 129,445 |
| | 1/3/2006 | 15,872 | 11.17 | 177,290 |
| | 1/4/2006 | 7,128 | 11.11 | 79,192 |

| Maier | 12/22/2005 | 13,116 | 11.26 | 147,686 |
|---|---|---|---|---|
| | 12/23/2005 | 51,524 | 10.97 | 565,218 |
| | 12/27/2005 | 7,638 | 10.83 | 82,719 |
| | 1/2/2006 | 8,907 | 10.84 | 96,569 |
| | 1/3/2006 | 14,815 | 11.03 | 163,335 |
| Ewert | 12/22/2005 | 50,000 | 11.17 | 558,500 |
| | 12/23/2005 | 13,018 | 10.95 | 142,547 |
| | 12/28/2005 | 15,777 | 10.80 | 170,392 |
| | 1/2/2006 | 15,700 | 10.86 | 170,463 |
| | 1/3/2006 | 9,300 | 11.00 | 102,337 |
| **TOTALS** | | **394,795** | | **4,325,131** |

66.     These stock sales were made pursuant to pre-arranged stock trading plans designed to comply with Rule 10b5-1 of the United States Securities Exchange Act of 1934, German law and GPC's insider trading policy.  As noted in the filings however, under Rule 10b5-1, corporate insiders are only permitted to establish pre-arranged written stock trading plans when they are not aware of any material, non-public information (inside information).  All of the stock sold during the Class Period pursuant to these pre-arranged stock trading plans, however, was sold pursuant to plans created *after* the Individual Defendants learned from the FDA that the primary endpoint they selected for the SPARC trial, PFS, was one with which the FDA had no experience and which the FDA would not approve as a primary endpoint.

67.     Having obtained fast track designation for the Company's application, GPC was allowed to submit its NDA in parts.  In December, 2005, the Company submitted the first portion of its NDA to the FDA, the section discussing the drug's chemistry, manufacturing and controls.

68.     On February 23, 2006, GPC announced that it had privately sold 2.86 million shares of the Company's common stock, raising approximately $49 million.

69.     On March 15, 2006, the Company reported that cash burn for 2005 was approximately $60 million, but that its purported progress with Satraplatin had enabled it to raise substantial fresh money: "Of note, in the first quarter of 2006, the Company received an additional € 67.5 million from an upfront development-related payment of € 31.3 million from its partner Pharmion in connection with the co-development and license agreement signed in December 2005, and € 36.2 million through a private placement with two investment companies..."

70.     In the March 15, 2006 earnings release, Defendant Scherer stated, "[o]ur financial results for 2005 continue to reflect our expanding efforts to successfully develop our anticancer pipeline, especially satraplatin." Defendant Seizinger added,

> During 2005, we took critically important steps to build a sustainable future for GPC Biotech...We had several key achievements with our lead drug candidate satraplatin, including reaching target accrual in December in our Phase 3 registrational trial - the SPARC trial - making this one of the fastest-accruing Phase 3 trials for a chemotherapy drug ever to be conducted in prostate cancer. Also in December, we started the rolling NDA submission with the U.S. FDA. In addition to advancing the registrational trial in prostate cancer, we initiated several additional clinical trials for satraplatin, to broadly explore its anti-cancer activity in various other important tumor types, such as breast cancer and non-small cell lung cancer....
>
> The year 2006 promises to be even more important as we expect to see efficacy data from our Phase 3 registrational trial for satraplatin. Provided these data are positive, our goal is to then complete the NDA filing for marketing approval of satraplatin in the U.S. by the end of this year and file through our partner Pharmion in Europe in the first quarter of 2007. We look forward to another successful year as we continue to drive forward satraplatin, as well as our other anticancer programs.

71.     The foregoing statements by the 10(b) Individual Defendants were false and misleading because at the time the statements were made, they knew the FDA had rejected the Company's proposed primary endpoint, PFS, but omitted this material information from the release. Moreover, based on the FDA's clear guidance, the 10(b) Individual Defendants had no reason to expect Satraplatin would be granted expedited approval based on their current Phase 3 protocol, or that final approval would be obtained.

72.     On April 3, 2006, GPC filed its annual report with the SEC on Form 20-F. The annual report was signed by the 10(b) Individual Defendants. In the report, the Company boldly stated, "[a]s agreed with the FDA and the European Medicines Agency, or EMEA, the primary endpoint for the SPARC trial is progression-free survival and the secondary endpoints are overall survival and time to pain progression."

73.     The Company also described its clinical trials of Satraplatin as follows:

> ***Current Clinical Trials.***     Shortly after we licensed satraplatin in 2002, we began discussions with the FDA that culminated in an official "End-of-Phase 2 Meeting" with the FDA in July 2003. The purposes of this meeting included assessing the safety of the drug in earlier trials, evaluating our Phase 3 registrational trial plan, and identifying any additional information that would be needed to support an NDA. Additionally, we requested a review of our Phase 3 registrational trial protocol under the FDA's Special Protocol Assessment program. The combination of the "End-of-Phase 2 Meeting" and the Special Protocol Assessment provided us the opportunity to hold meaningful discussions with the FDA regarding our overall registrational approach. As a result, the FDA confirmed its agreement with us that successful completion of the SPARC trial will form the primary basis for an efficacy claim for our NDA for satraplatin, if executed flawlessly. This agreement becomes part of the administrative record and may only be changed by mutual agreement of the parties or if the FDA identifies a substantial scientific issue relevant to safety or efficacy after the trial has begun. The FDA has also granted fast track designation to satraplatin as a second-line chemotherapy treatment for patients with HRPC. The FDA's fast track program is intended to facilitate the development and expedite the review of drugs that

24

treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs. The fast track designation enables us to file sections of the NDA on a rolling submission basis, submitting sections as they become available. In December 2005, we began the rolling NDA submission for satraplatin, submitting the CMC section.

*　　　*　　　*

 In September 2003, we initiated the SPARC trial. The SPARC trial is a multinational, multicenter, randomized, double-blind Phase 3 registrational trial to test satraplatin plus prednisone versus a placebo plus prednisone in patients with HRPC whose disease has progressed on first-line chemotherapy. "Randomized" means that patients are randomly assigned to receive the drug candidate or a placebo. To encourage participation, we have set the randomization ratio at 2:1 in favor of active treatment. "Double-blind" means that neither the physician nor the patient knows whether the patient has received the drug candidate or a placebo. "Progressed on first-line chemotherapy" means that a patient with HRPC has shown further advancement of their cancer while being treated with a regimen that includes a chemotherapy drug. The SPARC trial is designed to determine the efficacy and evaluate the safety of satraplatin plus prednisone in slowing the progression of cancer in this patient population. According to the criteria we have discussed with the FDA and the EMEA, the trial was designed to detect a 30% or greater increase in the period of time required for the progression of disease to occur in the treatment group, as compared with the control group. In December 2005, enrollment completed in the trial, with a total of 950 patients enrolled at approximately 200 clinical centers in sixteen countries on four continents.

During the course of the SPARC trial an independent data monitoring board, or DMB, established in accordance with guidelines provided by the FDA, meets periodically to review the results of the trial and evaluate the safety and/or efficacy of satraplatin in the trial population. The DMB makes recommendations to us regarding the continuation, modification or discontinuation of the trial based on its review of safety and efficacy data. To date, the DMB has held three meetings—one in 2004 and two in 2005—each focused on a review of safety data from the trial. After each of these meetings, the DMB reported that the design and conduct of the trial remained sound and recommended that the trial continue as planned. The third of these safety reviews was held in December 2005, based on 592 patients. The DMB has also set a date in late April 2006 to conduct a pre-

> planned interim efficacy analysis of data from the SPARC trial.
> There can be no assurances regarding any recommendation by the
> DMB based upon such interim analysis or whether data from such
> interim analysis would be sufficient to form the basis of a
> submission for regulatory approval in the United States or Europe.
> Full progression-free survival data are expected in the second half
> of 2006.

74.     The statements made in the Company's annual report were false and misleading

because, by the time they were made, the FDA had already told Defendants, including the 10(b)

Individual Defendants, that it would not approve "progression-free survival" as a primary

endpoint for the study. Thus, although the Company continued its Phase 3 trials, it had no reason

to expect that Satraplatin would be approved by the FDA pursuant to this trial and omitted the

material fact that the FDA had already indicated the Phase 3 protocol's primary endpoint was not

acceptable. Defendants hid the FDA's statements from the public in order to allow them to

create the appearance that the ongoing SPARC trials were successful, which in turn allowed

Defendants to continue to raise money from investors and allowed the Individual Defendants to

sell their own shares at higher prices.

75.     On April 25, 2006, GPC announced that the SPARC trial had been deemed safe

enough by an independent board to continue with testing.   However, the Defendants failed to

disclose that this decision reflected a finding that the drug had a possibility of meeting the

endpoint selected by the Company, and did not meet a primary endpoint acceptable to the FDA.

The press release stated, in relevant part:

> "We are delighted that the independent Data Monitoring Board
> made this recommendation and that satraplatin passed the futility
> analysis," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive
> Officer. "The results of this planned interim analysis are as
> expected - namely that the Board has recommended that the
> SPARC trial continue to its completion. We look forward to
> reporting the final PFS results from the trial this fall and, if the data
> are positive, we anticipate completing the NDA filing by the end of
> 2006. In parallel to completing the registrational trial, we will

26

> continue to initiate additional clinical trials with satraplatin in other
> cancer indications and in combination with other anticancer
> treatments."

These statements were false and misleading because Defendants did not disclose that the PFS

results referenced in the press release were results that the FDA had already rejected as a

meaningful, recognized primary endpoint for determining the safety and efficacy of satraplatin.

76.    In July 2006, GPC filed the second portion of its rolling New Drug Application

with the FDA. This part of the application dealt with non-clinical issues.

77.    On September 24, 2006, the Company issued a bullish press release stating that

Satraplatin was showing positive top-line results for the endpoint selected by the Company,

"progression free survival." No mention was made that the FDA had specifically rejected PFS as

a valid endpoint. Moreover, the release created the false impression that PFS was an endpoint

that had broad acceptance and was familiar to the FDA. Specifically, the press release stated, in

relevant part:

> The study data show that the results for progression-free survival
> (PFS) are highly statistically significant (p<0.00001) using the
> protocol-specified log-rank test. PFS is the primary endpoint for
> submission for accelerated approval in the U.S. and will also serve
> as the primary basis for a Marketing Authorization Application
> (MAA) in Europe.
>
> Using the protocol-specified hazard ratio, which measured the
> overall risk of disease progression, patients in the SPARC trial
> who received satraplatin plus prednisone had a 40% reduction in
> the risk of disease progression (hazard ratio of 0.6; 95%
> Confidence Interval: 0.5-0.7) compared with patients who received
> prednisone plus placebo. The improvement seen in progression-
> free survival by patients treated with satraplatin increased over
> time. Progression-free survival at the median (50th percentile)
> demonstrated a 13% improvement in patients who received
> satraplatin plus prednisone (11 weeks) compared to patients who
> received prednisone plus placebo (9.7 weeks). Progression-free
> survival at the 75th percentile showed an 89% improvement for
> patients in the satraplatin arm (36 weeks) versus patients in the
> placebo arm (19 weeks). At 6 months, 30% of patients in the

satraplatin arm had not progressed, compared to 17% of patients in the control arm. At 12 months, 16% of patients who received satraplatin had not progressed, compared to 7% of patients in the control arm. All of these analyses were conducted on an intent-to-treat basis.

78.     On November 9, 2006, GPC issued another press release touting the alleged

progress the Company was making in its efforts to develop Satraplantin, without revealing the

flawed, proposed measure of success for the ongoing drug trial. The release stated, in relevant part:

Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said: "In the third quarter of 2006, we achieved a landmark event in the corporate history of GPC Biotech, with the announcement of positive results on progression-free survival from our Phase 3 registrational trial with our lead anticancer drug candidate satraplatin. These results will form the basis of our NDA filing, which we expect to submit to the FDA in the next six to twelve weeks, with the goal of filing by the end of this year. They will also serve as the basis for our partner Pharmion to move forward with the MAA filing in Europe in the first half of 2007. We are also moving forward aggressively to further build our marketing and sales infrastructure in the U.S. for the commercialization of satraplatin."

**_Highlights from the third quarter of 2006 and later_**

• Positive results announced from satraplatin pivotal Phase 3 SPARC trial

• Highly statistically significant results seen for progression-free survival endpoint (p<0.00001)

• 40% reduction in risk of disease progression seen with satraplatin compared to control.

79.     The purported positive developments announced by the Company allowed the

Individual Defendants the opportunity to sell large portions of their holdings of GPC stock.

Specifically, between September 25, 2006 and January 19, 2007, Defendants sold shares of GPC

stock as follows:

| Name | Date of Transaction | Number of Shares | Avg. Share Price (Euros) | Total Proceeds (Euros) |
|---|---|---|---|---|
| Seizinger | 9/25/2006 | 49,940 | 14.92 | 738,391 |
| | 10/9/2006 | 50,000 | 15.83 | 791,500 |
| | 12/15/2006 | 50,000 | 16.08 | 803,800 |
| | 12/20/2006 | 3,000 | 17.18 | 51,540 |
| | 12/22/2006 | 200 | 17.18 | 3,436 |
| | 12/28/2006 | 25,000 | 18.07 | 451,750 |
| | 12/28/2006 | 50,000 | 17.79 | 889,500 |
| | 1/2/2007 | 22,750 | 19.74 | 449,085 |
| | 1/19/2007 | 61,430 | 22.06 | 1,355,146 |
| Scherer | 10/4/2006 | 30,000 | 15.21 | 456,300 |
| | 10/5/2006 | 20,000 | 15.06 | 301,200 |
| | 10/9/2006 | 23,000 | 15.89 | 365,470 |
| | 10/13/2006 | 23,000 | 16.09 | 370,070 |
| | 12/18/2006 | 16,030 | 17.17 | 275,235 |
| | 12/20/2006 | 6,970 | 17.17 | 119,675 |
| | 12/28/2006 | 25,000 | 17.82 | 445,500 |
| | 12/28/2006 | 25,000 | 18.18 | 454,000 |
| | 12/29/2006 | 18,750 | 19.12 | 358,500 |
| Maier | 10/4/2006 | 50,000 | 15.13 | 756,500 |
| | 10/9/2006 | 23,000 | 15.52 | 356,960 |
| | 10/9/2006 | 25,000 | 15.78 | 394,500 |
| | 10/16/2006 | 4,225 | 16.43 | 69,417 |
| | 10/20/2006 | 8,770 | 16.43 | 144,091 |

| | | | | |
|---|---|---|---|---|
| | 12/11/2006 | 12,005 | 16.48 | 197,836 |
| | 12/20/2006 | 23,000 | 17.22 | 396,060 |
| | 12/28/2006 | 25,000 | 17.76 | 444,000 |
| | 12/28/2006 | 23,000 | 18.12 | 416,760 |
| | 12/29/2006 | 33,000 | 19.06 | 628,980 |
| | 1/2/2007 | 32,000 | 19.55 | 625,600 |
| | 1/2/2007 | 6,813 | 19.73 | 134,420 |
| | 1/2/2007 | 17,106 | 19.97 | 341,607 |
| | 1/4/2007 | 3,081 | 19.97 | 61,528 |
| Ewert | 10/4/2006 | 20,000 | 15.15 | 302,900 |
| | 10/5/2006 | 15,000 | 15.04 | 225,660 |
| | 10/6/2006 | 37,500 | 15.27 | 572,625 |
| | 10/10/2006 | 55,628 | 15.91 | 885,041 |
| | 10/11/2006 | 2,512 | 15.91 | 39,966 |
| | 10/13/2006 | 1,860 | 15.91 | 29,593 |
| | 10/16/2006 | 10,775 | 16.43 | 177,033 |
| | 10/20/2006 | 22,361 | 16.43 | 367,391 |
| | 12/11/2006 | 30,614 | 16.48 | 504,503 |
| | 12/18/2006 | 8,611 | 17.03 | 146,645 |
| | 1/12/2007 | 25,514 | 20.11 | 513,087 |
| **Totals** | | **1,016,445** | | **17,412,801** |

80.     Like the first set of sales by the Individual Defendants in late 2005 and early 2006,

these sales were also made pursuant to pre-arranged stock trading plans designed to comply with

Rule 10b5-1 of the United States Securities Exchange Act of 1934, German law and GPC's

insider trading policy. And, like the first set of sales, the Plans pursuant to which the sales were made were created at a time when the Individual Defendants were already in possession of material inside information that the FDA had rejected the Company's proposed primary endpoint for the SPARC trial.

81.     This positive announcements by GPC about the alleged progress the Company was making in its efforts to develop Satraplatin allowed the Company to raise additional funds from private investors. In a January 24, 2007 press release the Company stated, in relevant part:

> GPC Biotech...has raised gross proceeds of € 33.6 million (approximately $43.7 million) in a private placement with institutional investors. GPC Biotech sold 1,564,587 million shares at a price of E 21.50/share and will receive the proceeds upon registration of the corresponding capital increase. The share price and the number of shares were determined by an accelerated bookbuilding procedure with an underwriter.

> "With the announcement this past fall of positive data from the satraplatin Phase 3 trial in second-line hormone refractory prostate cancer, we were able to accelerate the building of our commercialization infrastructure in the U.S.," said Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer. "The funds we have raised will assist us both in aggressively moving forward with commercialization activities, as well as continuing to expand the development of satraplatin in other cancer settings."

82.     On January 3, 2007, securities analysts with Needham & Company, LLC, issued a bullish report on GPC's prospects. "Given the near-term opportunity in 2nd line in HRPC as well as ongoing combination trials in other diseases, we believe the current valuation provides for a very favorable investment opportunity, and we reiterate our BUY rating and our $27 price target." At the time, Needham's analysts did not know that the FDA had already informed Defendants that the positive results reported from the SPARC trial were not relevant to the FDA, as it had already rejected PFS as a primary endpoint.

83.    On January 11, 2007, securities analysts with Piper Jaffray Ltd. also issued a positive report, stating that GPC was a "must have" stock for 2007. In placing GPC in this category, Piper Jaffray relied upon Defendants' statements that PFS was an accepted primary endpoint, not knowing that the FDA had already informed Defendants that the positive results reported from the SPARC trial were not relevant to the FDA, as it had already rejected PFS as a primary endpoint.

84.    London and Germany-based securities analyst WestLB issued an analyst report on January 19, 2007. In reliance on the reported results from the SPARC trial and the purported efficacy the trial demonstrated in showing progression free survival, WestLB gave Satraplatin a "90% launch probability." Had WestLB known that the FDA did not approve of PFS as a primary endpoint, it no doubt would have provided a much lower estimate.

85.    On February 15, 2007, GPC announced that it had completed its filing of the rolling NDA to the FDA for Satraplatin for the treatment of patients with prostate cancer who relapsed following one round of chemotherapy. This portion included the clinical results, based on data from the SPARC trial. Defendants did not announce, however, that the data submitted supported a finding of improved progression free survival, an endpoint the FDA had already rejected as an appropriate primary endpoint.

86.    On February 23, 2007, GPC issued yet another bullish press release announcing the Company's plan to present a program at the ASCO Prostate Cancer Symposium in Orlando, Florida, while also announcing the Company's plan to commence the building up of a sales organization for Satraplatin once the drug was approved by the FDA. The press release stated in relevant part:

> GPC Biotech AG ... today announced that final progression-free
> survival (PFS) results for the double-blind, randomized satraplatin
> Phase 3 registrational trial, the SPARC trial (Satraplatin and
> Prednisone Against Refractory Cancer) are being presented today
> at the ASCO Prostate Cancer Symposium in Orlando, Florida. The
> trial is evaluating satraplatin plus prednisone versus placebo plus
> prednisone in 950 patients with hormone-refractory prostate cancer
> (HRPC) who have failed prior chemotherapy. All analyses of PFS
> being presented were conducted on an intent-to-treat basis.

*        *        *

> "We are delighted with the strong detailed results presented today
> from the satraplatin SPARC Phase 3 trial," said Bernd R.
> Seizinger, M.D., Ph.D., Chief Executive Officer of GPC Biotech.
> "Moving forward, we plan to work closely with the FDA regarding
> our application for marketing approval of satraplatin in the U.S.
> We also are continuing to aggressively build our marketing and
> sales organization in the U.S. to prepare for a potential launch of
> satraplatin later this year."

The Press release did not disclose that Defendants knew that the FDA would not approve the

Company's NDA based on a PFS primary endpoint and that as such, the building up of a

marketing and sales organization would be futile. The February 23, 2007 bullish announcement

however, succeeded in maintaining demand for the Company's stock.

87.    In attendance at the ASTO conference was an analyst from the investment banker,

Credit Suisse Securities, Ltd. ("Credit Suisse"). Credit Suisse reported that in addition to the

positive PFS results already disclosed by the Company, at this conference representatives of

GPC also stated that the SPARC clinical trials showed that there were few side effects

experienced by those on the Satraplatin plus prednisone treatment, which would bode well for

use of the drug as a first line treatment among those suffering from prostate cancer who had not

yet taken other chemotherapy drugs. This, in turn, would lead to additional sales of the drug.

88.    Echoing the Credit Suisse report was one issued by Pacific Growth Equities, LLC

("Pacific") on February 26, 2007. Citing good results which support the "primary endpoint" of

PFS, and the potential use of Satraplatin as a potential first line drug, Pacific estimated that

Satraplatin had sales potential of $1 billion.

89.     On April 1, 2007, the Company in conjunction with its European partner,

Pharmion Corporation, issued a press release touting preliminary results of the SPARC trial,

stating:

> "We are delighted with the strong detailed results presented today
> from the satraplatin SPARC Phase 3 trial," said Bernd R.
> Seizinger, M.D., Ph.D., Chief Executive Officer of GPC Biotech.
> "Moving forward, we plan to work closely with the FDA regarding
> our application for marketing approval of satraplatin in the U.S.
> We also are continuing to aggressively build our marketing and
> sales organization in the U.S. to prepare for a potential launch of
> satraplatin later this year."

The April 1, 2007 press release failed to disclose that the Company's application for marketing

approval of Satraplatin faced near certain rejection from the FDA because of its reliance on a

primary endpoint that the FDA had previously rejected.

90.     On April 16, 2007, the Company issued a press release announcing that the

Company's NDA, the final portion of which was submitted to the FDA on February 15, 2007,

had been accepted for filing and review, and that the NDA would be reviewed on an expedited

basis.  The Company failed to disclose that acceptance of the NDA by the FDA did not imply,

however, that the FDA approved of the protocols followed in clinical testing of Satraplatin or of

the primary endpoint cited in the NDA, a primary endpoint the FDA had already rejected.

91.     On May 15, 2007, GPC issued yet another false and misleading press release,

forecasting expected FDA approval of the Company's NDA and the anticipated near-term launch

of Satraplatin, stating:

> Bernd R. Seizinger, M.D., Ph.D., Chief Executive Officer, said:
> "We have already had several key achievements in the first few
> months of 2007, including completion of the NDA submission for
> satraplatin and its acceptance for filing by the FDA. We are very

pleased that FDA has granted the NDA submission priority review status and look forward to an action by the agency in August this year."

Dr. Seizinger [stated]: "We are very busy preparing for the possible U.S. launch of satraplatin later this year. With the acceptance of the NDA filing and the assignment of priority review by the FDA, and with the senior management of our U.S. marketing and sales organization in place, we have begun to hire the field sales force. In addition, we continue to move forward satraplatin clinical trials in other oncology indications, as well as our other development and discovery programs."

**Key Achievements: Year-to-Date 2007**

• Private placement with institutional investors raising net proceeds of € 32.6 million

• Rolling submission of an NDA for satraplatin completed and accepted for filing by the U.S. FDA

• NDA for satraplatin granted priority review status, setting target date for FDA action in August 2007

• Key progression-free survival (PFS) results as well as positive data on pain and PSA response rates from the satraplatin SPARC Phase 3 registrational trial in second-line chemotherapy for hormone-refractory prostate cancer presented at major international oncology and urology meetings

• Satraplatin Expanded Rapid Access protocol (SPERA) launched in the U.S.

These statements were false and misleading because Defendants knew the FDA would not approve PFS as a primary end-point for the study. Thus, although the Company continued its Phase 3 trials, it had no reason to expect that Satraplatin would be approved by the FDA pursuant to this trial and omitted the material fact that the FDA had already indicated that PFS was not acceptable to the FDA as a primary endpoint.

92.    On May 15, 2007, the Company also announced in a press release that the FDA would consider approval of Satraplatin at a meeting scheduled for July 24, 2007. Specifically, the release stated:

"Presentation of the satraplatin data to the Oncologic Drugs
Advisory Committee is the next important milestone in the NDA
review process. We remain committed to successfully completing
this review as quickly as possible," said Marcel Rozencweig,
M.D., Chief Medical Officer and Senior Vice President, Drug
Development of GPC Biotech. "We expect an action on the
application from the FDA in August of this year and are thus
moving forward with commercialization plans for satraplatin. If
approved, we believe that satraplatin has the potential to become
an important therapy for hormone-refractory prostate cancer
patients whose disease has progressed after prior chemotherapy, an
area of significant unmet medical need."

The Company's stock price closed on $28.50 per share that day.

93.    The May 15, 2007 press releases were well received by securities analysts, who

did not know that the FDA had already rejected PFS as a primary endpoint for the SPARC trials.

For example, on May 16, 2007, Needham issued a report stating that "we believe that the

regulatory risk as well as the commercialization risk has been reduced," and that "we believe that

the robust data on the primary endpoint of PFS will form the basis for an accelerated approval.

Given the significance of the efficacy and safety profile, we expect a positive review at the

ODAC meeting on July 24, 2007."

94.    On June 4, 2007 GPC presented data at an oncology conference in Chicago that

showed Satraplatin to be extremely effective. In a press release issued on June 4, 2007 that

discussed the Company's Chicago presentation, Defendants indicated that :

- All pre-specified subset analyses of progression-free
  survival in the SPARC Phase 3 trial consistently
  demonstrate a reduction in relative risk of disease
  progression for patients receiving satraplatin. These
  analyses included prior Taxotere use, geographies, as well
  as presence or absence of pain.

- The two major causes of progression in the SPARC trial -
  radiologic progression and pain progression - were each
  associated with a 36% reduction in relative risk of disease
  progression.

36

95.    On June 21, 2007, the Company filed its annual report for the fiscal year ended

December 31, 2006 with the SEC on Form 20-F.  Defendants Seizinger and Scherer signed the

Form 20-F, as well as the Sarbanes-Oxley certifications attached thereto.  The report included a

detailed discussion of the regulatory process undertaken by the Company in hope of obtaining

NDA approval by the FDA.  As detailed below, the Company misled the public by stating that

the FDA and Defendants had agreed on an appropriate endpoint or measure of success for the

human trials which formed the basis of Defendants' claim that Satraplatin was effective.

> ### Satraplatin
>
> Our lead product candidate is satraplatin, a member of the
> platinum family of drugs.
>
> *        *        *
>
> **The SPARC Trial.**    Shortly after we licensed satraplatin in 2002,
> we began discussions with the FDA that culminated in an official
> "End-of-Phase 2 Meeting" with the FDA in July 2003. The
> purposes of this meeting included assessing the safety of the drug
> in earlier trials, evaluating our Phase 3 registrational trial plan, and
> identifying any additional information that would be needed to
> support an NDA. Additionally, we requested a review of our Phase
> 3 registrational trial protocol under the FDA's Special Protocol
> Assessment program. The combination of the "End-of-Phase 2
> Meeting" and the Special Protocol Assessment provided us the
> opportunity to hold meaningful discussions with the FDA
> regarding our overall registrational approach. In September 2003,
> we initiated the SPARC trial.
>
> *        *        *
>
> In September 2006, we announced positive topline results for the
> SPARC trial. Data from the SPARC trial was presented during the
> first half of 2007 at several major medical meetings. The study
> data show that satraplatin significantly reduces the risk of disease
> progression in these patients using the protocol-specified log-rank
> test.
>
> *        *        *

**The interim analysis for overall survival conducted in June 2006 showed a trend, although not statistically significant, in favor of the satraplatin arm.**

\*          \*          \*

The FDA confirmed its agreement with us that successful completion of the SPARC trial will form the primary basis for an efficacy claim for our NDA for satraplatin. This agreement becomes part of the administrative record and may only be changed by mutual agreement of the parties or if the FDA identifies a substantial scientific issue relevant to safety or efficacy after the trial has begun. The FDA has also granted fast track designation to satraplatin as a second-line chemotherapy treatment for patients with HRPC. The FDA's fast track program is intended to facilitate the development and expedite the review of drugs that treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs. The fast track designation enabled us to file sections of the NDA on a rolling submission basis, submitting sections as they became available.

*Status of Regulatory Review.*   We completed the rolling submission of the NDA for satraplatin on February 15, 2007. In April 2007, the FDA accepted for filing our NDA for satraplatin for patients with HRPC whose prior chemotherapy has failed. The FDA has also granted the NDA priority review status. Priority review designation is intended for those products that address significant unmet medical needs and sets the target date for FDA action at six months from the date of submission. The FDA also informed us that the application will be reviewed under the provisions of 21 CFR 314 Subpart H, for accelerated approval. In addition, we were informed by the FDA that the NDA will be reviewed by ODAC on July 24, 2007. Advisory committees provide the FDA with independent advice from outside experts on issues related to human drugs and other regulated areas. Although the committees provide advice to the agency, final decisions are made by the FDA.

**Regulation in the United States**
     **New Drug Application**
          **Fast Track Designation**

**Based upon an agreement reached with the FDA in 2005, the primary endpoint of the Phase 3 registrational trial for accelerated approval by the FDA will be progression-free survival. (emphasis added).**

96.    The statements made in the Company's annual report were false and misleading because Defendants knew the FDA had already rejected PFS as a primary end-point for the study and that interim results were insufficient to support a finding of improved patient overall survival. Thus, Defendants had no reason to expect that Satraplatin would be recommended for approval by the Panel reviewing the Company's NDA on July 24, 2007 or approved by the FDA itself in August, 2007. In other words, Defendants knew their flagship drug would never receive FDA approval, certainly not on an accelerated basis, but they intentionally led the market to believe that the testing and approval procedures were progressing on schedule and as planned.

97.    As the FDA assessment date approached, GPC's stock price remained high, closing at $31.80 on July 19, 2007. This price was inflated by the false and misleading reports Defendants issued to the public indicating that the SPARC trials achieved the goals and endpoints agreed to by the Company and the FDA.

98.    The Individual Defendants took advantage of the elevated stock price in the last days before the July 24, 2007 meeting with the FDA panel, by resuming their insider sales. Anticipating that the NDA would be rejected or at least that a ruling on it would be deferred, Defendants cashed in more than 240,000 shares for proceeds of more than 5 million euros.

99.    Specifically, between May 21, 2007 and July 19, 2007, the Individual Defendants sold the following shares of GPC stock from their personal holdings:

| Name | Date of Transaction | Number of Shares | Avg. Share Price (Euros) | Total Proceeds (Euros) |
|------|---------------------|------------------|--------------------------|------------------------|
| Seizinger | 7/19/2007 | 75,660 | 22.94 | 1,735,640 |
| Scherer | 5/29/2007 | 10,000 | 21.36 | 213,560 |
| | 5/30/2007 | 6,250 | 21.20 | 132,500 |
| | 5/31/2007 | 9,084 | 21.90 | 198,939 |

| | 6/29/2007 | 12,500 | 20.90 | 261,250 |
|---|---|---|---|---|
| | 7/13/2007 | 26,916 | 22.50 | 605,610 |
| | 7/13/2007 | 12,500 | 22.80 | 285,000 |
| Maier | 5/24/2007 | 11,250 | 21.33 | 239,972 |
| | 5/24/2007 | 2,271 | 21.75 | 49,402 |
| | 5/24/25007 | 6,729 | 21.75 | 146,381 |
| | 5/25/2007 | 11,250 | 21.63 | 243,371 |
| | 6/12/2007 | 1,254 | 20.09 | 25,197 |
| | 6/15/2007 | 9,996 | 20.05 | 200,468 |
| | 6/15/2007 | 11,250 | 20.06 | 225,675 |
| Ewert | 5/21/2007 | 6,500 | 20.12 | 130,773 |
| | 5/22/2007 | 6,500 | 20.56 | 133,640 |
| | 5/23/2007 | 6,500 | 21.13 | 137,345 |
| | 5/24/2007 | 1,750 | 21.00 | 36,750 |
| | 6/18/2007 | 5,000 | 20.22 | 101,100 |
| | 6/19/2007 | 5,000 | 19.91 | 99,550 |
| | 6/20/2007 | 2,500 | 19.91 | 49,775 |
| **Totals** | | **240,660** | | **5,251,898** |

100.    Like the previous stock sales by Defendants, these sales were also made pursuant to pre-arranged stock trading plans designed to comply with Rule 10b5-1 of the United States Securities Exchange Act of 1934, German law and GPC's insider trading policy.  And like the previous sales, the Plans pursuant to which the sales were made were created at a time when

Defendants had material inside information related to the position the FDA had already taken with respect to the primary endpoint for the SPARC trial advanced by them in their NDA.

## THE TRUTH EMERGES

101.     The Company's rosy announcements to the public were in sharp contrast to the adverse news that began to be revealed on July 20, 2007.   That day, the Oncological Drugs Advisory Committee ("ODAC") of the FDA issued preliminary comments in advance of the July 24, 2007 meeting with the Company. Among other things, ODAC questioned the measurements in the study that GPC used to determine the drug's effectiveness, including the PFS endpoint. The committee said the FDA had no prior experience with the PFS endpoint, an issue which was "clearly communicated" to Defendants while the drug was in development.   On this news, the stock dropped $10.85 over the next two trading days, closing at $20.95 on July 23, 2007.

102.     On July 24, 2007, GPC's meeting with ODAC was held in Rockville, Maryland. During this meeting, representatives of GPC presented their findings, which supported a showing of efficacy for Satraplatin in progression free survival.   Overall survival statistics were not presented at this hearing, because the required number of deaths (700) has not yet been observed.

103.     Representing ODAC at the hearing was clinical reviewer Martin Cohen, M.D. and Ethan Basch, M.D. from the Office of New Drugs.

104.     The ODAC report, officially dated July 24, 2007, recommended against approving Defendants' application for fast track approval of Satraplatin.   By a 12-0 vote, the panel voted to delay its ruling on the drug until overall survival statistics were available.   In support of its recommendation, the panel raised five major issues:

1)     PFS was defined as a composite endpoint, consisting of radiographic progression, symptomatic progression (pain, analgesics, ECOG performance status, weight loss and other

clinical events related to prostate cancer) and skeletal related events. The Report stated: "The FDA has no prior experience with this endpoint. **This was clearly communicated to the applicant at the development phase."**   [emphasis added].

2)      Radiologists were unable to clearly determine disease progression from GPC's results. The Report stated: "This raises the question whether PFS could be reliably assessed in this clinical trial."

3)      GPC used a methodology to asses pain progression that was unapproved, and due to a high level of toxic reactions, the FDA Panel openly doubted GPC's claim that the study had remained "blinded" throughout.

4)      It wasn't clear whether patient survival would be shown to be improved in patients who were taking newer prostate cancer drugs, and GPC had failed to study this, even though it could have done so; and

5)      The FDA Panel took issue with GPC's claim of improved overall survival from the data it had so far, stating, "[a]n interim analysis of overall survival after 463 deaths does not show that [Satraplatin] is better than placebo."

105.    In reaction to these revelations and ODAC's recommendation not to approve GPC's NDA until more results were known, the Company's stock fell to $13.16, from $31.80 just a few days before.

106.    Industry analysts were highly critical of GPC's behavior. For example, an analyst for Friedman Billings & Ramsey observed that both public investors and the Company's collaborators (such as Spectrum) had been deceived.  An article in *Science Daily* on July 25, 2007 observed:

> GPC had been handling the discussions with the FDA, and it
> appears the clinical trial design and endpoints for the SPARC study
> were never signed off on by the agency even though both investors
> and Spectrum were under the impression they had been.

107.    Forbes.com reported that the meeting between the Company and the FDA had

been a "spectacle":

> There was a spectacle at the event, watched via a Webcast. It
> basically came down to a debate between the company and the
> FDA in which the FDA insisted, fairly strenuously, that it had let
> the biotech know that its measures of disease progression and pain
> were not valid.

108.    Deutsche Bank's Holger Blum, a securities analyst covering the Company, was

also surprised by the findings. In a report dated July 22, 2007, Blum wrote, "[a]ccording to the

company the FDA reviewers agreed in a pre-NDA meeting in June-05 with GPC's proposal to

make PFS the primary endpoint for both FDA and EMEA filings." Three days later, Blum

downgraded the Company's stock after learning that this endpoint was not in fact approved by

the FDA.

109.    In an equity research report issued on July 23, 2007, Societe Generale wrote that

the FDA Panel's report "raised five main issues: 1/ on the definition of the composite PFS

primary endpoint itself, where it appears that the FDA did not fully agree with it from the

beginning – **this is new information.**" [emphasis added].

110.    Credit Suisse expressed the same sentiment. In a report dated July 23, 2007,

Credit Suisse reported, "[i]n conclusion, we are clearly surprised by some of the issues which

suggest that the combination of the clinical trial programme, trial set up, analysis techniques and

data produced so far for Satraplatin may be inadequate for accelerated approval." Credit Suisse

again expressed surprise in a report dated July 25, 2007, regarding news that interim overall

survival statistics showed a sharp downturn from those previously reported: "A major surprise

from the meeting was GPC's admission that the event rate for the ongoing survival portion of the

SPARC trial has decreased considerably...."

111. On July 30, 2007, GPC announced that it had withdrawn its application for

accelerated approval of Satraplatin.

112. On August 2, 2007, an analyst report issued by DZ Bank questioned the veracity

and motivation of GPC's management:

> In hindsight, one wonders why GPC sought an accelerated
> approval using PFS as its end point, when the FDA had already
> told the company during the regulatory process that it had no
> previous experience in this area. In our view, the use of an end
> point not used by the FDA in any approval carries a higher
> development risk and reflects an ambitious development strategy.
> We see three potential reasons for this:
>
> Firstly, an accelerated approval means earlier market entry, which
> in view of the high cash-burn rate, is desirable from a financial
> standpoint.
>
> Secondly, a PFS-based end point – albeit pursued here in
> disagreement with the FDA in detail – is often a less risky end
> point in oncology studies than meeting a survival advantage, which
> has so far only been demonstrated with Taxotere, especially in the
> case of prostate cancer.
>
> Another aspect involves the patent situation. The chemical patent
> for Satraplatin expires in the EU and the US in 2009. If Satraplatin
> fails in the meantime to win approval on the basis of extended
> survival, then it might not be possible to extend the chemical
> patent by five years neither in the US (as per Hatch Waxman) nor
> on the EU (as per Supplementary Protection Certificate – SPC),
> since the product in question must still have patent protection at
> the time of approval for this to happen....

This analyst report also took note of the selling by insiders in advance of the FDA hearing:

> Press reports suggest that progression may not have been part of
> the SPA, that the FDA did not agree to the definition of
> progression end point, and that its acceptance would depend
> among other things on the extent of the efficacy observed. In
> contrast, communications from the company seem to be indicating
> that PFS was the end point for an accelerated approval. **In light of**

> **this, the fact that members of the board sold shares from a
> stock-option program already decided before the ODAC held
> its deliberations makes the situation even more difficult.**
> (emphasis added).

113.    On August 23, 2007, GPS announced a restructuring and reduction in U.S.

staffing of 15% of its workforce. The restructuring also cost the Company's chief medical

officer, Marcel Rozencweig, his role in the development of Satraplatin.

114.    On October 30, 2007, GPC announced that Satraplatin had failed to demonstrate a

statistically significant benefit in overall survival in the SPARC trial.

115.    On December 4, 2007, Defendant Scherer announced his resignation from GPC,

effective immediately.

116.    On February 25, 2008, Defendants Maier and Ewert announced their resignations

from GPC, also effective immediately.

## ADDITIONAL SCIENTER ALLEGATIONS

117.    As alleged herein, Individual Defendants acted with scienter in that they knew

that the public documents and statements issued or disseminated in the name of the Company

were materially false and misleading; knew that such statements or documents would be issued

or disseminated to the investing public; and knowingly and substantially participated or

acquiesced in the issuance or dissemination of such statements or documents as primary

violations of the federal securities laws. As set forth elsewhere herein in detail, Individual

Defendants, by virtue of their receipt of information reflecting the true facts regarding GPC and

its quest for FDA approval of Satraplatin, their control over, and/or receipt and/or modification

of GPC's allegedly materially misleading misstatements and/or their associations with the

Company which made them privy to confidential proprietary information concerning GPC,

participated in the fraudulent scheme alleged herein.

45

118.    The Individual Defendants had the motive and opportunity to engage in the
fraudulent conduct because the Individual Defendants knew from the start of the Class Period
that they had selected an endpoint for the SPARC trial that would not lead to fast track FDA
approval for Satraplatin, but hid that information to allow them to simultaneously raise money
from unsuspecting investors and to sell their personal holdings for huge profits.

## LOSS CAUSATION/ECONOMIC LOSS

119.    During the Class Period, as detailed herein, Defendants engaged in a scheme to
deceive the market and a course of conduct that artificially inflated the price of GPC stock and
operated as a fraud or deceit on Class Period purchasers of GPC stock by concealing the true
facts concerning the SPARC Trial and the FDA's comments about acceptable endpoints. When
Defendants' prior misrepresentations and fraudulent conduct were disclosed and became
apparent to the market, the price of GPC stock fell precipitously as the prior artificial inflation
was released. As a result of their purchases of GPC stock during the Class Period, Plaintiffs and
the other Class members suffered economic loss, i.e., damages under the federal securities laws.

120.    Defendants' false and misleading statements had the intended effect and caused
GPC common stock to trade at artificially inflated levels throughout the Class Period, reaching
prices well over $30 per share.

121.    As a direct result of the announcements in July 2007, the price of GPC stock fell
precipitously. These stock price drops removed the inflation from the price of GPC stock causing
real economic loss to investors who had purchased the Company's common stock during the
Class Period.

122.    The over 50% decline in the price of GPC common stock after these disclosures
and partial disclosures came to light was a direct and foreseeable result of the nature and extent

46

of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of GPC's stock price decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.

123.    Plaintiffs and the other Class members sustained losses as a direct result of Defendants' fraudulent scheme to artificially inflate the prices of GPC's equities and the subsequent significant decline in the value of GPC's equities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

124.    The market for GPC's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, GPC's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired GPC securities relying upon the integrity of the market price of GPC's securities and market information relating to GPC, and have been damaged thereby.

125.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of GPC's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

126.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the

damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about GPC's business, prospects and operations. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of GPC and its business, prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

127.    At all relevant times, the market for GPC's securities was an efficient market for the following reasons, among others:

(a)    GPC's securities met the requirements for listing, and were listed and actively traded on the NASDAQ Global Market and the Frankfurt Stock Exchange, highly efficient markets;

(b)    As a regulated issuer, GPC filed periodic public reports with the SEC, including annual reports on Form 20-F; and

(c)    GPC regularly communicated with public investors by established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services. GPC was also a frequent presenter at conferences attended and monitored by stock analysts in the United States and in Europe. GPC's website lists no fewer than 21 investment analysts who follow the Company, all of whom are with respected and influential firms.

128.    As a result of the foregoing, the market for GPC's securities promptly digested current information regarding GPC from all publicly available sources and reflected such information in GPC's stock price. Under these circumstances, all purchasers of GPC's securities during the Class Period suffered similar injury through their purchase of GPC's securities at artificially inflated prices and a presumption of reliance applies.

## ADDITIONAL ALLEGATIONS REGARDING SUBJECT MATTER JURISDICTION

129.    Defendants made materially false and misleading statements in the United States through filings with the SEC, as well as in press releases disseminated in the United States. These SEC filings and press releases affected both the price of GPC's shares traded in the United States and the price of GPC's common stock traded in Germany.  The price of GPC's shares trading in the U.S. on NASDAQ and the common stock listed on the Frankfurt Stock Exchange in Germany traded in tandem, so that conduct affecting price on one exchange affected the price on the other exchange.  GPC's operations were conducted both in Germany and at its wholly-owned subsidiary, GPC Biotech, Inc., located at 101 College Road East, Princeton, New Jersey.

130.    Defendants' actions and conduct in connection with GPC's submission of an application with the FDA to market Satraplatin in the United States, and disclosures in connection therewith, played a substantial role in Plaintiffs' decision to purchase shares of GPC securities.  During the Class period, GPC promoted Satraplatin and GPC shares heavily in the United States and made false statements in the United States regarding Satraplatin's clinical prospects.  These included:

(a)    A December 5, 2005 announcement regarding Satraplatin which was published over the U.S.-based MarketWire news service, listing U.S.-based financial relations

representatives Laurie Doyle and Matt Haines as persons from whom investors could get more information regarding GPC and Satraplatin;

(b)    A December 9, 2005 announcement over MarketWire regarding the Phase II Satraplatin trial specifically stated that it was issued from Waltham, Massachusetts (where GPC had an additional research facility) and Princeton, New Jersey. It reports that the study "is an open label study being led by investigators at the Sarah Cannon Research Institute (SCRI) in *Nashville, Tennessee*." Once again, GPC listed two U.S.-based investor relations contacts;

(c)    A similar announcement to those above, emanating from the U.S. and listing U.S. contacts was issued on December 12, 2005;

(d)    An announcement was issued from the U.S. on December 20, 2005 that another company would have primary overseas rights to Satraplatin while GPC "retains rights to the North American market and all other territories." This indicates the Satraplatin's primary focus so far as GPC was concerned was the U.S. market. The company with whom GPC shared marketing rights was Pharmion Corp., located in *Boulder, Colorado.*

(e)    On December 30, 2005, Medicine and Law Weekly reported that GPC "announced the presentation of new preclinical data on its lead drug candidate satraplatin at the American Association for Cancer Research-U.S. National Cancer Institute-European Organization for Research and Treatment of Cancer International Conference on Molecular Targets and Cancer Therapeutics: Discovery, Biology, and Clinical Applications *in Philadelphia, Pennsylvania*."

(f)    On February 7, 2006, GPC announced that it "will give a corporate presentation and participate in a focus panel session at the upcoming Eighth Annual BIO CEO & Investor Conference *in New York, NY*."

(g)     On February 27, 2006, GPC announced the presentation of new clinical and preclinical data on its lead drug candidate satraplatin at the ASCO Prostate Cancer Symposium: A Multidisciplinary Approach in *San Francisco, California.*

(h)     On February 28, 2006, GPC announced that it would discuss Satraplatin "at the upcoming Cowen & Co. 26th Annual Health Care Conference *in Boston, MA* as well as at the Ninth Annual Lehman Brothers Global Healthcare Conference in *Miami, FL.* "

(i)     On or before March 2, 2006, it was announced that GPC would discuss Satraplatin at a luncheon that day arranged by Lehman Brothers *in New York, NY.*

(j)     On March 8, 2006, GPC executives made a presentation at the Lehman Global Healthcare Conference in *New York, NY.*

(k)     On April 3, 2006, GPC issued a press release from the U.S. stating that it "today announced the presentation of new pre-clinical data on its lead drug candidate satraplatin at the 97th Annual Meeting of the American Association for Cancer Research (AACR) *in Washington, DC.* "

(l)     On April 19, 2006, GPC announced that "it has created three new senior positions, hiring three executives to expand its drug development and commercialization management teams... All three individuals are based at the Company's *Princeton, New Jersey site.* "

(m)     On May 16, 2006, GPC announced a new Phase I drug combination study involving Satraplatin: "The Phase 1 study is an open label study being conducted at Northwestern University Medical Center *in Chicago.* "

(n)     On June 2, 2006, GPC announced that "the Company will give a corporate presentation at three upcoming conferences in the U.S. - the Pacific Growth Equities Life

Sciences Growth Conference *in San Francisco, CA*; the Goldman Sachs 27th Annual Global Healthcare Conference *in Dana Point, CA*; and the Fifth Annual Needham & Company Biotechnology and Medical Technology Conference in *New York, NY.* "

(o)    On June 8, 2006, GPC and Pharmion of *Boulder, Colorado* issued a joint announcement emanating from Germany and from the U.S. touting the progress of Satraplatin.

(p)    On June 15, 2006, GPC made a presentation regarding Satraplatin at the Needham 5th Annual BioTechnology & Medical Technology Conference i*n New York, NY.*

(q)    On July 12, 2006, GPC announced that it "has submitted the non-clinical section of the rolling submission of a New Drug Application (NDA) to the U.*S. Food and Drug Administration (FDA)* for Satraplatin in combination with prednisone as a second-line chemotherapy treatment for patients with hormone-refractory prostate cancer (HRPC)."

(r)    On September 24, 2006, GPC announced that it " intends to move forward with the *U.S. Food and Drug Administration* (FDA) with the goal of completing the submission of the rolling New Drug Application (NDA) by the end of 2006 for approval to market satraplatin. "

(s)    On September 25, 2006, GPC announced that it would present data at a UBS Life Science conference the followimg day *in New York, NY.* On that same day, GPC and Pharmion issued a joint press release emanating primarily from the U.S. touting Satraplatin's progress.

(t)    On October 12, 2006, GPC announced that "the Company will present at the BIO Investor Forum in *San Francisco, CA*" on October 19, 2006.

(u)    On October 30, 2006, GPC stated that it would make a presentation on Satraplatin at the upcoming Rodman & Renshaw conference *in New York, NY.*

(v)     On November 22, 2006, GPC announced that it would present at the Piper

Jaffray November 29, 2006 conference in *New York, NY.*

(w)     On December 13, 2006, GPC issued an update on its co-development and

licensing agreement with Spectrum Pharmaceuticals, Inc. *of Irvine, California*, and stated that

disputes that had arisen had led to an arbitration proceeding before the *American Arbitration*

*Association.*

(x)     On February 5, 2007, GPC announced that it will "give a corporate

presentation at the 9th Annual BIO CEO & Investor Conference *in New York, NY.*"

(y)     On February 16, 2007, GPC announced that it had completed the NDA

rolling submission to the *U.S. FDA* and would "work closely with the FDA during the review

process to move the application forward as expeditiously as possible. We believe that, if

approved, satraplatin has the potential to become an important new treatment option for

advanced prostate cancer patients who today have very little hope. *We are currently building*

*our commercial infrastructure in the U.S. to prepare for the potential launch of satraplatin* so

that it will be available for these patients as quickly as possible."

(z)     On February 21, 2007 GPC announced that "the Company has launched

the Satraplatin Expanded Rapid Access protocol (SPERA) in *the U.S.*

(aa)    On March 16, 2007 GPC announced that "the Company will give a

corporate presentation at the upcoming Lehman Brothers Tenth Annual Global Healthcare

Conference *in Florida.* "

(bb)    On May 3, 2007, GPC announced the consolidation of certain drug

discovery efforts and noted that GPC would "continue to have a strong and growing presence *in*

*the U.S. at our Princeton, New Jersey site,* where we have an ongoing effort to expand our

clinical development team and build our commercialization organization, including *hiring a field sales force for the U.S."*

        (cc)    On May 9, 2007, GPC said it would present at the Citigroup Healthcare Conference *in New York, NY.*

        (dd)    On May 21, 2007 GPC and Pharmion announced that "data are being presented today at the Annual Meeting of the American Urological Association (AUA) *in Anaheim, California.* "

        (ee)    On May 29, 2007 GPC "announced that the Company will host an investor event on Monday, June 4, 2007, 6:00-7:30 pm Central Time (June 5, 2007 at 1 am CEST) during the ASCO Conference in Chicago, IL. "

        (ff)    On June 4, 2007 GPC touted staraplatin at the Annual Meeting of the American Society for Clinical Oncology (ASCO) in Chicago.

        (gg)    On June 8, 2007, GOPC announced that later in June it would give a corporate presentation at the upcoming Goldman Sachs 28th Annual Global Healthcare Conference in *Dana Point, California* and at the Needham 6th Annual Biotechnology & Medical Technology Conference in *New York, NY.*

## COUNT I

### For Violations of Sections 10(b) of
### The Exchange Act And Rule 10b-5 Against the 10(b) Individual Defendants

131.    Plaintiffs repeat and reallege paragraphs 1 through 130 as if set forth fully herein.

132.    In connection with the sale of GPC securities throughout the Class Period, the 10(b) Individual Defendants participated, directly or by acquiescence, despite a duty to act, in the preparation and/or issuance of materially false and misleading statements and omissions.

133.    The 10(b) Individual Defendants knew, or were reckless in not knowing, that the statements contained in GPC's public filings and press releases were materially false and misleading. Plaintiffs and the Class relied, directly or indirectly by reliance on the integrity of the market, on Defendants' misstatements and/or omissions and were damaged as a result. But for the 10(b) Individual Defendants' misrepresentations and/or omissions, Plaintiffs and the Class would not have purchased GPC securities or would have purchased them at non-artificially inflated prices.

## COUNT II

### For Violation Of Section 20(a) Of The Exchange Act
### (Against the Individual Defendants, as defined below)

134.    Plaintiffs repeat and reallege each of the preceding paragraphs 1 through 133 as if fully set forth herein.

135.    This claim is brought against the Individual Defendants.

136.    The Individual Defendants were control persons within the meaning of the Exchange Act.

137.    As set forth above, these Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5, and/or Section 20(A) by their acts and omissions as alleged in this complaint. By virtue of their positions as officers of the Company and as control persons, the Section 20(a) Defendants, each of whom violated Section 10(b) and Rule 10b-5 and/or Section 20(A), are liable pursuant to Section 20(a) of the Exchange Act.

138.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### For Violations of Section 20A of the Exchange Act
### (Against the Individual Defendants)

139.    Plaintiffs repeat and reallege each of the preceding paragraphs 1 through 138 as if fully set forth herein.

140.    This Count is asserted against each of the Individual Defendants for their violations of Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of Plaintiffs and all other members of the Class who purchased GPC securities contemporaneously with the Individual Defendants' improper insider sales during the Class Period.

141.    The Individual Defendants, by virtue of their positions with GPC, as well as their role in the alleged fraud, had access to, and were in possession of, material non-public information about GPC and the prospects (or lack there of) for the successful approval and marketing of its lead drug, Satraplatin, at the time they reaped millions of dollars in proceeds from sales of GPC securities.

142.    As set forth above, the Individual Defendants sold a substantial number of shares of GPC securities during the Class Period.  The Individual Defendants sold millions of shares of GPC securities (for aggregate proceeds of more than 26 million Euros) in trades during the Class Period.

143.    These sales were made while the Individual Defendants were in the possession of material, adverse non-public information regarding GPC and the efficacy of Satraplatin, what the FDA said with regard to the unacceptability of "progression-free survival" as a primary endpoint for the SPARC study, and this conduct violated Sections 10(b) and 20A of the Exchange Act.

144.    As set forth in the attached certifications, Lead Plaintiff purchased GPC securities on June 11 and July 23, 2007, and Plaintiff Chua purchased GPC securities on June 12, 2007,

which purchases were made "contemporaneously" with sales of GPC securities by the Individual

Defendants on at least the following dates: June 12, 2007, June 15, 2007, June 18, 2007, June 19,

2007 and July 19, 2007.

145.    Numerous other Class members also purchased GPC common stock
contemporaneously with the Individual Defendants Class Period sales, as set forth in paragraphs
65, 79 and 99 above.

146.    As a result, under Section 20A of the Exchange Act, the Individual Defendants
are liable to Plaintiffs and the Class for all profits gained and losses avoided as a result of these
transactions.

## NO SAFE HARBOR

147.    The statutory safe harbor provided for forward-looking statements under certain
circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.
The statements alleged to be false and misleading herein all relate to then-existing facts and
conditions. In addition, to the extent certain of the statements alleged to be false may be
characterized as forward looking, they were not identified as "forward-looking statements" when
made, there was no statement made with respect to any of those representations forming the basis
of this Complaint that actual results "could differ materially from those projected," and there
were no meaningful cautionary statements identifying important factors that could cause actual
results to differ materially from those in the purportedly forward-looking statements. In the
alternative, to the extent that the statutory safe harbor is intended to apply to any forward-looking
statements pleaded herein, Defendants are liable for those false forward-looking statements
because at the time each of those forward-looking statements was made, the speaker had actual
knowledge that the forward-looking statement was materially false or misleading, and/or the

forward-looking statement was authorized or approved by an executive officer of GPC who knew that the statement was false when made.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of itself and all other Class members, prays for judgment as follows:

A.    A determination that this action is a proper class action and a certification of the Class under Rule 23 of the Federal Rules of Civil Procedure;

B.    An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants for damages sustained as a result of Defendants' wrongdoing, including interest thereon;

C.    An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees, expert fees and other disbursements; and

D.    A grant of such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiffs demand a trial by jury.

Dated:    March 12, 2008

LABATON SUCHAROW LLP

By: _____
       Joel H. Bernstein, Esq. (JB-0763)
       Michael W. Stocker, Esq.
       140 Broadway
       New York, New York 10005
       Tel:    (212) 907-0700
       Fax:    (212) 818-0477

*Counsel for Lead Plaintiff Axxion*

Nancy Kaboolian, Esq. (NK-6346)
Richard B. Margolies, Esq. (RM-9311)
ABBEY SPANIER RODD
      & ABRAMS, LLP
212 East 39th Street
New York, NY  10016
Tel.:    212-889-3700
Fax:    212-684-5191

*Counsel for Plaintiff Agamemnon Chua*

# Exhibit A

## CERTIFICATION

I, Roman Mertes as Managing Director of Axxion S.A. Luxemburg, a Luxemburg investment firm ("Axxion"), hereby certify as follows:

1.    Axxion and I are fully authorized to enter into and execute this Certification. I have reviewed a complaint prepared against GPC Biotech AG ("GPC") alleging violations of the federal securities laws;

2.    Axxion did not purchase securities of GPC at the direction of counsel or in order to participate in any private action under the federal securities laws;

3.    Axxion is willing to serve as a lead plaintiff in this matter, including providing testimony at deposition and trial, if necessary;

4.    Axxion has transactions in the securities of GPC as reflected in Exhibit A, are attached hereto;

5.    Axxion has not sought to serve as a lead plaintiff in a class action under the federal securities laws during the last three years.

6.    Beyond the pro rata share of any recovery, Axxion and I will not accept payment for serving as a lead plaintiff on behalf of the class, except the reimbursement of such reasonable costs and expenses (including lost wages) as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 24th day of September, 2007.

_Roman Mertes, Managing Director of Axxion S.A. Luxemburg_

## EXHIBIT A

## TRANSACTIONS IN
## GPC BIOTECH AG

### AKROBAT FUND -VALUE

| Transaction Type | Trade Date | Share | Price Per Share (EUR) | Cost/Proceeds (EUR) | Price Per Share (USD) | Cost/Proceeds (USD) |
|---|---|---|---|---|---|---|
| Purchase | 3/6/07 | 52,000 | € 18.9736 | -€ 988,157.14 | $24.9085 | -$1,295.244.19 |
| Purchase | 5/11/07 | 10,000 | € 20.7650 | -€ 207,700.00 | $28.0826 | -$280,825.86 |
| Purchase | 5/11/07 | 40,000 | € 21.0100 | -€ 841,450.00 | $28.4139 | -$1,136,556.96 |
| Purchase | 6/11/07 | 12,550 | € 19.1500 | -€ 240,743.00 | $25.5825 | -$321,060.19 |
| Purchase | 7/23/07 | 35,450 | € 19.0000 | -€ 674,610.33 | $26.2333 | -$929,970.49 |
| Sale | 8/2/07 | 75,000 | € 10.7250 | € 803,118.44 | $14.6975 | $1,102,315.50 |
| Sale | 8/22/07 | 3,100 | € 11.3500 | € 35,082.22 | $15.3713 | $47,651.05 |
| Sale | 9/7/07 | 25,900 | € 11.3124 | € 292,501.67 | $15.5760 | $403,419.53 |

**Exhibit B**

08/15/2007  13:53   6786573274          ACCENTURE ATLANTA               PAGE  01
                                                                              A . CHUA

## CERTIFICATION OF LEAD PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I AGAMEMNON   CHUA, declare as follows:

1.  I have reviewed a copy of the complaint filed in this action.

2.  I did not purchase the security that is the subject of this action [GPC Biotech AG  (GPCB)] at the direction of counsel, Abbey Spanier Rodd & Abrams, LLP, or in order to participate in any private action arising under the Private Securities Litigation Reform Act (the "PSLRA").

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

| Security (Common Stock, Call, Put, Bonds) | Transaction (Purchase/Sale) | Quantity | Trade Date | Price Per Share/ Security |
|---|---|---|---|---|
| Common stock | Purchase | 200 | 6/12/07 | $26.57 |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

*List additional transactions on a separate sheet of paper, if necessary.  If the securities were purchased by joint owners, please provide the above information for the co-owner.

5.  I have not served as or sought to serve as a representative party on behalf of a class during the last three years, except as stated herein:

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court or any award to me by the Court of reasonable costs and expenses (including lost wages) directly relating to my representation of the class.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:   8/15/07                    Signed: _____

Print Name: AGAMEMNON   CHUA

08/15/2007  13:53    6786573274                     ACCENTURE ATLANTA                    PAGE  02
                                                                                                    A. CHUA

Address, City, State, Zip Code: 4810-101 Ivy Ridge Drive, Smyrna GA 30080

Telephone No.: 404.918.4424

Business Telephone No. (if applicable):

Telecopier No. (if applicable):

E-mail address (if applicable): agachua@gmail.com

If the securities were purchased by joint owners, please provide the above information for the co-owner.

2