# EXHIBIT 2

# GPC BIOTECH AG (GPCB)

FRAUNHOFERSTRABE 20
82152 MUNCHEN
GERMANY, J0 00000

http://www.gpc-biotech.com

# 20-F

**ANNUAL REPORT FOR THE FISCAL YEAR ENDED DECEMBER 31, 2006**
Filed on 06/21/2007 – Period: 12/31/2006
File Number 000-50825



www.gsionline.com

**Table of Contents**

and its development for other tumor types depends partially on Pharmion's efforts, over which we have limited control. If Pharmion is not successful or does not adequately fulfill its obligations, our business may be adversely affected.

**The primary patents covering satraplatin in the United States will expire in 2008 and 2010, and in 2009 in most other countries. If we and the owner of the patent are unable to extend the protection of these patents beyond such dates, we may be subject to competition from third parties with products with the same active pharmaceutical ingredients as satraplatin.**

Even if our product candidates and technologies are covered by valid and enforceable patents, the patents will provide protection only for a limited amount of time. For example, the primary patents covering the active pharmaceutical ingredient and anticancer use of satraplatin will expire in 2008 and 2010 in the United States, respectively, and in 2009 in most other countries. Thereafter, we will have no direct means to prevent third parties from making, selling, using or importing satraplatin in the United States, Europe or Japan. Instead, we and Johnson Matthey Plc. as the owner of the primary patents, expect to rely upon the U.S. Drug Price Competition and Patent Term Restoration Act of 1984, commonly known as the Hatch-Waxman Act, and comparable foreign legislation, to seek additional product exclusivity for satraplatin. While we believe that satraplatin will meet the Hatch-Waxman criteria for patent extension, delays in obtaining regulatory approval may jeopardize our ability to obtain a timely patent extension or a patent extension may ultimately not be granted. The terms of the Hatch-Waxman Act, or similar foreign statutes, could be amended to our disadvantage. If we do not qualify or timely apply for such patent extension for satraplatin, the competition we will face upon expiration of the primary patents would increase significantly, reducing our potential revenues and harming our ability to achieve profitability.

In addition, we have to rely on the owner of the patent to make the formal applications for the extension covering satraplatin. Whereas they are under an obligation to maximize patent protection for satraplatin and we will provide any support needed for the application, our possibilities to enforce timely and appropriate actions by the owner of the patent are limited.

Under the provisions of applicable law, including the Hatch-Waxman Act, we and/or the owner of the patent may also have to defend one or more of our patents, if challenged. Although we are currently not involved in any litigation concerning our intellectual property related to satraplatin and we are not currently aware of any threats or challenges with respect to our product candidates, the risk of a challenge increases as our product candidates progress toward commercialization. Information about the patents covering drug products in the United States is published by the FDA in a publicly available database, Approved Drug Products with Therapeutic Equivalence Evaluations, also known as the Orange Book. A competitor (usually a generic drug company) seeking to market a proposed competing or generic version of our drug products in the United States may notify us and/or the owner of the patent that its competing drug product would not infringe one or more patents listed in the Orange Book covering our product, or may challenge the validity or enforceability of one or more of our listed patents covering our product. Once so notified, the owner of the patent has 45 days in which to file a lawsuit claiming patent infringement based on the competitor's assertion about the characteristics of its proposed product. If a lawsuit is filed within 45 days, the FDA is required to delay, or stay, final approval of the competing product for up to thirty months. If a court determines that the patent would be infringed by the product proposed in the competitor's drug application, the FDA will not approve the application until the patent expires. If, however, the court decides that the patent would not be infringed, is invalid or is unenforceable, the FDA may approve the competitor's drug application when that decision occurs. The FDA may approve the application at the thirty-month date, even if the litigation is ongoing. If litigation is pending and the FDA approves the application at the end of the thirty-month period, the competitor may launch a competing product. Under the provisions of the Medicare Prescription Drug Improvement and Modernization Act of 2003, we are limited to only a single thirty-month stay per competing or generic drug application.

8

**Table of Contents**

effective classes of anticancer therapies and are used to treat a wide range of cancers. All currently marketed platinum-based drugs are administered intravenously; satraplatin is given in capsules that patients can take at home. The SPARC trial is evaluating satraplatin plus prednisone versus placebo plus prednisone in 950 patients with hormone-refractory prostate cancer whose prior chemotherapy has failed. In September 2006 we announced positive topline results from the SPARC trial and data from the trial on progression-free survival and on safety have been presented at recent medical conferences. In accordance with the recommendation of the Independent DMB for the SPARC trial, patients who have not progressed continue to be treated and all patients will be followed for overall survival.

On April 16, 2007, the FDA accepted for filing our NDA for satraplatin submitted on February 15, 2007 for patients with HRPC whose prior chemotherapy has failed. The FDA has also granted the NDA priority review status. Priority review designation is intended for those products that address significant unmet medical needs and sets the target date for FDA action at six months from the date of submission. The FDA informed us that the application will be reviewed under the provisions of 21 CFR 314 Subpart H, for accelerated approval. The FDA has also informed is that the NDA will be reviewed by ODAC on July 24, 2007. Advisory committees provide the FDA with independent advice from outside experts on issues related to human drugs and other regulated areas. Although the committees provide advice to the agency, final decisions are made by the FDA. For Europe, our partner Pharmion has announced that they expect to submit the MAA for satraplatin in the second quarter of 2007.

Based on clinical data from the SPARC trial and earlier clinical trials, we believe that satraplatin may have application in a number of cancers. Additional clinical trials exploring satraplatin in various tumor types and as a combination therapy with other cancer treatments are underway or planned.

We also launched the Satraplatin Expanded Rapid Access protocol, or SPERA, in the U.S. in February 2007. Expanded access programs are intended to give patients access to investigational drugs to treat serious or life-threatening diseases or conditions for which there are no adequate therapies available. Under the SPERA protocol, satraplatin will be provided to hormone-refractory prostate cancer patients whose prior chemotherapy has failed free of charge until satraplatin is cleared for marketing in the U.S.

In December 2005, we signed a major co-development and license agreement with Pharmion for satraplatin. Under this collaboration, Pharmion gained exclusive commercialization rights to satraplatin for Europe, the Middle East, including Turkey, Australia and New Zealand. We retain our current rights to the U.S., as well as other key non-European markets, including Japan.

Our second most advanced product candidate is 1D09C3, a monoclonal antibody that is in Phase 1 clinical testing and is intended for the treatment of selected leukemias and lymphomas, including non-Hodgkin's lymphoma. A monoclonal antibody is an immune system related protein that binds preferentially to one type of foreign substance, potentially stimulating a biological response. We initiated clinical testing for 1D09C3 early in 2005. The aim of this program is to assess the safety of this drug and to recommend a dose for Phase 2 clinical trials. Furthermore, we have several distinct research programs to discover and develop new anticancer drug candidates, with a focus on kinase inhibitors.

In past years, we have funded our operations primarily through the issuance of equity securities, payments received under our agreements with other pharmaceutical companies, interest earned on investments and other sources of funding. We expect to continue to fund our operations over the next several years primarily through our cash, cash equivalents, marketable securities and short-term investments on hand, interest earned on our investments as well as potential product sales

**Table of Contents**

the design and conduct of the trial remained sound. In addition, the DMB determined that the SPARC trial had also passed the pre-defined futility analysis. Subsequent to this meeting, the DMB notified us that that it wished to conduct an expedited interim analysis of overall survival data from the SPARC trial, and we agreed to this request. This interim analysis of overall survival was conducted in June 2006. Following its meeting, the DMB recommended the trial continue as planned, per protocol and without changes. No safety concerns were raised by the DMB.

In September 2006, we announced positive topline results for the SPARC trial. Data from the SPARC trial was presented during the first half of 2007 at several major medical meetings. The study data show that satraplatin significantly reduces the risk of disease progression in these patients using the protocol-specified log-rank test. The hazard ratio of 0.6 (95% CI: 0.5-0.7, p<0.00001), which was first reported in September 2006, adjusted for nine pre-specified prognostic factors. Using a more conservative analysis, which adjusted only for the three pre-specified stratification factors, the hazard ratio is 0.67 (95% CI: 0.57-0.77, p=0.0000003). These hazard ratio numbers correspond to a reduction in relative risk of disease progression of 40% and 33%, respectively. All disease progression events were assessed by an independent expert review committee of medical oncologists and radiologists. Progression-free survival at the median (50th percentile) demonstrated a 14% improvement in patients who received satraplatin plus prednisone (11.1 weeks) compared to patients who received prednisone plus placebo (9.7 weeks). The improvement seen in PFS by patients treated with satraplatin increased over time. PFS at the 75th percentile showed an 81% improvement for patients in the satraplatin arm (34.6 weeks) versus patients in the placebo arm (19.1 weeks). At six months, 30% of patients in the satraplatin arm had not progressed, compared to 17% of patients in the control arm. At twelve months, 16% of patients who received satraplatin had not progressed, compared to 7% of patients in the control arm.

Disease progression in the SPARC trial was defined as the first occurrence of any of several types of progression, including radiologic tumor progression (RECIST for soft tissue lesions or two or more new lesions on a bone scan); skeletal-related events (including a bone fracture, bone surgery or initiation of bisphosphonates); symptomatic progression (pain, weight loss, worsening of performance status); or death from any cause. Approximately 37% of patients in the trial progressed by pain and approximately 36% progressed on radiologic evidence. The hazard ratio for PFS for the subset of patients with pain progression or death was 0.64 (95% CI: 0.51-0.79, p=0.0001), representing a 36% reduction in the relative risk of progression. The hazard ratio for PFS for the subset of patients with radiologic progression or death was 0.64 (95% CI: 0.51-0.81, p=0.0001), representing a 36% reduction in the relative risk of progression. The hazard ratio for PFS for the subset of patients who progressed in ways other than radiologic or pain progression was 0.86 (95% CI: 0.63-1.17, p > 0.05). The improvement in PFS in the satraplatin arm was not affected by the type of prior chemotherapy; importantly, the improvement was similar for patients who had received prior Taxotere, as well as those who received other types of chemotherapy treatments. Fifty-one % of patients in the trial were previously treated with Taxotere. The hazard ratio for PFS for patients in the SPARC trial who were previously treated with Taxotere was 0.67 (95% CI: 0.54-0.83; p=0.0006) and therefore numerically equivalent to the entire study population. The relative risk of disease progression favored satraplatin for all pre-specified patient subsets, including prior Taxotere use, geographies, and the presence or absence of pain. For each of the 20 subsets that have been presented, the reduction in relative risk of disease progression ranged from 26% to 46%, corresponding to hazard ratios between 0.74 and 0.54.

Data have also been presented related to pain. Patients with metastatic hormone-refractory prostate cancer frequently suffer from substantial pain associated with bone metastases. Data from the SPARC trial showed that the median time to pain progression was 66.1 weeks for the satraplatin arm compared with 22.3 weeks for the placebo arm. The hazard ratio was 0.64 (95% CI: 0.51-0.79, p<0.001), which translates into a 36% reduction in the relative risk of pain progression. These results were consistent across multiple pre-defined subsets of patients, including patients treated with prior

32

**Table of Contents**

Taxotere. All pain progression events were assigned by a blinded independent review committee. Complementing the time to pain progression data, pain response rates were 24.2 % for the satraplatin plus prednisone arm (N=351) compared with 13.8 % for the placebo arm (N=181) (p=0.005). Pain response rates for patients treated with prior Taxotere were 25.7 % for the satraplatin arm compared with 13.1 % for control (p<0.015). Pain response was assessed by patients using a weekly present pain intensity (PPI) and analgesic score. The PPI score was defined according to the McGill-Melzack questionnaire with 0 = no pain, 1 = mild pain, 2 = discomforting pain, 3 = distressing pain, 4 = horrible pain and 5 = excruciating pain. The criteria for pain response are a greater than or equal to 2 point reduction in the patient's weekly PPI score from baseline and maintenance of the two point reduction for at least five consecutive weeks in the setting of a stable or decreasing weekly analgesic score compared to baseline. Patients were evaluable for pain response if their baseline PPI score was greater than or equal to one and had completed four consecutive weekly assessments of PPI and analgesic scores during the study treatment.

Data from the SPARC trial also showed that the prostate specific antigen, or PSA, response rate for patients treated with satraplatin was significantly improved compared to the PSA response rate for those patients in the placebo arm. PSA response rates were 25.4 % for the satraplatin plus prednisone arm compared with 12.4 % for the placebo arm (p<0.001). PSA response was analyzed using the widely adopted Bubley criteria of a decrease of PSA level by greater than or equal to 50 % from baseline, with confirmation at least four weeks later. The median number of cycles of treatment that patients received while on study was four for the satraplatin group compared to two for the control group. Nearly 40% of patients treated with satraplatin received five or more cycles of treatment compared to approximately 20% of patients in the control arm. In accordance with the recommendation of the independent DMB for the SPARC trial, patients who have not progressed continue to be treated and all patients will be followed for overall survival. The interim analysis for overall survival conducted in June 2006 showed a trend, although not statistically significant, in favor of the satraplatin arm.

Safety findings in the SPARC trial were consistent with previous clinical studies involving satraplatin. Myelosuppression (decrease in the production of blood cells by the bone marrow) was the most common adverse reaction associated with satraplatin therapy. Twenty-one % of patients in the satraplatin arm experienced grade 3 or 4 thrombocytopenia; 14% had grade 3 or 4 leucopenia and 21% had grade 3 or 4 neutropenia. Gastrointestinal disorders were the most frequent non-hematological adverse events (occurring in 57.9% of the patients receiving satraplatin). Eight % of patients in the satraplatin arm experienced grade 3 or 4 gastrointestinal toxicities, including nausea (1.3%), vomiting (1.6%), diarrhea (2.1%) and constipation (2.1%). Additionally, 5% or less of patients in the satraplatin arm experienced grade 3 or 4 fatigue (1.7%), grade 3 or 4 infections (4.0%) and pulmonary/respiratory grade 3 or 4 toxicities (3.0%).

The FDA confirmed its agreement with us that successful completion of the SPARC trial will form the primary basis for an efficacy claim for our NDA for satraplatin. This agreement becomes part of the administrative record and may only be changed by mutual agreement of the parties or if the FDA identifies a substantial scientific issue relevant to safety or efficacy after the trial has begun. The FDA has also granted fast track designation to satraplatin as a second-line chemotherapy treatment for patients with HRPC. The FDA's fast track program is intended to facilitate the development and expedite the review of drugs that treat serious or life-threatening conditions and that demonstrate the potential to address unmet medical needs. The fast track designation enabled us to file sections of the NDA on a rolling submission basis, submitting sections as they became available.

*Status of Regulatory Review.*   We completed the rolling submission of the NDA for satraplatin on February 15, 2007. In April 2007, the FDA accepted for filing our NDA for satraplatin for patients with HRPC whose prior chemotherapy has failed. The FDA has also granted the NDA priority review status. Priority review designation is intended for those products that address significant unmet medical needs and sets the target date for FDA action at six months from the date of submission. The

33

Table of Contents

FDA also informed us that the application will be reviewed under the provisions of 21 CFR 314 Subpart H, for accelerated approval. In addition, we were informed by the FDA that the NDA will be reviewed by ODAC on July 24, 2007. Advisory committees provide the FDA with independent advice from outside experts on issues related to human drugs and other regulated areas. Although the committees provide advice to the agency, final decisions are made by the FDA.

We also received a Scientific Advice Letter from the EMEA in 2004 relating to our Phase 3 clinical trial. Although the Scientific Advice Letter was not required for the initiation of a Phase 3 clinical trial in Europe, it was helpful because it allowed the EMEA to comment on our overall registrational approach before implementation. Our partner Pharmion now has primary responsibility for regulatory activities and filings for Europe and disclosed that it was advised by the EMEA in early 2006 that the EMEA would accept the final analysis of PFS as a basis for an MAA submission for satraplatin, but that the submission must also include available overall survival data from the SPARC trial.

*Other Current Clinical Trials.* In addition to SPARC, we have a number of trials underway, evaluating satraplatin in combination with other anticancer treatments and in other cancer types beyond prostate cancer. Earlier clinical studies indicate that satraplatin has activity in several cancer types, and pre-clinical data support the combination of satraplatin with various other cancer therapies. Marketed platinum compounds are frequently combined with other established chemotherapies such as taxanes (e.g. Taxol and Taxotere), as well as with newer targeted therapies, to treat a wide variety of cancer types. During 2006, we initiated several new trials with satraplatin and a number of studies are now underway with this compound. We are focused on finding areas of development for satraplatin where its unique profile of activity and the added convenience and flexibility of oral administration may offer an improved treatment option and not simply replace another platinum compound. For example, since satraplatin is an oral compound that is given as capsules that patients can take at home, we are exploring combinations with other oral anticancer therapies. In 2006, two Phase 1 trials were opened evaluating satraplatin in combination with Xeloda in advanced solid tumors. Xeloda is an oral form of 5FU (5-Fluorouracil), a marketed chemotherapy treatment that is used to treat various cancers, including metastatic breast and colorectal cancers. We also opened a Phase 1/2 study evaluating satraplatin plus Xeloda in combination with radiation therapy in rectal cancer. Also in 2006, we initiated a Phase 2 study evaluating satraplatin in combination with another oral anticancer drug, Tarceva. The trial is evaluating this combination in elderly patients with advanced NSCLC.

Lung cancer is the most common cause of cancer death in the U.S. and Europe. More than 213,000 new cases are estimated for 2007 and over 160,000 are expected to die in the U.S. alone. Recent statistics in Europe estimated more than 375,000 cases annually and more than 345,000 deaths from the disease. Non-small cell lung cancer accounts for more than 80% of all lung cancer cases, and more than 50% of patients present with inoperable disease. Patients with localized disease are generally treated with surgery alone. Increasingly, though, patients are also being treated with chemotherapy after surgery. The standard of care for locally advanced, inoperable disease is a combination of chemotherapy and radiation therapy. The standard of care for advanced metastatic disease is chemotherapy. A platinum agent is almost always part of the treatment regimen, both for combined modality therapy (drugs combined with radiation therapy) and for the first-line treatment of metastatic disease.

Although a number of drugs are available for the treatment of NSCLC, many of the patients with this disease are not treated with conventional approved chemotherapies, generally because patients are older and not able to tolerate the available agents. There is therefore an important need to develop effective regimens that would be better tolerated by these patients. NSCLC can be divided into three broad categories: (1) localized, operable disease (cancer has not spread and can be removed surgically); (2) locally advanced, inoperable disease (cancer has spread within the lungs and cannot be removed surgically); and (3) advanced, metastatic disease (disease has spread to other parts of the body).

Table of Contents

in which we attempted to address questions raised by the agency about the requested orphan indication. On May 4, 2007, FDA responded to our previous correspondence and denied our request for orphan designation. We are currently considering our options regarding orphan designation for satraplatin.

*Drug Price Competition and Patent Term Restoration Act of 1984*

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, established a regulatory framework designed to balance the incentives for innovative drug research with the opportunities for market entry of generic manufacturers. In order to achieve this balance, the Hatch-Waxman Act provided for the restoration of patent terms based on the regulatory review period of a drug product, and data exclusivity periods following the FDA approval of an NDA, while allowing for the submission of simplified drug applications by generic manufacturers. The simplified drug applications created by the Hatch-Waxman Act include two kinds of applications: (1) an abbreviated new drug application, or ANDA, which can rely on FDA's previous finding of safety and effectiveness for the referenced innovator drug product, and (2) a new drug application for which the sponsor must submit full reports of clinical studies, some of which the sponsor does not own or have a legal right of reference. The latter type of application is known as a Section 505(b)(2) application after its authorizing statutory provision. The patent and exclusivity status of the innovator drug product has implications for the review and approval of both ANDAs and Section 505(b)(2) applications.

A key element of the Hatch-Waxman Act is the extension of the life of a patent to compensate the innovator drug company for marketing time lost while developing the product and awaiting regulatory approval. The Act added Section 156 to the Patent Act permitting patent term extensions for patents on products (or processes for making or using the same) including, but not limited to, drug products used to treat humans. The Hatch-Waxman Act allows only partial recovery of the patent term lost to regulatory approval requirements. In addition, the statute imposes caps on term extension. The term of the patent eligible for extension equals one half of the IND testing phase and the full NDA review phase of testing required under the Federal Food, Drug, and Cosmetic Act. The IND testing phase is measured as the time between the effective date of an IND and the date the FDA receives the NDA; the NDA review phase is the time between FDA's receipt of the NDA and approval of the NDA. However, any testing conducted prior to patent issuance is not considered for patent extension. The maximum total patent term remaining after term extension is capped at fourteen years. Similarly, absolute caps limit the duration of term extension to five years. Furthermore, a patent is only eligible for one term extension. This patent term extension is only available for the first commercial marketing of a given active ingredient. In addition, the product must have been subject to regulatory review before its commercial marketing or use, and the resulting permission for commercial marketing or use must be the first granted. As a practical consequence, generally, only one patent may be extended per approved product. Also, the original patent must still be in force when the application for term extension is filed, and the application must be filed by the patent owner of record or its agent. The application for patent term extension is subject to approval by the USPTO. The FDA, however, determines the length of the product's regulatory review period at the request of the USPTO. In some instances, the term of the patent for which a patent term extension is being requested may expire before such an extension is granted.

The Hatch-Waxman Act also provides for data exclusivity for the data demonstrating safety and efficacy of a drug product as submitted in an NDA: five-year new chemical entity, or NCE, exclusivity and three-year new clinical trial exclusivity. Five-year NCE data exclusivity is granted to those drugs for which the active ingredient is an active moiety (*i.e.*, the molecule or ion responsible for physiological or pharmacological action, excluding appended portions that would cause the drug to be an ester, salt, or other noncovalent derivative of the molecule) not previously approved by the FDA.

48

**Table of Contents**
Five-year NCE data exclusivity prohibits the FDA from accepting an ANDA or Section 505(b)(2) application for a drug product containing the same active moiety for a five-year period beginning from the date of approval of the NDA. The only exception to this prohibition is if a generic competitor challenges patents listed in the Orange Book for the drug product at the end of four years. The five-year exclusivity provision, however, does not prohibit the FDA from accepting another full NDA, for example from a competitor, if the sponsor of the second application has done all the work itself. The FDA can accept the second application, review it, and approve it; NCE exclusivity only prohibits the agency from accepting a Section 505(b)(2) application or an ANDA.

Three-year clinical trial data exclusivity is granted for certain changes in a drug product, for which the NDA or supplement contains reports of new clinical studies in humans conducted by the sponsor that are essential to approval. This data exclusivity covers only the change in the product supported by the new clinical studies. If there are other indications not covered by any patent or exclusivity, and available for competition, generic drugs can be approved for those indications. A grant of three years of data exclusivity to a drug product means the FDA cannot approve a Section 505(b)(2) application or an ANDA for the same product for three years. Unlike the five-year data exclusivity, the agency can accept such an application and review it during this time period. Like NCE data exclusivity, this data exclusivity will not bar approval of a full NDA where the applicant has done the work to support the same change for the drug product. Data exclusivities are also published in the Orange Book.

The Hatch-Waxman Act requires an applicant for an ANDA to submit a certification for each patent listed in the Orange Book. This certification requirement also extends to Section 505(b)(2) applications. One of four certifications must be made: 1) that the drug has not been patented; 2) that the patent has already expired; 3) the date on which the patent will expire, and that the generic drug will not go on the market until that date passes; and 4) that the patent is not infringed or is invalid. Those certifications are now referred to as paragraph I, II, III, or IV certifications. Whereas the first three certifications are relatively straightforward, the paragraph IV certification presents added requirements.

When an ANDA contains a paragraph IV certification, the applicant is required to notify the innovator company that it has filed the ANDA with the FDA, and describe the reasons it believes the patent will not be infringed, is invalid, or is unenforceable. The only exception to this rule is if a company is not seeking approval for one of the drug's uses. In that case, an applicant may submit a "Section 8" statement that the company is not seeking approval for a particular use. Once the innovator company receives notice that a generic application has been filed and its patent is being challenged, the innovator drug company has 45 days in which to file a lawsuit claiming patent infringement based on the generic drug company's assertion about the characteristics of its proposed product. The filing of a lawsuit as a result of the paragraph IV notice has a substantial effect on the time of approval of the ANDA or 505(b)(2) application. If a lawsuit is brought by the innovator drug company, the FDA's final approval is stayed for 30 months. If the patent court determines that the patent would be infringed by the product proposed in the ANDA or 505(b)(2) application, the FDA will not approve the application until the patent expires. If the court decides that the patent will not be infringed, or is invalid, the FDA may approve the generic application when that decision occurs. The FDA may approve the application at the thirty-month date, even if the litigation is ongoing. If litigation is pending and the agency approves an ANDA at the end of the 30-month period, most generic drug companies seem unwilling to risk liability for damages by bringing a generic drug product onto the market before the patent litigation is resolved. A generic applicant who is the first to challenge a listed patent using a paragraph IV certification is granted a 180-day exclusivity period with respect to other generic applicants. This exclusivity period provides generic applicants with an incentive by which to challenge listed patents for the innovator drug product.