# EXHIBIT 11

# Guidance for Industry
## Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics

### *DRAFT GUIDANCE*

**This guidance document is being distributed for comment purposes only.**

Comments and suggestions regarding this draft document should be submitted 60 days of publication in the *Federal Register* of the notice announcing the availability of the draft guidance. Submit comments to the Division of Dockets Management (HFA-305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. All comments should be identified with the docket number listed in the notice of availability that publishes in the *Federal Register*.

For questions regarding this draft document contact (CDER drugs) Grant Williams at 301-594-5758, (CDER biologics) Patricia Keegan at 301-827-5097, or (CBER biologics) Steven Hirschfeld at 301-827-6536.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2005**
**Clinical/Medical**

# Guidance for Industry
## Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics

*Additional copies are available from:*

*Office of Training and Communications*
*Division of Drug Information, HFD-240*
*Center for Drug Evaluation and Research*
*Food and Drug Administration*
*5600 Fishers Lane*
*Rockville, MD 20857*
*(Tel) 301-827-4573*
*http://www.fda.gov/cder/guidance/index.htm*

*or*

*Office of Communication, Training, and*
*Manufacturers Assistance, HFM-40*
*Center for Biologics Evaluation and Research*
*Food and Drug Administration*
*1401 Rockville Pike, Rockville, MD 20852-1448*
*(Tel) 800-835-4709 or 301-827-1800*
*http://www.fda.gov/cber/guidelines.htm*

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Center for Drug Evaluation and Research (CDER)**
**Center for Biologics Evaluation and Research (CBER)**

**April 2005**
**Clinical/Medical**

# TABLE OF CONTENTS

I.     INTRODUCTION...................................................................................................... 1

II.    BACKGROUND .................................................................................................... 2

   A.   Regulatory Requirements for Effectiveness ................................................ 2

   B.   Endpoints Supporting Past Approvals in Oncology ................................... 3

III.   GENERAL ENDPOINT CONSIDERATIONS ................................................... 4

   A.   Overall Survival ............................................................................................ 5

   B.   Endpoints Based on Tumor Assessments.................................................... 6

      1. Disease-Free Survival.................................................................................. 7
      2. Objective Response Rate.............................................................................. 8
      3. Time to Progression and Progression-Free Survival  ................................ 8
         a.   TTP vs. PFS .................................................................................... 9
         b.   PFS as an endpoint to support drug approval ............................... 9
         c.   PFS trial design issues ................................................................. 10
         d.   Analysis of PFS ............................................................................. 10
         e.   Future methods for assessing progression .................................. 11
      4. Time to Treatment Failure ......................................................................... 11

   C.   Endpoints Involving Symptom Assessment................................................ 12

      1. Specific Symptom Endpoints...................................................................... 12
      2. Problems Encountered with Symptom Data ............................................. 13

   D.   Biomarkers ................................................................................................... 13

IV.    ENDPOINTS AND CLINICAL TRIAL DESIGN; SELECTED ISSUES ............... 14

   A.   Single-Arm Studies .................................................................................... 14

   B.   Studies Designed to Demonstrate Noninferiority...................................... 15

   C.   No Treatment or Placebo Control ............................................................. 16

   D.   Isolating Drug Effect in Combinations ..................................................... 16

   E.   Trial Designs for Radiotherapy Protectants and Chemotherapy Protectants ..................... 16

V.     SUMMARY AND CONCLUSION ................................................................... 16

APPENDIX 1:  THE COLLECTION OF TUMOR MEASUREMENT DATA................... 18

APPENDIX 2:  ISSUES TO CONSIDER IN PFS ANALYSIS ........................................ 19

APPENDIX 3:  EXAMPLE TABLES FOR PFS ANALYSIS .......................................... 21

APPENDIX 4:  INDEPENDENT REVIEW OF TUMOR ENDPOINTS............................ 23

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

# Guidance for Industry[1]
# Clinical Trial Endpoints
# for the Approval of Cancer
# Drugs and Biologics

---

This draft guidance, when finalized, will represent the Food and Drug Administration's (FDA's) current thinking on this topic. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. If you want to discuss an alternative approach, contact the FDA staff responsible for implementing this guidance. If you cannot identify the appropriate FDA staff, call the appropriate number listed on the title page of this guidance.

---

## I.    INTRODUCTION

This guidance provides recommendations to sponsors on endpoints for cancer clinical trials submitted to the FDA to support effectiveness claims in new drug applications (NDAs), biologics license applications (BLAs), or supplemental applications.[2]

The FDA is developing guidance on oncology endpoints through a process that includes public workshops of oncology experts and discussions before the FDA's Oncologic Drugs Advisory Committee (ODAC).[3] This guidance is the first in a planned series of cancer endpoint guidances. It provides background information and discusses general regulatory principles. Each subsequent guidance document will focus on endpoints for specific cancer types (e.g., lung cancer, colon cancer) to support drug approval or labeling claims. The endpoints discussed in this guidance document are for drugs to treat patients with an existing cancer. This guidance does not address endpoints for drugs to prevent or decrease the incidence of cancer.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are

---

[1] This guidance has been prepared by the Division of Oncology Drug Products and the Division of Therapeutic Biologic Oncology Drug Products in the Center for Drug Evaluation and Research (CDER) in cooperation with the Center for Biologics Evaluation and Research (CBER) at the Food and Drug Administration.

[2] For the purposes of this guidance, all references to *drugs* include both human drugs and biological products unless otherwise specified.

[3] Transcripts are available at http://www.fda.gov/cder/drug/cancer_endpoints/default.htm.

37  cited.  The use of the word *should* in Agency guidances means that something is suggested or
38  recommended, but not required.
39
40
41  **II.    BACKGROUND**
42
43  Clinical trial endpoints serve different purposes.  In conventional oncology drug development,
44  early phase clinical trials evaluate safety and identify evidence of biological drug activity, such
45  as tumor shrinkage.  Endpoints for later phase efficacy studies evaluate whether a drug provides
46  a clinical benefit such as prolongation of survival or an improvement in symptoms.  The
47  following sections discuss the general regulatory requirements for efficacy and how they have
48  influenced endpoint selection for the approval of cancer drugs.  Later sections describe these
49  endpoints in more detail and discuss whether they might serve as measures of disease activity or
50  clinical benefit in various clinical settings.
51
52      **A.    Regulatory Requirements for Effectiveness**
53
54  The requirement that new drugs show effectiveness is based on a 1962 amendment to the Federal
55  Food, Drug, and Cosmetic Act.  This law requires substantial evidence of effectiveness and
56  specifies that this evidence must be derived from adequate and well-controlled clinical
57  investigations.  Clinical benefits that have supported drug approval have included important
58  clinical outcomes (e.g., increased survival, symptomatic improvement) but have also included
59  effects on established surrogate endpoints (e.g., blood pressure or serum cholesterol).
60
61  In 1992, the accelerated approval regulations (21 CFR part 314, subpart H and 21 CFR part 601,
62  subpart E) allowed use of additional endpoints for approval of drugs or biological products that
63  are intended to treat serious or life-threatening diseases and that either demonstrate an
64  improvement over available therapy or provide therapy where none exists.  In this setting, the
65  FDA may grant approval based on an effect on a surrogate endpoint that is *reasonably likely* to
66  predict clinical benefit ("based on epidemiologic, therapeutic, pathophysiologic, or other
67  evidence").  These surrogates are less well-established than surrogates in regular use, such as
68  blood pressure or cholesterol for cardiovascular disease.  A drug is approved under the
69  accelerated approval regulations on condition that the manufacturer conduct clinical studies to
70  verify and describe the actual clinical benefit.  If the postmarketing studies fail to demonstrate
71  clinical benefit or if the applicant does not demonstrate due diligence in conducting the required
72  studies, the drug may be removed from the market under an expedited process.  From December
73  1992 to June 2004, 22 cancer drug applications were approved under the accelerated approval
74  regulations.  In the following discussion, we will use the term *regular approval* to designate the
75  longstanding route of drug approval based on demonstrating clinical benefit to distinguish it
76  from *accelerated approval* associated with use of a surrogate endpoint that is reasonably likely to
77  predict benefit.
78
79  The nature of evidence to support drug approval, including the preferred number of clinical
80  trials, is discussed in general FDA guidance documents.  In most cases, the FDA has
81  recommended at least two well-controlled clinical trials.  In some cases, the FDA has found that
82  evidence from a single trial was sufficient, but generally only in cases in which a single

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

83  multicenter study provided highly reliable and statistically strong evidence of an important
84  clinical benefit, such as an effect on survival, and in which confirmation of the result in a second
85  trial would be practically or ethically impossible.[4]  For drugs approved for treatment of patients
86  with a specific stage of a particular malignancy, evidence from one trial may be sufficient to
87  support an efficacy supplement for treatment of a different stage of the same cancer.[5]
88
89  **B.      Endpoints Supporting Past Approvals in Oncology**
90
91  For regular approval, it is critical that the sponsor show direct evidence of clinical benefit or
92  improvement in an established surrogate for clinical benefit.  In oncology, survival is the gold
93  standard for clinical benefit, but the FDA has accepted other endpoints for cancer drug approval.
94  Indeed, in the 1970s the FDA usually approved cancer drugs based on objective response rate
95  (ORR), determined by tumor assessments from radiologic tests or physical exam.  In the early
96  1980s, after discussion with the ODAC, the FDA determined that it would be more appropriate
97  for cancer drug approval to be based on more direct evidence of clinical benefit, such as
98  improvement in survival or in a patient's quality of life (QOL), improved physical functioning,
99  or improved tumor-related symptoms — benefits not always predicted by ORR.
100
101  Over the next decade, several endpoints were used as surrogates for benefit.  Improvement in
102  disease-free survival supported drug approval in selected surgical adjuvant settings (when a large
103  proportion of patients had cancer symptoms at the time of recurrence).  Durable complete
104  response was considered an acceptable endpoint in testicular cancer and acute leukemia (a de
105  facto improvement in survival because the untreated conditions were quickly lethal) and in some
106  chronic leukemias and lymphomas (where it was clear that remission would lead to less
107  infection, bleeding, and blood product support).  The FDA has also considered that a very high
108  ORR alone might sometimes support regular approval, but that response duration, relief of
109  tumor-related symptoms, and drug toxicity should also be considered (O'Shaughnessy and
110  Wittes et al., 1991, Commentary Concerning Demonstration of Safety and Efficacy of
111  Investigational Anticancer Agents in Clinical Trials, J Clin Oncol 9:2225-2232).  ORR has been
112  an especially important endpoint for the less toxic drugs, such as the hormonal drugs for breast
113  cancer, where improvement in this endpoint has been the basis for regular approval.
114  Improvement in tumor-related symptoms in conjunction with an improved ORR and an adequate
115  response duration supported approval in several clinical settings.
116
117  In the last decade, in addition to its limited role in regular approval, ORR has been the primary
118  surrogate endpoint used to support cancer drug accelerated approval for several reasons.  First,
119  ORR is directly attributable to drug effect (tumors rarely shrink spontaneously and, therefore,
120  ORR can be accurately assessed in single-arm studies).  Second, tumor response is widely
121  accepted as relevant by oncologists and has a long-accepted role in guiding cancer treatment.
122  Finally, if the ORR is high enough and the responses are of sufficient duration, ORR does indeed
123  seem *reasonably likely* to predict clinical benefit.

---

[4] See guidance for industry *Providing Clinical Evidence of Effectiveness for Human Drug and Biological Products* (http://www.fda.gov/cder/guidance/index.htm)

[5] See guidance for industry *FDA Approval of New Cancer Treatment Uses for Marketed Drug and Biological Products* (http://www.fda.gov/cder/guidance/index.htm)

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

124
125   Drugs approved under accelerated approval regulations must provide a benefit over available
126   therapy.  To satisfy this requirement, many sponsors have designed single-arm studies in patients
127   with refractory tumors where, by definition, no available therapy exists.
128
129
130   **III.    GENERAL ENDPOINT CONSIDERATIONS**
131
132   The following is an overview of general issues in cancer drug development.  A discussion of
133   commonly used cancer endpoints is followed by a discussion of pertinent issues in cancer
134   clinical trial design using these endpoints.  Future guidance documents will discuss these issues
135   in more detail with regard to specific treatment indications.  Endpoints that will be discussed
136   include overall survival, endpoints based on tumor assessments (e.g., disease-free survival, ORR,
137   time to progression, progression-free survival, time to treatment failure), and endpoints based on
138   symptom assessment.  A comparison of important endpoints in cancer drug approval is provided
139   in Table 1.  Many of the issues relating to the proper analysis of efficacy endpoints are addressed
140   in general FDA guidance documents.[6]  Issues that commonly arise in oncology applications are
141   discussed in this guidance.
142
143   **Table 1.  A Comparison of Important Cancer Approval Endpoints**

| Endpoint | Regulatory Nature of Evidence | Assessment | Some Advantages | Some Disadvantages |
|---|---|---|---|---|
| Overall Survival | Clinical benefit | • Randomized studies needed<br>• Blinding not essential | • Universally accepted direct measure of benefit<br>• Easily measured<br>• Precisely measured | • Requires larger studies<br>• Requires longer studies<br>• Potentially affected by crossover therapy<br>• Does not capture symptom benefit<br>• Includes noncancer deaths |
| Disease-Free Survival | Surrogate for accelerated approval or regular approval* | • Randomized studies needed<br>• Blinding preferred | • Considered to be clinical benefit by some<br>• Needs fewer patients and shorter studies than survival | • Not a validated survival surrogate in most settings<br>• Not precisely measured; subject to assessment bias<br>• Various definitions exist |

144   *Adequacy as a surrogate endpoint for accelerated approval or regular approval is highly dependent upon other factors such as
145   effect size, effect duration, and benefits of other available therapy.  See text for details.
146                                                                                                                          *continued*
147

---

[6] See ICH guidance for industry *E9 Statistical Principles for Clinical Trials*
(http://www.fda.gov/cder/guidance/index.htm)

**Contains Nonbinding Recommendations**
*Draft — Not for Implementation*

148     *Table 1, continued*

| Endpoint | Regulatory Nature of Evidence | Assessment | Some Advantages | Some Disadvantages |
|---|---|---|---|---|
| Objective Response Rate (ORR) | Surrogate for accelerated approval or regular approval* | • Single-arm or randomized studies can be used<br>• Blinding preferred in comparative studies | • Can be assessed in single-arm studies | • Not a direct measure of benefit<br>• Usually reflects drug activity in a minority of patients<br>• Data are moderately complex compared to survival |
| Complete Response (CR) | Surrogate for accelerated approval or regular approval* | • Single-arm or randomized studies can be used<br>• Blinding preferred in comparative studies | • Durable CRs represent obvious benefit in some settings (see text)<br>• Can be assessed in single-arm studies | • Few drugs produce high rates of CR<br>• Data are moderately complex compared to survival |
| Progression Free Survival (PFS) | Surrogate for accelerated approval or regular approval* | • Randomized studies needed<br>• Blinding preferred<br>• Blinded review recommended | • Activity measured in responding and stable tumors<br>• Usually assessed prior to change in therapy<br>• Less missing data than for symptom endpoints<br>• Assessed earlier and in smaller studies compared with survival | • Various definitions exist<br>• Not a direct measure of benefit<br>• Not a validated survival surrogate<br>• Not precisely measured compared with survival<br>• Is subject to assessment bias<br>• Frequent radiologic studies are needed<br>• Data are voluminous and complex compared to survival |
| Symptom Endpoints | Clinical benefit | • Usually needs randomized blinded studies (unless endpoints have an objective component and effects are large — see text) | • Direct measure of benefit | • Blinding is often difficult in oncology trials<br>• Missing data are common<br>• Few instruments are validated for measuring cancer-specific symptoms<br>• Data are voluminous and complex compared to survival |

149     *Adequacy as a surrogate endpoint for accelerated approval or regular approval is highly dependent upon other factors such as
150     effect size, effect duration, and benefits of other available therapy. See text for details.
151     Abbreviations: complete response (CR); objective response rate (ORR); progression-free survival (PFS).
152
153         **A.    Overall Survival**
154
155     Overall survival is defined as the time from randomization until death from any cause, and is
156     measured in the intent to treat (ITT) population. Survival is the most reliable cancer endpoint,
157     and when studies can be conducted to adequately assess it, it is usually the preferred endpoint.
158     An improvement in survival is of unquestioned clinical benefit. The endpoint is precise and easy
159     to measure, documented by the date of death. Bias is not a factor in endpoint measurement.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

160
161  Overall survival almost always needs to be evaluated in randomized controlled studies.
162  Historically controlled data are seldom reliable for time-dependent endpoints such as overall
163  survival unless treatment effects are extreme (e.g., acute leukemia, testicular cancer).  Apparent
164  differences in outcome between historical controls and current treatment groups can arise from
165  differences other than drug treatment, including patient selection, improved imaging techniques
166  (which can alter tumor staging and prognosis), or improved supportive care.  Randomized
167  studies minimize the effect of such differences by allowing a comparison of outcomes in patient
168  groups where such factors should be similar.  Demonstration of a statistically significant
169  improvement in overall survival is usually considered to be clinically significant, and has often
170  supported new drug approval.
171
172  Criticisms of survival as an endpoint stem not from doubts about the worth of a proven survival
173  benefit, but from difficulties in performing studies large enough or long enough to detect a
174  survival improvement, difficulties in determining a drug's effect on survival because of the
175  confounding effects of subsequent cancer therapy, or a concern that the drug may be effective in
176  only a small fraction of those treated, making it difficult to see an effect on survival in the whole
177  population.
178
179  **B.    Endpoints Based on Tumor Assessments**
180
181  In this section we discuss several endpoints that are based on tumor assessments and are
182  therefore unique to oncology.  These endpoints include disease-free survival, objective response
183  rate, time to progression, progression-free survival, and time to treatment failure.  The data
184  collection and analysis of all time-dependent endpoints is complex, particularly when the
185  assessments are indirect and based on calculations and estimates as is the case for tumor
186  measurements.  The discussion of progression-free survival data collection and analysis is
187  particularly complex and is supplemented by tables in Appendix 3 of this guidance.
188
189  Selection of tumor-assessment endpoints for efficacy trials should include two judgments.  First,
190  will the endpoint support accelerated approval (is the endpoint a surrogate reasonably likely to
191  predict clinical benefit and does the drug provide an advantage over available therapy) or regular
192  approval (is it an established and/or validated surrogate for, or a direct measure of, clinical
193  benefit)?  Second, will the results be reliable, given the potential for uncertainty or bias in tumor
194  endpoint assessments?  Drug applications using studies that rely on tumor measurement based
195  endpoints as sole evidence of efficacy should generally provide confirmatory evidence from a
196  second trial.  Both the precision and the clinical meaning of endpoints based on tumor
197  assessments can vary in different cancer settings.  For instance, response rate determinations in
198  malignant mesothelioma and pancreatic cancer are often unreliable because of the difficulty in
199  measuring these tumors with currently available imaging modalities.
200
201  When the primary study endpoint for drug approval is based on tumor measurements (e.g.,
202  progression-free survival or ORR), it is recommended that tumor endpoint assessments generally
203  be verified by central reviewers blinded to study treatment (see Appendix 4), especially when the
204  study itself cannot be blinded.  Although the FDA will generally not ask that all tumor images be
205  submitted with the marketing application, it may need to audit a sample of the scans to verify the

206  central review process.  In all cases, we recommend submitting primary electronic data
207  documenting tumor measurements and assessments.[7]  Additional details regarding data
208  collection are listed in Appendix 1.
209
210        *1.      Disease-Free Survival*
211
212  Disease-free survival (DFS) is usually defined as the time from randomization until recurrence of
213  tumor or death from any cause.  Although DFS can also be an important endpoint when a large
214  percentage of patients achieve complete responses with chemotherapy, the most frequent use of
215  this endpoint is in the adjuvant setting after definitive surgery or radiotherapy.  In either of these
216  settings, DFS has special meaning to patients because until a recurrence occurs, a patient can
217  hope for cure.  Whereas overall survival is the standard endpoint for most adjuvant settings, DFS
218  has been the primary basis of approval for hormonal therapy after initial surgery for breast
219  cancer.  An important consideration is whether prolongation of DFS represents intrinsic benefit
220  or only a potential surrogate for survival prolongation.  In December 2003, the consensus of the
221  ODAC was that prolongation of DFS represented clinical benefit, but that the magnitude of this
222  benefit should be carefully weighed against the toxicity of adjuvant treatment, particularly as
223  measured by effects on patient function.  In May 2004, the ODAC recommended that DFS be
224  considered an acceptable endpoint for colon cancer drugs in the surgical adjuvant setting,
225  provided certain conditions were met.[8]  Additional cancer-specific guidances will address the
226  acceptability of DFS in other cancer settings.
227
228  Important considerations in evaluating DFS as a potential endpoint include the estimated size of
229  the treatment effect, proven benefits of standard therapies, and details of trial design.  For
230  instance, when a new drug is compared to a control drug that is known to improve overall
231  survival, an important consideration is whether the DFS of the new drug is superior to, or only
232  noninferior to, the control.  Clearly, proof of superiority with regard to a surrogate endpoint is
233  more persuasive than a demonstration of noninferiority.  Furthermore, relying on a conclusion of
234  noninferiority based on a surrogate endpoint to support a conclusion of noninferiority with
235  respect to the definitive endpoint is problematic.  Another critical issue is whether the duration of
236  study follow-up is adequate to evaluate the durability of the DFS benefit.
237
238  We suggest that the protocol carefully detail both the definition of DFS and the schedule for
239  follow-up studies and visits.  Unscheduled assessments can occur for many reasons (including
240  tumor-related symptoms, drug toxicity, anxiety), and differences between study arms in the
241  frequency or reason for unscheduled assessments is likely to introduce bias.  This potential bias
242  can be minimized by blinding patients and investigators to the treatment assignments if feasible.
243  The potential effects of bias due to unscheduled assessments can be evaluated by comparing their
244  frequency between treatment arms and by performing statistical analyses that assign events from
245  unscheduled visits to the time of the next scheduled visit.
246

---

[7] See guidance for industry *Cancer Drug and Biological Products — Clinical Data in Marketing Applications*
(http://www.fda.gov/cder/guidance/index.htm)

[8] Transcripts are available at http://www.fda.gov/cder/drug/cancer_endpoints/default.htm.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

247   Another issue in defining DFS is whether deaths occurring without prior documentation of tumor
248   progression should be scored as DFS events (disease recurrences) or should be censored in the
249   statistical analysis.  All methods for statistical analysis of deaths have limitations.  The approach
250   that seems less prone to introducing bias is to consider all deaths as recurrences.  Limitations of
251   this approach are a potential decrease in statistical power of the study (by *diluting* the cancer-
252   related events with deaths not related to cancer) and a potential to falsely prolong the DFS
253   estimates in patients who die after a long unobserved period.  The latter could introduce bias if
254   the frequency of long-term follow-up visits is dissimilar on the study arms or if there is
255   nonrandom dropout due to toxicity.  Some analyses count cancer-related deaths as DFS events
256   and censor noncancer deaths.  This method has the potential for bias in the post hoc
257   determination of the cause of death.  Furthermore, any method that censors patients, whether at
258   death or at the last visit, assumes that the censored patients have the same risk of recurrence as
259   noncensored patients.  This critical assumption needs close examination in any setting where
260   deaths are to be censored.  In settings where deaths due to causes other than cancer are common
261   (e.g., studies of patients with early metastatic prostate cancer), censoring deaths can be
262   appropriate.
263
264            *2.      Objective Response Rate*
265
266   ORR is the proportion of patients with tumor shrinkage of a predefined amount lasting for a
267   predefined minimum period of time.  Response duration is usually measured from the time of
268   initial response until documented tumor progression.  The FDA has generally defined ORR as
269   the sum of partial responses plus complete responses.  When defined in this manner, ORR is a
270   measure of drug antitumor activity even in a single-arm study.  Some sponsors have proposed
271   including stable disease as a component of ORR; however, evaluating drug effects based on the
272   stable disease rate generally involves comparison to a randomized concurrent control.  Also,
273   stable disease incorporates components of time to progression or progression-free survival,
274   which can be captured in a separate measurement.  A variety of response criteria have been
275   considered appropriate, including the RECIST criteria (Therasse and Arbuck et al., 2000, New
276   Guidelines to Evaluate Response to Treatment in Solid Tumors, J Natl Cancer Inst, 92:205-16).
277   Important issues for determining the clinical and regulatory significance of ORR include
278   response duration, the percentage of complete responses, the toxicity of treatment, and associated
279   improvement in tumor-related symptoms.  These issues, in addition to an assessment of benefits
280   of existing therapies, determine whether ORR will support marketing authorization, either for
281   regular approval (as a full surrogate for clinical benefit) or for accelerated approval (as a
282   *reasonably likely surrogate*).
283
284   It is important that criteria for response and progression be detailed in the protocol, and data
285   should be carefully and completely collected at intervals specified in the protocol.
286
287            *3.      Time to Progression and Progression-Free Survival*
288
289   In the past, time to progression (TTP) (the time from randomization until objective tumor
290   progression) and progression-free survival (PFS) (the time from randomization until objective
291   tumor progression or death) have seldom served as primary endpoints for drug approval.  Time
292   to symptomatic progression, which would represent a clear clinical benefit, is infrequently

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

293    assessed but would be a credible endpoint of a well-conducted (generally blinded) trial.  In
294    December 2003, the ODAC discussed both potential roles of TTP and PFS in cancer drug
295    approval and the committee's preference for PFS versus TTP.[9]  The ODAC suggested relying on
296    these endpoints in selected clinical situations, such as diseases with low complete response rates
297    or when documentation of a survival benefit in clinical trials can be difficult.  In settings where
298    most patients are symptomatic, the ODAC preferred measuring tumor response and symptom
299    benefit.  The definition of tumor progression varies widely; therefore, it is important that it be
300    carefully detailed in the protocol.
301
302              a.       TTP vs. PFS
303
304    The ODAC consensus was that PFS is a better predictor of clinical benefit than TTP and thus
305    preferable as a drug approval endpoint when used as a surrogate for clinical benefit (rather than
306    just as an indicator of antitumor activity) because PFS includes deaths.  Unanticipated effects of
307    drugs on survival would thus be included in the endpoint.  In the analysis of TTP, deaths are
308    censored, either at the time of death or at an earlier visit.  This approach is questionable because
309    it can represent *informative censoring* (i.e., there may be a nonrandom pattern of loss from the
310    study).  It seems unlikely in most cancer settings that patient deaths are randomly related to
311    tumor progression (e.g., it is likely that some deaths result from complications of undocumented
312    cancer progression).  Therefore, in most settings PFS is the preferred regulatory endpoint.  In
313    settings where most deaths are due to causes other than cancer, however, TTP can be an
314    appropriate endpoint.
315
316              b.       PFS as an endpoint to support drug approval
317
318    Some advantages and disadvantages of using PFS as an endpoint to support cancer drug approval
319    are listed in Table 1.  Conceptually, PFS has desirable qualities of a surrogate endpoint because it
320    reflects tumor growth (a phenomenon likely to be on the causal pathway for cancer-associated
321    morbidity and death), can be assessed prior to demonstration of a survival benefit, and is not
322    subject to the potential confounding impact of subsequent therapy (unless worsening of a blood
323    marker leads to a change in treatment prior to progression).  Moreover, an effect on PFS occurs
324    earlier than an effect on survival, so that a given advantage, say a median improvement of 3
325    months, represents a larger (and thus more detectable) hazard ratio improvement than would a 3-
326    month median survival benefit occurring later.  The formal validation of PFS as a surrogate for
327    survival for the many different malignancies that exist, however, would be difficult.  Data are
328    usually insufficient to allow a robust evaluation of the correlation between effects on survival
329    and PFS.  Oncology trials are often small, and proven survival benefits of existing drugs are
330    generally modest.  The role of PFS as an endpoint to support licensing approval varies in
331    different cancer settings.  In some settings PFS prolongation might be an accepted surrogate
332    endpoint for clinical benefit to support regular approval, and in others it may be a surrogate
333    reasonably likely to predict benefit for accelerated approval.  Important considerations will be
334    the magnitude of the effect, the toxicity profile of the treatment, and the clinical benefits and
335    toxicities of available therapies.  These issues will be discussed in future guidance documents for
336    specific cancer settings.
337

---

[9] Transcripts are available at http://www.fda.gov/cder/drug/cancer_endpoints/default.htm.

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

338          c.       PFS trial design issues

339

340 It is important that methodology for assessing, measuring, and analyzing PFS be detailed in the
341 protocol and statistical analysis plan.  It is also important to carefully define tumor progression
342 criteria in the protocol.  There are no standard regulatory criteria for defining progression.
343 Sponsors have used a variety of different criteria, including the RECIST criteria.  The broad
344 outline presented in most published PFS criteria should be supplemented with additional details
345 in the protocol and statistical analysis plan.  It is important that visits and radiological
346 assessments be symmetric on the two study arms to prevent systematic bias.  When possible,
347 studies should be blinded.  Blinding is particularly important when patient or investigator
348 assessments are included as components of the progression endpoint.  It is important that the
349 FDA and the sponsor agree prospectively on the protocol, data to be recorded on the case report
350 form, statistical analysis plan (including analysis of missing data and censoring methods), and, if
351 applicable, the operating procedures of an independent endpoint review committee (discussed in
352 Appendix 4).  The effect of follow-up visit frequency has been debated.  Frequent regular
353 assessments, depending on the type and stage of cancer, ensure that most progression events will
354 be detected on radiologic scans rather than as symptomatic events.  This approach increases the
355 expense and difficulty of the study, including an increased data collection burden on the
356 investigator and an increased number of scans for patients, and may not mirror clinical practice
357 standards.

358

359          d.       Analysis of PFS

360

361 The analysis of PFS is complicated by missing data.  It is important that the protocol specify
362 what constitutes an adequate assessment visit for each patient (i.e., a visit when all scheduled
363 tumor assessments have been done).  The analysis plan should outline a comparison of the
364 adequacy of follow-up in each treatment arm and specify how incomplete or missing follow-up
365 visits will be handled with regard to censoring.  For instance, if one or more assessment visits are
366 missed just prior to the progression event, to what date should the progression event be assigned?
367 It is important that the analysis plan specify the primary analysis and one or more sensitivity
368 analyses.  For instance, in the previous example, the primary analysis might assign the actual
369 date of observed progression as the progression date.  The sensitivity analysis might censor the
370 data at the last adequate assessment visit.  Although both analyses are problematic (the best
371 solution to missing data is to have none), the conclusion is probably valid if it is supported by the
372 results of both the primary and the sensitivity analyses.  Other methods could be considered if
373 adequately supported by the sponsor.  The analysis plan should evaluate the number of deaths in
374 patients who have been lost to follow-up for more than a substantial (prespecified) time.  An
375 imbalance in such deaths could bias the measurement of PFS, artificially prolonging PFS on the
376 arm with less adequate follow-up.

377

378 Because progression data can be collected from a variety of sources (including physical exams at
379 unscheduled visits and radiologic scans of various types) and at a variety of times, it is important
380 that data collection efforts for each assessment visit be limited to a specified short time interval
381 prior to the visit.  When data are collected over a longer time, the question then arises:  What
382 date should serve as the progression date or the censoring date?  A common method is to assign
383 progression to the earliest observed time when an observation shows progression and to censor at

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

384 the date when the last radiologic assessment determined a lack of progression. Because this
385 method could introduce an assessment bias, especially in unblinded trials, we recommend
386 assigning the progression and censoring times to the time of the scheduled assessment visits. A
387 study of time to symptomatic progression, if conducted blindly and with few scheduled
388 assessments, in contrast, could use the actual time of observed symptom progression. The PFS
389 date based on a death, however, would be the date of death rather than the assigned visit date
390 since death ascertainment is not related to visit time and not subject to interpretation.
391
392 Appendix 3 provides a set of tables for potential analyses of PFS that could be used for primary
393 or sensitivity analyses. We recommend that plans for PFS data collection and analysis be
394 discussed with the FDA at end-of-phase 2 meetings and verified in special protocol assessments.
395
396         e.      Future methods for assessing progression
397
398 In the future, it is important that other methods of progression assessment be evaluated as
399 potential surrogate endpoints for regular approval or accelerated approval. One proposed
400 method (not used to date) is the single time point assessment which could decrease the
401 complexity of progression assessment and eliminate time-dependent assessment bias. In the
402 single time point analysis, progression would be assessed at baseline and at one prespecified time
403 after randomization. If patients progress prior to the specified time, radiologic scans could
404 document progression and the patient could go off-study. All other patients would have a
405 detailed radiologic evaluation at the prespecified follow-up time. The statistical analysis could
406 compare the proportions of patients on each study arm with progression on or before the
407 prespecified time after randomization. Potential problems with this approach are decreased
408 statistical power, potential for missing a small benefit at a time different from the prespecified
409 time, and lack of information regarding the relationship between the single time point analysis
410 and the familiar endpoints of progression-free survival and overall survival. Although this
411 approach could provide some advantages and decrease assessment bias, study dropouts prior to
412 progression could present the same difficulty as they do for all progression endpoints. Settings
413 in which further evaluation of this approach seems warranted are those where a significant and
414 durable effect on progression-free survival is expected and where complete progression-free
415 survival data collection seems impossible or impractical.
416
417         *4.*      *Time to Treatment Failure*
418
419 Time to treatment failure (TTF) is a composite endpoint measuring time from randomization to
420 discontinuation of treatment for any reason (including progression of disease, treatment toxicity,
421 and death). Defined that way, TTF is not recommended as an endpoint for drug approval
422 because it combines efficacy and toxicity measures. For example, suppose the standard
423 comparator (Drug A) provides a known survival benefit, but only at the cost of considerable
424 toxicity with many patients leaving therapy because of that toxicity. A nontoxic investigational
425 drug (Drug B) could have a significantly longer TTF than Drug A solely because it caused fewer
426 toxic dropouts. These data alone could not support drug approval because they would not
427 demonstrate that Drug B is effective. Drug approval would require a demonstration of Drug B
428 efficacy, such as a survival improvement or other clinical benefit.
429

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

430    **C.    Endpoints Involving Symptom Assessment**
431
432    Symptomatic improvement has always been considered a clinical benefit, and many FDA cancer
433    drug approvals have used patient symptom assessments and/or physical signs thought to
434    represent symptomatic improvement (e.g., weight gain, decreased effusion) as the primary
435    evidence of effectiveness.  To date, broader measures of health-related quality of life (HRQL
436    instruments) have not served this role.  HRQL is discussed in a separate FDA draft guidance on
437    patient-reported outcomes (PRO).[10]  The FDA has relied on symptom scores, signs, and
438    symptoms representing obvious benefit (e.g., decreased esophageal obstruction, fewer bone
439    fractures, reduced size and number of skin lesions, physician actions [need for radiation therapy
440    in response to painful bone metastases], physician assessments of performance status, and
441    patient-reported assessments of symptom scales).  Relying on such evidence of clinical benefit as
442    the basis for approval has allowed the FDA to approve cancer drugs earlier than if demonstration
443    of a survival benefit had been required.  It seems self-evident that cancer patients will be in most
444    cases the best source for determining effects on patient symptoms, so that PRO instruments seem
445    most appropriate.  Formal PRO instruments can be designed that focus on specific symptoms
446    (e.g., a pain scale) or on a broader array of physical, emotional, and activity measures.
447
448    The use of improvement of signs and symptoms or QOL assessments as primary endpoints to
449    support cancer drug approval requires discrimination between tumor symptoms and drug
450    toxicity, especially when evidence is based on comparison to a toxic active control.  This poses
451    particular problems for general HRQL scales, which, by definition, are multidimensional scales
452    including elements other than physical problems.  An apparent effectiveness advantage of one
453    drug over another measured on a global HRQL instrument might simply indicate less toxicity of
454    one product or regimen versus the other, a matter of interest but not an effectiveness measure.
455    Morbidity endpoints used to date for cancer drug approvals have possessed *face validity* (value
456    obvious to patients and physicians, for example, an endpoint based on functional measures such
457    as the ability to swallow solids, liquids, or nothing) and have not measured benefit and toxicity
458    on the same scale.
459
460        *1.    Specific Symptom Endpoints*
461
462    One endpoint the FDA has suggested to sponsors is *time to progression of cancer symptoms*, an
463    endpoint similar to time to progression.  This endpoint would be a direct measure of clinical
464    benefit rather than a potential surrogate.  Sponsors have cited several problems with this
465    approach.  First, because few cancer trials are blinded, assessments can be biased and therefore
466    unreliable.  Another problem is the usual delay between tumor progression and the onset of
467    cancer symptoms.  Often alternative treatments are begun before reaching the symptom endpoint,
468    which can confound the results.  Many cancer trials are performed in patients with little prior
469    exposure to chemotherapy and who usually have minimal cancer symptoms.  Finally, it can
470    sometimes be difficult to differentiate tumor symptoms from drug toxicity, a problem noted in

---

[10] The draft guidance for industry *Patient-Reported Outcome Measures:  Use in Medical Product Development to
Support Claims* is currently being developed and is expected to publish in the summer of 2005.  When final, this
guidance will represent the FDA's current thinking on this topic.  For the most recent version of a CDER or CBER
guidance, check the CDER guidance Web page at http://www.fda.gov/cder/guidance/index.htm and the CBER Web
page at http://www.fda.gov/cber/guidance/index.htm.

471   discussions of time to treatment failure and HRQL.  *Time to progression of symptoms* and *time to*
472   *onset of symptoms* can be reasonable endpoints in cancer settings where treatment can be
473   blinded, most progressing patients are symptomatic, no effective therapy exists, and less frequent
474   radiologic follow-up is appropriate.  Symptom data should be carefully collected using a
475   validated instrument according to a schedule detailed in the protocol.
476
477   A *composite symptom endpoint* can be appropriate when the benefit of a drug is multifaceted.  It
478   is important that the components of the endpoint be related and generally of similar clinical
479   importance.  Drugs have been approved for treatment of patients with cancer metastases to the
480   skeleton based on a composite benefit endpoint consisting of one or more skeletal-related event
481   (SRE) that would be anticipated to be associated with pain and other distress.  SREs are defined
482   as pathologic fractures, radiation therapy to bone, surgery to bone, and spinal cord compression.
483   Clinical Benefit Response, a composite endpoint of pain and analgesic consumption reported by
484   the patient, and performance status assessed by a physician, in part supported approval of a drug
485   to treat pancreatic cancer.
486
487   Selection of the appropriate population for study can be critical for documenting symptom
488   benefit.  Patients symptomatic at study baseline can be evaluated with a categorical symptom
489   response analysis.  This approach can be appropriate for diseases such as lung cancer, when most
490   patients have symptoms at diagnosis.  Studies of asymptomatic patients could use a time-to-first-
491   symptom analysis.  Even if the patient discontinues the study drug or begins a new drug,
492   symptomatic progression could still be assessed if follow-up is continued until documentation of
493   the first symptom.  This approach is worth considering but has been infrequently attempted.
494
495         2.      *Problems Encountered with Symptom Data*
496
497   Many problems have been encountered in the analysis of symptom data submitted to the FDA.
498   The most important problem in oncology is that few trials are blinded so that the possibility of
499   observer bias is difficult to exclude.  Missing data are common and often cast doubt on study
500   conclusions.  It is critically important to have frequent assessments to minimize long unobserved
501   gaps.  In addition, symptom severity should be addressed, rather than providing only a binary
502   present or absent.  Withdrawing treatment because of drug toxicity or tumor progression is one
503   cause of missing symptom data.  Ideally, when patients stop treatment, data collection forms
504   should continue to gather information to inform the analysis.  Symptom data could lead to a large
505   number of different endpoints, and prospectively defined statistical plans need to correct for
506   multiplicity if each symptom is treated as a separate endpoint.
507
508   **D.      Biomarkers**
509
510   To date, evidence from biomarkers assayed from blood or body fluids has not served as primary
511   endpoints for cancer drug approval, although paraprotein levels measured in blood and urine
512   have contributed to response endpoints for myeloma.  Further research is needed to establish the
513   validity of the available tests and determine whether improvements in such biomarkers are
514   reasonably likely to predict clinical benefit (accelerated approval) or are established surrogates
515   for clinical benefit (regular approval).
516

517  Although tumor markers are not yet used alone as a basis for marketing approval, the FDA has
518  sometimes accepted their inclusion as elements in composite endpoints.  For instance, women
519  with ovarian cancer often show clinical deterioration from progression of unmeasured tumor.  In
520  blinded randomized controlled trials in advanced refractory ovarian cancer, the FDA has
521  accepted use of a composite endpoint that included CA-125.  The occurrence of certain clinical
522  events (a significant decrease in performance status, or bowel obstruction) coupled with marked
523  increases in CA-125 was considered progression in these patients.  The use of prostate specific
524  antigen (PSA) was discussed at a recent workshop on prostate cancer endpoints.  Different
525  methods of evaluating PSA as an endpoint were discussed, including PSA response, PSA slope,
526  and PSA velocity.  Although the FDA has not yet accepted a PSA endpoint to support drug
527  approval, evaluation of additional data and further discussions of PSA endpoints are planned in
528  future workshops and ODAC meetings.[11]
529
530
531  **IV.    ENDPOINTS AND CLINICAL TRIAL DESIGN; SELECTED ISSUES**
532
533  By law, the FDA must base new drug approval decisions on substantial evidence of efficacy
534  from "adequate and well-controlled investigations."  Regulations describe the meaning of
535  "adequate and well-controlled investigations."  Studies must allow a valid comparison to a
536  control and must provide a quantitative assessment of the drug's effect.  (See 21 CFR 314.126.)
537  Below we discuss several issues related to the design of cancer trials intended to support drug
538  approval.
539
540        **A.    Single-Arm Studies**
541
542  The most reliable method for demonstrating efficacy is to show a statistically significant
543  improvement in a clinically meaningful endpoint in blinded randomized controlled trials.  Other
544  approaches have also been successful in certain settings.  In settings where there is no effective
545  therapy and where major tumor regressions can be presumed to occur infrequently in the absence
546  of treatment (a historical control), the FDA has sometimes accepted ORR and response duration
547  observed in single-arm studies as substantial evidence supporting accelerated approval or even
548  regular approval (e.g., when many complete responses were observed or when toxicity was
549  minimal or modest).  In contrast to the success of this approach, evidence from historically
550  controlled trials attempting to show improvement in time-to-event endpoints such as survival,
551  time to progression, or progression-free survival have seldom been persuasive support for drug
552  approval, except when treatment provides survival outcomes that contrast markedly with
553  historical experience (e.g., testicular cancer, acute leukemias).  In most cases, however, these
554  outcomes vary among study populations in ways that cannot always be predicted; for example,
555  changes in concomitant supportive care or frequency and method of tumor assessment can differ
556  by location or change over time.  Consequently, comparisons involving these time-to-event
557  endpoints generally need a concurrent control (preferably in a randomized trial), unless, as noted,
558  the effect is very large.
559
560

---

[11] Transcripts are available at http://www.fda.gov/cder/drug/cancer_endpoints/default.htm.

561    **B.    Studies Designed to Demonstrate Noninferiority**
562
563    The goal of noninferiority (NI) trials is to demonstrate the effectiveness of a new drug showing
564    that it is not less effective, by a predefined amount, than a standard regimen known to have the
565    effect being investigated (Temple and Ellenberg, 2000, Placebo-Controlled Trials and Active-
566    Control Trials in the Evaluation of New Treatments, Part 1:  Ethical and Scientific Issues, Ann
567    Intern Med, 2000 Sep 19; 133(6):455-63).[12]  The difference to be ruled out, the *noninferiority*
568    *margin*, cannot be larger than the effect of the control drug in the new study.  As that effect is not
569    measured (the new study does not have a no-treatment arm), the effect must be assumed based
570    on the previous studies of the control drug that documented its effect.  If the new drug is inferior
571    by more than the noninferiority margin, it would have no effect at all.  In most cases the NI
572    margin is not set at the control drug's full effect, but at some fraction of it (e.g., 50 percent), so
573    that the study seeks to show that at least 50 percent of the control drug effect is preserved.
574
575    There are multiple difficulties with NI trials.  NI trials rely on historical data to establish the
576    expected size of treatment effect of the active control.  In many situations adequate historical
577    data for the control do not exist.  Moreover, a critical assumption is that the treatment effect of
578    the active control that was observed historically will also be observed in the current population in
579    the new study.  This assumption is difficult to support, as results of trials are almost never
580    identical (although one can evaluate control regimen response rates in the historical and NI trial
581    populations as some measure of comparability).  Optimally, the estimated size of the treatment
582    effect of the active control would be based on a comprehensive meta-analysis of historical
583    studies that reproducibly demonstrate the effectiveness, compared to no treatment, of the control
584    agent.  In the oncology setting, however, information is often lacking on effects compared to a
585    no-treatment control.  The variability in the meta-analysis will be reflected in the choice of the
586    noninferiority margin.  But there may be little data from randomized controlled trials available to
587    estimate the treatment effect and thus no basis for estimating the control treatment effect.
588    Furthermore, subsequent events in the trial, especially crossover from the control, can invalidate
589    NI survival analyses (producing a bias toward a showing of no difference).  NI designs generally
590    require many patients in order to provide meaningful results.  Given the complex issues
591    involved, we strongly recommend that sponsors designing noninferiority trials consult early with
592    the FDA.  Because of the difficulties with the design, conduct, and analysis of NI trials, a single
593    NI trial seldom provides sufficient evidence of efficacy to support drug approval.
594
595    When the new treatment has a different toxicity profile from available treatments, it may be
596    possible to *design around* the NI study problem by conducting an *add-on* study, adding new drug
597    or placebo/no treatment to the standard therapy.  This will not be possible if the goal is to show a
598    new treatment to be less toxic than existing therapy (but still effective).  In this case the NI
599    design is unavoidable in order to demonstrate that the survival benefit of the standard drug is
600    retained by the experimental drug.  If the standard drug is associated with only a small proven
601    survival benefit, however, interpretation of an NI study is difficult or impossible.  Moreover, the
602    size of such NI trials can be prohibitively large.
603

---

[12] See ICH guidance for industry *E10 Choice of Control Group and Related Issues in Clinical Trials*
(http://www.fda.gov/cder/guidance/index.htm)

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

604      **C.      No Treatment or Placebo Control**
605
606    Giving no anticancer drug treatment to patients in the control arm of a cancer study is often
607    considered unethical, but, in some settings, it can be acceptable.  For instance, in early stage
608    cancer when standard practice is to give no treatment, comparison of a new agent to a no-
609    treatment control would be acceptable.  This approach would not be an ethical problem in the so-
610    called *add-on* design, when all patients receive standard treatment plus either no additional
611    treatment or the experimental drug.  Using a control group that receives only best supportive care
612    is acceptable in an advanced refractory setting where there is no effective therapy.  Placebos
613    (identical appearing inactive controls) are generally preferred to no-treatment controls because
614    they permit blinding.  With many cytotoxic cancer drugs, blinding may not be feasible because
615    of a relatively high rate of recognizable toxicities, but newer interventions, many of them much
616    less toxic, are increasingly being studied in blinded trials.
617
618      **D.      Isolating Drug Effect in Combinations**
619
620    Because marketing approval is usually for a single drug product rather than for a drug
621    combination, clinical trials supporting regulatory approval need to isolate the effectiveness of the
622    proposed agent.  Evidence is needed showing not only the effectiveness of the regimen but also
623    establishing the contribution of the new drug to that regimen.  One way to demonstrate the
624    individual contribution of a new drug in a regimen is using the *add-on* design previously
625    discussed.  Sometimes the clinical effects seen in early phases of development can be used to
626    establish the contribution of a drug to a drug regimen, particularly if the combination is more
627    effective than any of the individual components.  We recommend discussing these issues with
628    the FDA at end-of-phase 1 or end-of-phase 2 meetings.
629
630      **E.      Trial Designs for Radiotherapy Protectants and Chemotherapy Protectants**
631
632    Radiotherapy protectants and chemotherapy protectants are drugs designed to ameliorate the
633    toxicities of radiotherapy or chemotherapy.  Trials to evaluate these agents usually have two
634    objectives.  The first is to assess whether the protecting drug achieves its intended purpose of
635    ameliorating the cancer treatment toxicity.  Unless the mechanism of protection is clearly
636    unrelated to the mechanism of antitumor activity (e.g., antiemetic agents which ameliorate
637    nausea via central nervous system receptors), a second trial objective is to determine whether
638    anticancer efficacy is compromised by the protectant.  Because the comparison of antitumor
639    activity between the two arms of the trial is a noninferiority comparison, a large number of
640    patients may be required to achieve this objective.  Generally, a second study is needed to
641    confirm the findings.  A critical question for the future is whether, in such cases where the same
642    drug is studied in both arms, ORR should be considered a sufficient endpoint for comparing drug
643    activity and benefit.
644
645
646    **V.      SUMMARY AND CONCLUSION**
647
648    Although general principles outlined in this guidance should help sponsors select endpoints for
649    marketing applications, we recommend that sponsors meet with the FDA before submitting

650  protocols intended to support NDA or BLA marketing applications.  The FDA will ensure that
651  these meetings include a multidisciplinary FDA team of oncologists, statisticians, clinical
652  pharmacologists, and often external expert consultants.  Sponsors may submit protocols after
653  these meetings and request a special protocol assessment that provides the acceptability of
654  endpoints and protocol design to support drug marketing applications.[13]  Ultimately, of course,
655  marketing approval will depend not only on the design of a single trial, but on FDA review of the
656  results and data from all studies in the drug marketing application.
657

---

[13] See guidance for industry *Special Protocol Assessment* (http://www.fda.gov/cder/guidance/index.htm)

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

658
659
660

**APPENDIX 1:**
**THE COLLECTION OF TUMOR MEASUREMENT DATA[14]**

661    The following are important considerations for tumor measurement data.  The Agency
662    recommends that:
663

664    •    The case report form (CRF) and electronic data document the target lesions identified during
665         the baseline visit prior to treatment.  Retrospective identification of such lesions would rarely
666         be considered reliable.
667    •    Tumor lesions are assigned a unique identifying letter or number.  This allows differentiating
668         among multiple tumors occurring at one anatomic site and matching of tumors measured at
669         baseline and tumors measured during follow-up.
670    •    A mechanism ensures complete collection of data at critical times during follow-up.  It is
671         important that the CRF ensures that all target lesions are assessed at each follow-up visit and
672         that all required follow-up tests are done with the same imaging/measuring method.
673    •    The CRF contains data fields that indicate whether scans were performed at each visit.
674    •    A zero is recorded when a lesion has completely resolved.  Otherwise, disappearance of a
675         lesion cannot be differentiated from a missing value.
676    •    Follow-up tests allow timely detection of new lesions both at initial and new sites of disease.
677         It is important that the occurrence of and location of new lesions be recorded in the CRF and
678         the submitted electronic data.
679
680

---

[14] *Tumor data* in this section refers to data in SAS transport files, not images.  Images are not generally submitted to the NDA/BLA, but may be audited by the FDA during the review process.

681 **APPENDIX 2:**
682 **ISSUES TO CONSIDER IN PFS ANALYSIS**
683
684 The protocol and statistical analysis plan (SAP) of a study should detail the primary analysis of
685 progression-free survival (PFS). This includes a detailed description of the endpoint, acceptable
686 modalities for evaluating tumors, and procedures for minimizing bias when determining
687 progression status, such as procedures for an independent endpoints review committee. It is
688 important that one or two secondary analyses be specified to evaluate anticipated problems in
689 trial conduct and to assess whether results are robust. The following are several important
690 factors to consider.
691
692 • **Definition of progression date.** Survival analyses use the exact date of death. In analyses
693 of PFS, however, the exact progression date is unknown. The following are two methods for
694 defining the *recorded progression date (PDate)* used for PFS analysis.
695
696 1. One approach assigns PDate to the first time at which progression can be declared:
697 · For progression based on a new lesion, the PDate is the date of the first observation
698 that detects the new lesion.
699 · For progression based on the sum of target lesion measurements, PDate is the date of
700 the last observation or radiologic assessment of target lesions (if multiple assessments
701 are done at different times).
702 This approach can introduce between-arm bias if radiologic assessments are done earlier
703 or more frequently in one treatment arm.
704
705 2. A second approach assigns the PDate to the date of the scheduled clinic visit immediately
706 after all radiologic assessments (which collectively document progression) have been
707 done. Although this approach provides a less accurate estimate of the true date of
708 progression, the error should be symmetrically distributed between arms, and between-
709 arm bias is minimized.
710
711 • **Definition of censoring date.** Censoring dates are defined in patients with no documented
712 progression prior to data cutoff or dropout. In these patients, the censoring date is often
713 defined as the last date on which progression status was adequately assessed. One acceptable
714 approach uses the date of the last assessment performed. However, multiple radiologic tests
715 can be evaluated in the determination of progression. A second acceptable approach uses the
716 date of the clinic visit corresponding to these radiologic assessments.
717
718 • **Definition of an adequate PFS evaluation.** In patients with no evidence of progression,
719 censoring for PFS often relies on the date of the last *adequate tumor assessment.* A careful
720 definition of what constitutes an adequate tumor assessment includes adequacy of target
721 lesion assessments and adequacy of radiologic tests both to evaluate nontarget lesions and to
722 search for new lesions.
723
724 • **Analysis of partially missing tumor data.** Analysis plans should describe the method for
725 calculating progression status when data are partially missing from *adequate tumor*

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

726   *assessment* visits.  For instance, are the values for missing target lesions to be *carried*
727   *forward*?
728

729   •   **Completely missing tumor data.**  Assessment visits where no data are collected are
730       sometimes followed by death or by assessment visits showing progression; in other cases the
731       subsequent assessment shows no progression.  In the latter case, at first glance, it might seem
732       acceptable to continue the patient on study and continue monitoring for evidence of
733       progression.  This approach, however, treats missing data differently depending upon
734       subsequent events and could represent informative censoring.  Therefore, another possibility
735       is for the primary analysis to include data from subsequent PFS assessments when only a
736       single follow-up visit is missed but censor data when there are two or more missed visits.  It
737       is important that the SAP detail primary and secondary PFS analyses to evaluate the potential
738       effect of missing data.  Reasons for dropouts should be incorporated into procedures for
739       determining censoring and progression status.  For instance, for the primary analysis, patients
740       going off-study for undocumented clinical progression, change of cancer treatment, or
741       decreasing performance status could be censored at the last adequate tumor assessment.  The
742       secondary sensitivity analysis would include these dropouts as progression events.
743

744   •   **Progression of nonmeasurable disease.**  When appropriate, progression criteria should be
745       described for each assessment modality (e.g., CT scan, bone scan).  It is important that scans
746       documenting progression based on nonmeasurable disease be verified by a blinded review
747       committee and be available for verification by the FDA if needed.
748

749   •   **Suspicious lesions.**  Sometimes new lesions are identified as suspicious.  An algorithm
750       should be provided for following up these lesions and for assignment of progression status at
751       the time of analysis.  For example, a radiological finding identified as suspicious at visit one
752       might be verified as being a new tumor at visit three.  It is important that the protocol or
753       analytical plan clarify whether the progression time would be visit one or visit three.
754
755

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

756 **APPENDIX 3:**
757 **EXAMPLE TABLES FOR PFS ANALYSIS**
758
759 As discussed in Section III.B., sensitivity analyses may be helpful in determining whether the
760 PFS analysis is robust.  Different sensitivity analyses can be described in tables that specify how
761 to assign dates of progression events and dates for censoring of progression data.  The following
762 three tables describe examples of three different sensitivity analyses:
763
764 **a.** Table A represents a sensitivity analysis that only includes well-documented and
765 verifiable progression events.  Other data are censored.  In Table A the progression dates
766 are:
767 • Based only on radiologic assessments verified by an independent review committee
768 (IRC).  *Clinical progression* is not considered a progression endpoint.
769 • Assigned to the first time when tumor progression was noted.
770 • The date of death when the patient is closely followed.  Deaths occurring after two or
771 more missed visits, however, are censored at last visit.
772
773 **Table A.  PFS 1 (includes documented progression only)**

| Situation | Date of Progression or Censoring | Outcome |
|---|---|---|
| No baseline tumor assessments | Randomization | Censored |
| Progression documented between scheduled visits | Earliest of: <br> • Date of radiologic assessment showing new lesion (if progression is based on new lesion); or <br> • Date of last radiologic assessment of measured lesions (if progression is based on increase in sum of measured lesions) | Progressed |
| No progression | Date of last radiologic assessment of measured lesions | Censored |
| Treatment discontinuation for undocumented progression | Date of last scan of measured lesions | Censored |
| Treatment discontinuation for toxicity or other reason | Date of last radiologic assessment of measured lesions | Censored |
| New anticancer treatment started | Date of last radiologic assessment of measured lesions | Censored |
| Death before first PD assessment | Date of death | Progressed |
| Death between adequate assessment visits | Date of death | Progressed |
| Death or progression after more than one missed visit | Date of last radiologic assessment of measured lesions | Censored |

774
775

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

776    The sensitivity analysis in Table B corrects for potential bias in follow-up schedules for
777    tumor assessment by assigning the dates for censoring and events only at scheduled visit
778    dates.
779
780    **Table B.  PFS 2 (uniform progression and assessment dates)**

| Situation | Date of Progression or Censoring | Outcome |
|---|---|---|
| No baseline tumor assessments | Randomization | Censored |
| Progression documented between scheduled visits | Date of next scheduled visit | Progressed |
| No progression | Date of last visit with adequate assessment | Censored |
| Treatment discontinuation for undocumented progression | Date of last visit with adequate assessment | Censored |
| Treatment discontinuation for toxicity or other reason | Date of last visit with adequate assessment | Censored |
| New anticancer treatment started | Date of last visit with adequate assessment | Censored |
| Death before first PD assessment | Date of death | Progressed |
| Death between adequate assessment visits | Date of death | Progressed |
| Death or progression after more than one missed visit | Date of last visit with adequate assessment | Censored |

781
782    **b.**   The sensitivity analysis in Table C evaluates PFS according to the investigator's
783            assessment.
784
785    **Table C.  PFS 3 (includes investigator claims)**

| Situation | Date of Progression or Censoring | Outcome |
|---|---|---|
| No baseline assessment | Randomization | Censored |
| Progression documented between scheduled visits | Next scheduled visit | Progressed |
| No progression | Date of last visit with adequate assessment | Censored |
| Investigator claim of clinical progression | Scheduled visit (or next scheduled visit if between visits) | Progressed |
| Treatment discontinuation for toxicity or other reason | Date of last visit with adequate assessment | Censored |
| New anticancer treatment started with no claim of progression | Date of last visit with adequate assessment | Censored |
| Death before first PD assessment | Date of death | Progressed |
| Death between adequate assessment visits or after patient misses one assessment visit | Date of death | Progressed |
| Death after an extended lost-to-follow-up time (two or more missed assessments) | Last visit with adequate assessment | Censored |

786
787

*Contains Nonbinding Recommendations*
*Draft — Not for Implementation*

788       **APPENDIX 4:**
789       **INDEPENDENT REVIEW OF TUMOR ENDPOINTS**
790

791    Sponsors and the FDA need to be able to verify clinical trial results that support drug approval,
792    including ORR and progression-free survival.  ORR determined in single-arm studies can be
793    verified by scrutiny of a limited number of images.  However, when drug approval is based on
794    measurement of progression-free survival in a randomized study, careful planning is needed to
795    minimize bias and to allow the sponsor and the FDA to verify results.  This is especially true
796    when investigators and patients cannot be blinded to treatment assignment because of drug
797    toxicities or manner of administration.  An independent endpoints review committee (IRC)
798    provides a mechanism to minimize bias in interpretation of the radiologic findings and
799    independent adjudication of endpoints.  We recommend that a clearly described written plan
800    outlining the IRC function and process, sometimes called an independent review charter, be
801    agreed upon with the FDA prior to study conduct.  It is important that the plan describe how the
802    independence of the committee will be assured; how images will be collected, stored,
803    transported, and reviewed; how differences in image interpretation will be resolved; how clinical
804    data will be used in final endpoint interpretation; and how, if needed, images and IRC results will
805    be made available to the FDA for audit.  The use of an IRC is discussed further in a draft
806    guidance for the development of medical imaging products.[15]
807

---

[15] See draft guidance for industry *Developing Medical Imaging Drug and Biological Products, Part 3:  Design, Analysis, and Interpretation of Clinical Studies*.  When final, this guidance will represent the FDA's current thinking on this topic.  For the most recent version of a CBER guidance, check the CBER guidance Web page at http://www.fda.gov/cber/guidelines.htm.

Resources and Housing Branch, Attention: Christopher Martin, New Executive Office Building, Room 10235, Washington, DC 20503.

Dated: March 24, 2005.

**John P. Burke, III,**

*CMS Paperwork Reduction Act Reports Clearance Officer, Office of Strategic Operations and Regulatory Affairs, Regulations Development Group.*

[FR Doc. 05–6534 Filed 4–1–05; 8:45 am]

BILLING CODE 4120–01–P

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

[Docket No. 2005D–0112]

**Draft Guidance for Industry on Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics; Availability**

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Notice.

**SUMMARY:** The Food and Drug Administration (FDA) is announcing the availability of a draft guidance for industry entitled "Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics."

This is the first of a series of guidances that will provide recommendations to sponsors on endpoints for cancer clinical trials submitted to FDA to support effectiveness claims in new drug applications (NDAs), biologics license applications (BLAs), or supplemental applications. Sponsors are encouraged to use this draft guidance to design cancer clinical trials and to discuss protocols with the agency. This draft guidance provides background information and discusses general regulatory principles. Each subsequent guidance will focus on endpoints for specific cancer types (e.g., lung cancer, colon cancer) to support drug approval or labeling claims. These guidances are expected to speed the development and improve the quality of protocols submitted to the agency to support anticancer effectiveness claims.

**DATES:** Submit written or electronic comments on the draft guidance by June 3, 2005. General comments on agency guidance documents are welcome at any time.

**ADDRESSES:** Submit written requests for single copies of the draft guidance to the Division of Drug Information (HFD–240), Center for Drug Evaluation and Research, Food and Drug Administration, 5600 Fishers Lane, Rockville, MD 20857, or the Office of Communication, Training, and Manufacturers Assistance (HFM–40), Center for Biologics Evaluation and Research, Food and Drug Administration, 1401 Rockville Pike, Rockville, MD 20852–1448. Send one self-addressed adhesive label to assist that office in processing your requests. The draft guidance may also be obtained by mail by calling the Center for Biologics Evaluation and Research Voice Information System at 1–800–835–4709 or 301–827–1800. Submit written comments on the draft guidance to the Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852. Submit electronic comments to *http://www.fda.gov/dockets/ecomments*. See the **SUPPLEMENTARY INFORMATION** section for electronic access to the draft guidance document.

**FOR FURTHER INFORMATION CONTACT:**
Grant Williams, Center for Drug Evaluation and Research (HFD–150), Food and Drug Administration, 1451 Rockville Pike, Rockville, MD 20852, 301–594–5758;
Patricia Keegan, Center for Drug Evaluation and Research (HFD–107), Food and Drug Administration, 1451 Rockville Pike, Rockville, MD 20852, 301–827–5097; or
Steven Hirschfeld, Center for Biologics Evaluation and Research (HFM–755), Food and Drug Administration, 1401 Rockville Pike, Rockville, MD 20852, 301–827–6536.

**SUPPLEMENTARY INFORMATION:**

### I. Background

FDA is announcing the availability of a draft guidance for industry entitled "Clinical Trial Endpoints for the Approval of Cancer Drugs and Biologics." FDA is developing guidance on oncology endpoints through a process that includes public workshops of oncology experts and discussions before FDA's Oncologic Drugs Advisory Committee. This draft guidance is the first in a planned series of cancer endpoint guidances. It provides background information and general principles. The endpoints discussed in this draft guidance are for drugs to treat patients with an existing cancer. This draft guidance does not address endpoints for drugs to prevent or decrease the incidence of cancer.

This draft guidance is being issued consistent with FDA's good guidance practices regulation (21 CFR 10.115). The draft guidance, when finalized, will represent the agency's current thinking on clinical trial endpoints for the approval of cancer drugs and biologics. It does not create or confer any rights for or on any person and does not operate to bind FDA or the public. An alternative approach may be used if such approach satisfies the requirements of the applicable statutes and regulations.

### II. Comments

Interested persons may submit to the Division of Dockets Management (see **ADDRESSES**) written or electronic comments on the draft guidance. Submit one copy of electronic comments or two paper copies of any mailed comments, except that individuals may submit one paper copy. Comments are to be identified with the docket number found in brackets in the heading of this document. The draft guidance and received comments are available for public examination in the Division of Dockets Management between 9 a.m. and 4 p.m., Monday through Friday.

### III. Electronic Access

Persons with access to the Internet may obtain the document at *http://www.fda.gov/cder/guidance/index.htm, http://www.fda.gov/cber/guidelines.htm,* or *http://www.fda.gov/ohrms/dockets/default.htm.*

Dated: March 26, 2005.

**Jeffrey Shuren,**

*Assistant Commissioner for Policy.*

[FR Doc. 05–6647 Filed 4–1–05; 8:45 am]

BILLING CODE 4160–01–S

---

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### National Institutes of Health

**Proposed Data Collection; Comment Request; Survey of Colorectal Cancer Screening Policies, Programs, and Systems in U.S. Health Plans**

**SUMMARY:** In compliance with the provisions of section 3507(1)(D) of the Paperwork Reduction Act of 1995, for opportunity for public comments on proposed data collection projects, the National Institutes of Health (NIH), National Cancer Institute (NCI) has submitted to the Office of Management and Budget (OMB) a request to review and approve the information collection listed below. This proposed information collection was previously published in the **Federal Register** on October 29, 2004 (Volume 69, No. 209, pages 63159–63160) and allowed 60 days for public